UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

FORT LAUDERDALE DIVISION

CASE NO. 24-60126-CR-DSL

UNITED STATES OF AMERICA,       .
                               .
        Plaintiff,       . Fort Lauderdale, Florida
                               . July 23, 2025
        v.             . 10:30 a.m.
                               .
JANICE ELEANOR TURNER,       .
                               .
        Defendant.       .
. . . . . . . . . . . . . . . . . . . . .

- - - - -

Transcript of Sentencing Hearing had

before the Honorable David S. Leibowitz,

United States District Judge.

- - - - -

Proceedings recorded by mechanical stenography, transcript produced by computer.

APPEARANCES:

For the Government:    Marc Anton
                       Trevor C. Jones
                       Assistant U.S. Attorneys
                       U.S. Attorney's Office
                       500 E. Broward Boulevard
                       Seventh Floor
                       Fort Lauderdale, Florida  33394

For the Defendant:     Humberto R. Dominguez, Esq.
                       Law Office of Humberto R. Dominguez
                       9100 S. Dadeland Boulevard
                       Suite 1500
                       Miami, Florida  33156

Court Reporter:        Francine C. Salopek, RMR, CRR
                       Official Court Reporter
                       3010 NE 39th Street
                       Fort Lauderdale, Florida 33308
                       (305)301-3276

                       -  -  -  -  -

**WEDNESDAY, JULY 23, 2025, 10:30 A.M.**

*(The Judge is presently on the bench)*

THE COURT:  T, whenever you're ready.

ROOM CLERK:  Calling the matter of the United States vs. Janice Eleanor Turner, Case Number 24-Criminal-60126.

Counsel, please announce your appearances for the record, beginning with the government.

MR. ANTON:  Good morning, Your Honor.  Marc Anton and Trevor Jones on behalf of the United States.

THE COURT:  Gentlemen, good morning.

MR. DOMINGUEZ:  Good morning, Your Honor.  Humberto Dominguez on behalf of Janice Turner, who's present.

THE COURT:  Ms. Turner, good morning.

THE DEFENDANT:  Good morning.

THE COURT:  Mr. Dominguez, good morning.

THE DEFENDANT:  Good morning, sir.

THE COURT:  Good morning.

We're here for sentencing.  My understanding from the government is that they have additional evidence that they wish to put into the sentencing record.

Mr. Anton?

MR. ANTON:  Judge, yes, that's correct.  We do have additional evidence we need to put into the sentencing record because it's my understanding that defense counsel's objecting

to the loss amount.

THE COURT:  They have.

MR. ANTON:  They have.  So we do have Special Agent Amanda Cook from the United States Secret Service who could testify as to loss in the instant case.

THE COURT:  Okay.  Bring her forward.  We'll swear her in.

T.

ROOM CLERK:  Please remain standing and raise your right hand to be sworn.

*(AMANDA COOK, GOVERNMENT'S WITNESS, WAS SWORN)*

ROOM CLERK:  Thank you.  You may be seated.

Please state your full name for the record into the microphone and spell your last name.

THE WITNESS:  Amanda Cook, C-O-O-K.

THE COURT:  Okay.  Mr. Anton, your witness.

MR. ANTON:  Thank you, Judge.

**DIRECT EXAMINATION**

BY MR. ANTON:

Q.  Good morning, Agent Cook.

Obviously the Court is familiar with who you are, but were you the lead investigative agent in the United States of America vs. Janice Eleanor Turner and Kisean Paul Anderson?

A.  That's correct.

Q.  And as a result of your investigation, did you ultimately

testify in the underlying trial?

A.   Yes.

Q.   And as part of your investigation, did you seize certain items of evidentiary value that were introduced into the underlying case in chief?

A.   Yes.

Q.   And did those items include Defendant Janice Turner's cell phone?

A.   Yes.

Q.   And as a result of your review of the cell phone, did you recover any items of evidentiary value as it relates to the loss in the instant case?

A.   Yes, I did.

Q.   Can you describe for the Court, just very briefly, what types of evidence you found contained within the defendant's seized cell phone?

A.   I found text messages between the defendant, Janice Turner, and the individual who was making the receipts.

I also found text messages between Janice Turner and victims, which included text messages of fake wire receipts to those victims.

Q.   And is this the same type of evidence that was introduced into the underlying trial?

A.   That's correct.

Q.   In addition to the evidence that was produced at trial

concerning the specific counts of ultimate conviction, did you have the opportunity to go back and take a look at the defendant's cell phone to determine whether or not any other additional relevant transactions had been conducted?

A.   Yes, I did.

Q.   Okay.  Can you describe for the Court briefly what you found?

A.   I found an additional 17 victims who had received text messages containing fake wire documents.  And then I subsequently reached out to those victims to confirm that they had in fact received those fake wire transfer receipts.

Q.   Okay.  So when you say "fake wire transfer receipts" and "an additional 17 victims," can you describe for the Court how you determined that these 17 individuals were all recipients of these, quote, fake wire receipts?

A.   I went through the defendant's text messages and found those fake wire receipts in the text messages to the victims for the purchase of various jewelry, cars.

Q.   Now, you say "fake wire receipts."  Has this Court previously seen a stack of these receipts?

A.   Yes.  There were 33 of them that were introduced during the trial.

Q.   Okay.  And when you went through those receipts, what did you find?

A.   I found -- can you repeat -- what receipts?

COOK - DIRECT/ANTON

Q.  Just generally what did you find?

A.  I found various receipts that were for First Republic, and these additional 17 matched the same format as the ones that were sent to the victims that were introduced during trial.

Q.  And as a result of your review of the cell phone, did you have the opportunity to put everything together and put it on a loss spreadsheet?

A.  Yes, I did.

Q.  And, additionally, did you also download and segregate all these individual victims into folders that contained not only wire instructions but the fake wire receipts and relevant portions of text messages?

A.  Yes.

Q.  Okay.

          (Discussion had off the record between counsel)

          MR. ANTON:  Objection to these -- do you want to see them again?

          MR. DOMINGUEZ:  The what?  The -- this is the same thing you have up.

          MR. ANTON:  Yeah.

          MR. DOMINGUEZ:  So what is on the drive?

          MR. ANTON:  The underlying documents that were sent to you.

          (Discussion had off the record between counsel)

          MR. DOMINGUEZ:  No, that's fine.  Just -- Judge, for

the record, these are documents I think I was sent yesterday, uhm --

THE COURT:  You've not received them before yesterday?

MR. DOMINGUEZ:  I would imagine that I -- they could be in the stack that was introduced at trial.

THE COURT:  Let's find out from the evidence as it gets authenticated and gets asked, and then we'll find out if it dovetails with stuff that was previously provided or if it's a --

MR. DOMINGUEZ:  All right.

THE COURT:  -- July 22nd ambush.  I think it's the former, but let's find out.

MR. ANTON:  May I approach, Judge?

THE COURT:  Yes.

BY MR. ANTON:

Q.  Agent, I'm showing you what's been marked for identification as Government's Exhibit Number 1.  Do you recognize Government's 1?

*(Government's Exhibit Number 1 marked for identification)*

A.  Yes, I do.

Q.  And what is Government's Exhibit 1?

A.  It's a spreadsheet I created to total the number of victims, the date that the fraudulent receipts were sent to those victims and the intended loss amounts, and any

restitution owed to each of those victims.

Q.   And also showing you Government's Exhibit 2.  Do you recognize Government's 2?

(Government's Exhibit Number 2 marked for identification)

A.   Yes, I do.

Q.   What is Government's Exhibit 2?

A.   It's a thumb drive that contains all of the supporting documents for the text messages between Janice Turner and the additional victims, text messages containing Janice Turner's correspondence with the accountant to make those fake documents, and the fake wire transfer receipts for each of those victims.

Q.   And when you say text messages and wire receipts and other documents, where did these items that are now contained within Government's Exhibit Number 2 come from?

A.   The defendant's cell phone.

Q.   Okay.  And has the defendant previously been provided with a copy of the cell phone?

A.   Correct.

Q.   And, in fact, was the government's cell phone seizure introduced into evidence in the underlying case in chief?

A.   Yes, it was.

Q.   Okay.  So are any of these documents new documents or simply put into convenient folders for convenience of the Court

and for sentencing?

A. They were sorted into convenient folders so that way they were organized by victim. It was easier to see.

Q. But all this evidence was previously introduced into the underlying trial.

A. Yes.

MR. DOMINGUEZ: May I voir dire, Judge, a second?

THE COURT: Go ahead. You can voir dire.

**VOIR DIRE EXAMINATION**

BY MR. DOMINGUEZ:

Q. You said that this phone was introduced at trial?

A. Correct.

Q. Or was it --

A. It was a copy of -- it was on the thumb drive.

Q. Right. Wasn't it a mirror?

A. Yes.

Q. That was introduced via a witness that only contained parts of the phone?

A. I'm not aware if it contained parts. I was told that it contained all of the information from the search warrant that we were allowed to search via those dates that were permissible.

Q. Which is not the whole phone.

A. It's -- correct. It's the phone limited in scope via the search warrant.

Q.  Right.

A.  Yep.

Q.  So what you said before is not correct.  It's not the phone.  You just had excerpts from the phone that was introduced via your expert.

You sat here at trial listening to the testimony.

A.  Correct.

Q.  So you know that it wasn't the whole phone.

A.  Correct.  It was everything that we were allowed to search according to that search warrant, that's correct.

Q.  Right.

THE COURT:  Anything else you want to do, Mr. Anton?  I have some questions after you.

MR. ANTON:  No, Judge.  At this time, the government would move Exhibits 1 and 2 into evidence.

THE COURT:  So let's do Number 1.  Again, to just make sure the foundation is clear beyond per adventure.

You testified a moment ago, Agent Cook, that as part of the trial, there was a stack of 33 receipts, fake wires that were introduced at the trial.  You recall that testimony?

THE WITNESS:  Yes, I do.

THE COURT:  You answered affirmatively to Mr. Anton's question about that.  You recall that?

THE WITNESS:  Yes, Judge.

THE COURT:  So looking at Exhibit 1 -- if you want,

you can put it in front of her again, Mr. Anton, the actual hard copy.

So this spreadsheet that is being marked as Exhibit 1, what, if any, connection does the information on Exhibit 1 have with regard to the stack of receipts that were introduced at trial?  Can you just explain for the record the connection?

THE WITNESS:  So the receipts that were introduced were from the time period 2023 to 2024.  So the connection here, the victims -- if you look at that date, "fraudulent receipts sent," those receipts were introduced during trial if they were within that time period.

THE COURT:  For the 2023 and 2024 time period, correct?

THE WITNESS:  Correct, because 2022 was excluded.

THE COURT:  Okay.  So Exhibit 1 contains, if I'm looking at it right, some lines that are additional information, that do not connect to evidence that was submitted at trial.  Is that a fair characterization?

THE WITNESS:  Yes, Judge.

THE COURT:  Okay.  So with that stated --

MR. ANTON:  Judge, can I make one additional --

THE COURT:  In a moment, sir.

With respect to the additional information, Mr. Anton asked you questions about what had been provided previously to the defense.

Do you know if the 2022 information or the 2021 information had been provided previously to the defense?

THE WITNESS:  Yes, it was contained in that mirror of the phone that was provided to defense counsel.

THE COURT:  Okay.  So you know about a connection between this information and the mirror of the phone.

THE WITNESS:  Yes.

THE COURT:  Anything else?  Or is that the connection?

THE WITNESS:  That's the connection, Judge.

THE COURT:  Okay.  Mr. Anton, you can make a further record, and then, Mr. Dominguez, I'll let you ask.

MR. ANTON:  And, Judge, just by way of proffer, the additional receipts that are outside of the time period of the charged conspiracy were attempted to have been moved into exhibits *(sic)* at trial, were subject to a motion in limine and were ultimately excluded by the Court for purposes of the trial testimony.  So they had them and they argued about them.

THE COURT:  Yes.  I understand the proffer.  But for today, since we have the witness, what I want to make sure is that if this witness can connect anything that you're putting in to what has previously been provided to the defense, I just want to make sure the government has the fullest opportunity to make that record.  You think you've made that record?

MR. ANTON:  Yes, Judge, I believe the witness has testified that all the receipts have come from the seized cell

phone pursuant to the search warrant.

THE COURT:  Okay.  Mr. Dominguez, any further voir dire?

MR. DOMINGUEZ:  Well, I have cross-examination regarding -- unless he's got more --

THE COURT:  That's right.  But with respect to the admission of these exhibits, any further voir dire?  You will have full cross.

BY MR. DOMINGUEZ:

Q.  Well, were these items verified as being fraudulent?

A.  Yes.

Q.  By who?

A.  By me.  I reviewed each of the wire transfer receipts.

THE COURT:  And you'll have cross, sir, but just as to the exhibits.

MR. DOMINGUEZ:  I understand, Judge.

BY MR. DOMINGUEZ:

Q.  So you're saying all these were in the mirror.

A.  Correct.

Q.  That was provided.

A.  Correct.

MR. DOMINGUEZ:  Okay.  I have no further questions.

THE COURT:  Okay.  Exhibit 1 and Exhibit 2 are received.

*(Government's Exhibit Numbers 1 and 2 admitted into*

*evidence)*

THE COURT: Mr. Anton, you can continue.

MR. ANTON: Okay.

DIRECT EXAMINATION (CONTINUED)

BY MR. ANTON:

Q. Okay. Agent, I am showing you on the screen what has been introduced into evidence as Government's Exhibit 1.

Can you describe for the Court what we're looking at?

A. So we're looking at a spreadsheet that I created after going through the defendant's cell phone and then subsequently contacting each of those victims.

Q. Okay. So let's just go through them very briefly line by line.

Some of these victims seem familiar. Can you explain why?

A. Yeah, so victims on line 3 through 6 are familiar because those were the ones that were introduced during trial.

Q. Okay. And are there additional victims on this spreadsheet?

A. Yes.

Q. Can you explain to the Court how you added these individuals to the list?

A. So I went through the defendant's text messages with the accountant who was making the fake receipts. And then I would pull those fake receipts and see if I was able to identify the

receipt being sent to a victim.  If I was able to do that in that case, I then contacted that victim using the number that was on the defendant's cell phone and then talked with the victims to see if they had, in fact, received the fraudulent receipt and the circumstances surrounding that.

Q.  Okay.  And in each of these cases and specific instances that you put on the spreadsheet, did you have the opportunity to reach out to the victims identified in column A?

A.  Yes.

Q.  And in column B, you indicated the "date fraudulent receipt was sent."  How did you populate that particular column?

A.  That was populated from the defendant's cell phone, the information from the cell phone.

Q.  Column C is titled "intended loss."  Where did those numbers come from?

A.  So those numbers were the value of the items that the defendants were purportedly purchasing.

Q.  And column D says "recovered."  What does that mean?

A.  That's how much money the victims had received back, whether the -- they received their items back or they had been paid in full at a later date.

Q.  And finally, there's a column E.  What is column E?

A.  It's the "restitution owed."  So in talking with each of those victims figuring out how much money they were still owed for the items.

COOK - DIRECT/ANTON

Q. Now, how do these transactions all relate to the defendant, Janice Turner?

A. The defendant sent every single one of these receipts.

Q. Okay. When you say "sent," what do you mean?

A. She sent a text message to these victims that contained that fake wire receipt.

Q. And where do these fake wire receipts come from?

A. It came from the accountant who was making them.

Q. And how do you know the defendant is associated with the particular accountant who was making them?

A. There's numerous text messages back and forth where the defendant would send wire transfer information to this individual who would then subsequently make the fake wire document and send it back to the defendant.

Q. Okay. So this conduct, which the government is claiming is relevant conduct, is identical to the offense conduct that was charged and convicted in the underlying case?

A. Correct.

Q. And what types of items were being purchased with these fake wire receipts?

A. It was various items. So some of these were for vehicles, some of them were for jewelry and watches. One of them was actually for rent. Another one was for a private chartered flight.

Q. All right. Let's go through now some of the underlying

information just by way of example.  I don't think we need to go through all 17 of them, but let's take a look, for instance, at Government's Exhibit 2.  You said everything was itemized in specific folders?

A.   Correct.  I broke them down by victims.

Q.   Okay.  Let's take a look at the 4610SWR LLC folder.

What does that folder contain?

A.   So this contains the text messages between the defendant and the accountant in which the wire confirmation was created, and then the defendant in the victim text messages --

MR. DOMINGUEZ:  Judge --

THE COURT:  One moment, one moment.

MR. DOMINGUEZ:  The document should speak for itself. Why is she testifying about it?  Just pull up the document.

THE COURT:  She's allowed to describe the -- overruled.  She's allowed to describe what she's about to testify about.

Go ahead, Mr. Anton.

A.   And then the defendant in the victim text messages, and then the wire transfer receipt.

Q.   And is that the same for each of those specific folders that you broke out into Government's Exhibit 2 that comprise the data in Government's Exhibit 1, the spreadsheet?

A.   Yes.

Q.   So it repeats itself over and over again.

A.   Yes.

Q.   Okay.  So by way of example, let's take a look at the 4610SWR.  You said this was for the payment of what?

A.   This was rent for the property that they were renting at 4610 Southwest Ranches.

Q.   When you say "they," who are you referring to?

A.   Defendant Turner and Kisean Anderson.

Q.   Okay.

         MR. ANTON:  Let's pull up the PDF Turner and victim texts.

BY MR. ANTON:

Q.   What is the Court now looking at?

A.   We're looking at text messages between the defendant and the manager for that Southwest Ranches property.

Q.   And by way of summary, what is the discussion about?

A.   The discussion is the manager's asking for when the rent payment is going be to paid, and the defendant's saying that it's already paid.

Q.   Okay.  So, again, like at the underlying trial, on the left side or in the blue, you've got the manager for Southwest Ranches, which is what, the landlord?

A.   Correct.

Q.   And on the right, Mamakingston Bookings.

A.   Yes.

Q.   And who's Mamakingston Bookings?

COOK - DIRECT/ANTON

A.   Defendant Janice Turner.

Q.   Now, you said the blue portion of the screen, the landlord's asking for rent.

A.   Correct.

Q.   And the defendant says what?

A.   "It's already paid."

Q.   Okay.  Now scrolling down, does the discussion continue about payment?

A.   Yes.

Q.   Does an argument ensue?

A.   Yes.

Q.   Okay.  Over what?

A.   The payment.  He's saying that they're going to start the eviction process if the payment isn't made.

Q.   And there are multiple text messages on February 7th, 2024, from the landlord to the defendant?

A.   Yes.

Q.   And what is the landlord asking for in this barrage of text messages?

A.   The payment.

Q.   Proof of the payment?

A.   Correct.

Q.   And what does the defendant, if anything, say?

A.   "Sir, with due respect had to go to email from accounting."

Q.   And does that buy some initial time?

A.   Yes.

Q.   Okay.  What happens next?

A.   She's saying she didn't ghost the manager for Southwest Ranches.

Q.   Okay.  Had the manager accused the defendant of "ghosting" them?

A.   Yes.

Q.   What does that mean?

A.   It means not responding to text messages or phone calls.

Q.   Is that conduct that is consistent with the under -- your underlying testimony in the instant trial?

A.   Yes.

Q.   Does the argument continue on for the remainder of the day?

A.   Yes.

Q.   Okay.  Does the landlord now demand payment again?

A.   Yes.

Q.   What is the defendant's response?

A.   "It will clear by tomorrow for sure."

Q.   And a "thank you" response.

A.   Yes.

Q.   Okay.  The next morning was payment made?

A.   No.

Q.   And what does the landlord say?

A.   "Good morning, Janice, payment has not been made, still unfortunately, and the owner will be proceeding to evict.

Please call me immediately."

Q.   Now, at 5:32 p.m. UTC on February 8th, 2024, what does Mamakingston Bookings send to the landlord?

A.   FR-wire, which is First Republic wire.

Q.   PDF attachment?

A.   Yes.

Q.   And what is the response from the landlord?

A.   "Thank you."

Q.   Were you able to determine what FR-wire.pdf was?

A.   Yes.

Q.   Okay.  Showing you the screen now from that particular folder, what is the Court looking at?

A.   We're looking at that PDF file that was sent from Defendant Turner to the Southwest Ranches manager.

Q.   And the client name?

A.   Eyes Above Water LLC.

Q.   In the amount of?

A.   32,400.

Q.   And the purported receiver?

A.   4610 Southwest Ranches LLC.

Q.   Were you able to determine whether or not this was a legitimate wire receipt?

A.   Yes.  It was not a legitimate wire receipt.

          MR. DOMINGUEZ:  I'm going to object, Judge, to -- object --

COOK - DIRECT/ANTON

THE COURT:  Ground.

MR. DOMINGUEZ:  To hearsay, as well as hasn't established a basis for knowledge.

THE COURT:  One moment.

Overruled.  This is a sentencing proceeding.  The rules of evidence are relaxed.  I'm allowed to consider rank hearsay, but even that aside, these documents are of striking similarity to the evidence that was submitted at trial.  And for that reason, unless you have an authentication objection that it can't be coming from her phone, which I don't hear you making, the objection's overruled.

You can continue, Mr. Anton.

MR. ANTON:  Thank you, Judge.

BY MR. ANTON:

Q.  Okay.  Also contained within the sentencing folder for 4610SWR, you have an image.  What are we looking at now?

A.  So we're looking at wiring instructions for -- this was for 4610 Southwest Ranches, is the beneficiary.

Q.  Provided by who?

A.  Southwest Ranches manager to the defendant.

Q.  Okay.  So they could make proper payment.

A.  Correct.

Q.  Were you able to determine what these wiring instructions were ultimately used for?

A.  Yes.  To create the fake wire transfer receipt document.

Q. Okay. Were you also able to take a look at the defendant's phone and find text messages between the defendant and, quote, her accountant?

A. Yes.

Q. Pulling up the folder that's titled "Turner and accountant text messages," what is the Court looking at?

A. So we're looking at the text messages between the accountant and Defendant Turner.

Q. And on the page that's annotated as February 7th, 2024, at 2:35:20 p.m. UTC, does Mark Mosquera business account send anything of relevance to this case?

A. Yes.

Q. What?

A. That wire document that we saw that was sent to the victim for 4610 Southwest Ranches.

Q. That's entitled what?

A. "FR-wire."

Q. That's the same pdf.

A. Yes. And there's a few there because there were actually other victims within this chat as well.

Q. Was the defendant -- well, did the defendant also send the template picture of the amounts and other wiring information to the Mark Mosquera business account so the fake receipt could be made?

A. Yes. That's that image right there that you're looking at,

the 2906, it's the wiring instructions, and then Defendant Turner says, "This one is 32,400."

Q.   And it turns into a 32,400 fake wire receipt, as indicated by the FR-wire file?

A.   Correct.

Q.   And that corresponds with the purported wiring instructions as provided by the landlord.

A.   Yes.

Q.   Okay.   Now, we've gone through this specific transaction. Did it repeat itself again and again and again?

A.   Yes.

Q.   And is that how you compiled the loss spreadsheet in the instant case?

A.   Yes.

Q.   And in each one of these folders were there conversations between the victim, as indicated in column A, and the defendant?

A.   Yes.

Q.   And in each one of these spreadsheet folders, as contained in Government's Exhibit 2, are there conversations between the defendant and the person who provided or created the fake wire receipts?

A.   Yes.

Q.   Also contained within Government's Exhibit 2, were you able to uncover and locate in each folder identified in column A the

fake wire receipts that came back from the -- we'll call it the purported manufacturer of the fake receipts?

A.   Yes.

Q.   Were you then able to find in each one of the columns, and each one of the victims that are identified in column A, the transmission of that fake wire receipt in matching amounts to the victim from the defendant?

A.   Yes.

Q.   As identified in column A, did you then reach out to each of these victims to confirm that they, in fact, received these fake wire receipts?

A.   Yes, I did.

Q.   And what did they all tell you?

A.   That they had received them.

Q.   What, if anything, did you learn by speaking to the victims concerning the purported payments that identified in either columns A, C, D, or E?

A.   Can you rephrase the question, please?

Q.   Sure.

     Did you also then follow up with each one of these victims to find out whether or not they were ever ultimately paid?

A.   Yes, I did.

Q.   And what happened in each of these transactions?

A.   The victims had to continuously contact the defendants in

order to try to get payment.  In some cases, they were paid; in other cases, they were not paid.

Q.  But in each one of these cases and each one of these victims identified in column A, did they all initially receive these fake wire receipts?

A.  Yes.

Q.  In the amount of whatever it is the defendant or defendants were trying to purchase?

A.  Yes.

Q.  And it's your testimony then that sometimes they got made whole and other times they were just, what, completely defrauded?

A.  Correct.

Q.  At times when defendants -- I'm sorry -- at times when the victims figured out that these were fake wire receipts prior to tendering over property, what would have happened?

A.  They would never lease the property.

Q.  So those deals fell through.

A.  Yes.

Q.  And as a result of your compilation of these additional fake wire receipts, you said you put it all on a spreadsheet.

A.  Yes.

Q.  Were you able, as indicated in column C, to total up the amount that the fake wire receipts represented or purported to pay?

COOK - DIRECT/ANTON

A.   Yes, for those items, yes.

Q.   And what was the total number or the sum of the wire receipts as indicated on Government's Exhibit 1?

A.   It was over $3 million.

Q.   Okay.   Specifically $3,125,601.92?

A.   Yes.

Q.   And that was the sum of each one of the aggregate wire receipts.

A.   That was the sum of the intended loss for each of those victims.

Q.   And when you say "intended loss," what do you mean?

A.   How much the defendants agreed to purchase those items for.

Q.   Now, there's another column, column D, that says "recovered."   How were you able to compile that particular column?

A.   By speaking with each of the victims.

Q.   And what did they tell you?

A.   Some of them told me that they were able to get their merchandise back, others said that they were eventually paid by the defendants.

Q.   But each time they confirmed that they initially received a fake wire receipt as purported payment.

A.   Correct.

Q.   And in column E, you say "restitution owed."   Can you explain to the Court how you populated that particular column?

A.   Yes.  Again, by talking with each of the victims to see how much money they had been paid or if they had received any of their items back.

Q.   And the result of your specific conversations with each of these victims, as identified in Government's Exhibit 1, were you able to determine, in your opinion, a restitution amount owed?

A.   Yes.

Q.   And what is that number?

A.   $1,167,700.

Q.   And what does that number represent?

A.   The money that's still owed to these victims.

Q.   What is date range of these fraudulent receipts, the earliest and then the latest?

A.   November 4th, 2021, until -- there's -- it's a little out of order -- I believe March 14th, 2024.

Q.   So in your opinion, based upon your review of the evidence in the instant case and your review of the seized documents from the defendant's phone, these fake wire receipts were being generated as proof of payment as early as November 4th of 2021?

A.   Correct.

Q.   And continued up until at least March 14th of 2024?

A.   Yes.

        MR. ANTON:  Nothing further, Judge.  Thank you.

        THE COURT:  Before cross-examination -- and I'll

invite the government to do it, to question as they see fit, otherwise I'll do it -- I'd like the government to focus on the spreadsheet line 22, Scott Gai Evans-Kings Life Group, and I'd like you to ask within either of the exhibits questions that you have asked with respect to other vendors, but that line item has particular relevance in this sentencing. So I'd like to invite the government to ask, albeit it may be similar questions, but specifically as to line 22, and then Mr. Dominguez will have full cross on the entire thing.

MR. DOMINGUEZ: That's fine, Judge.

BY MR. ANTON:

Q. Agent, are you familiar with the line item as indicated in your loss spreadsheet as Scott Gal Evans or Kings Life Group?

A. Yes.

Q. Could you explain to the Court the specifics of that particular entry?

A. So this entry, if you recall from trial, I believe it was Exhibit 41, the text messages between the codefendants, Janice Turner and Kisean Anderson, are referencing that transaction.

Q. Can you -- what do you mean?

MR. DOMINGUEZ: The 404(b) evidence?

THE COURT: You'll have your chance, sir. And she's just referencing trial evidence. You'll have full cross, Mr. Dominguez.

You can continue, Mr. Anton.

A.   So, yeah, that's the Turner and Sean texts right there. Those are the text messages where, if you recall, Defendant Anderson was asking for the fake receipt to be made.

Q.   Okay.  So let me pull up the "Turner and Sean texts.pdf."

A.   Yes.

Q.   We've seen this one before?

A.   Correct.

Q.   This was introduced in trial?

A.   Yes.

Q.   And you said the creation of the receipts.  What do you mean?

A.   So if you continue down, they're discussing paying this jeweler $133,000.  The ultimate amount ended up being $133,000, but there's a discussion back and forth between the two codefendants.

Q.   Okay.

A.   About the purchase of these.  And if you keep scrolling, it's where they talk about the wire receipt.

Q.   So there's a discussion about the particular watch.

A.   Correct.

Q.   And November 4th, 2021, at 8:42, what did Codefendant Sean Kingston say to his mom?

A.   "Then we need Dainty to make us a wire receipt."

Q.   And the defendant provides information?

A.   Correct.  That's the victim's phone number right there.

Q.   And ultimately, did the defendant, Janice Turner, procure a fake wire receipt?

A.   Not -- not from the same accountant.  This was a different individual.  But, yes, if you keep going down, they talk about the accountant sending -- emailing the wire receipt.

Q.   Okay.  And on November 4th of 2021, we've previously seen this at trial, but codefendant Anderson reaffirms that he's telling his mom, "I told you to make a fake receipt"?

A.   Correct.

Q.   And to make it look like the transfer will be there in a couple days.

A.   Yes.

THE COURT:  That's fine, Mr. Anton.  If you could just ask questions about -- the Court's interested in the spreadsheet saying that zero dollars was recovered versus 133,000 intended.  I'd just like you to inquire of the witness about that.

BY MR. ANTON:

Q.   Okay.  So you've testified about how this scheme to procure fake wire receipts ultimately began back as early as November 4th of 2021.  What happened specifically in that transaction?  Are you aware?

A.   Yes.  So in speaking with the victim -- and there's LAPD reports as well, because the victim did file a report with LAPD.  So reviewing all the police files and talking with the

COOK - DIRECT/ANTON

victim, the victim did in fact receive a receipt that purported to be payment for $133,000.  And he never received any of that money.  So he eventually went to LAPD to file a report, because he was still owed $133,000 for those three items.

Q.   Well, what happened to the watches?

A.   The watches were ultimately pawned by Defendant Turner.

Q.   Okay.  So let's take a step back.

So Defendant Kisean Anderson was able to take possession of the watches based on the use of the fake wire receipt?

A.   Yes.

Q.   And the fake wire receipt purported to pay for the watches that Codefendant Anderson took possession of.

A.   Yes.

Q.   What happens to the watches, were you able to determine based upon your review of the LAPD police reports and your own additional investigation?

A.   Yes.

Q.   So where did the watches go?

A.   Coral Gables Pawn.

Q.   Okay.  And then what happened?

A.   I don't know what happened to the watches after that.

Q.   Well, who pawned them?

A.   The defendant.

Q.   Which defendant?

COOK - DIRECT/ANTON

A.   Defendant Turner.

Q.   How do you know that?

A.   Based off of the pawn shop records.

Q.   Okay.  So you were able to review pawn shop records?

A.   Correct.

Q.   And what did you review and see when you reviewed those records?

A.   I reviewed the serial numbers for those watches.  So some of these high-end watches, the majority of them will have individual serial numbers on them.  So based off of the LAPD files and talking with the victim, I was able to get a -- basically an itemization of each of those watches with their serial numbers.  And then the pawn records, whenever any of those items were pawned, the pawn shop put the serial numbers in with the item.  And those two serial numbers matched from the victim to that pawn shop, pawned by Defendant Turner.

Q.   And you say "pawned by Defendant Turner," how do you know it was Defendant Turner who pawned them?

A.   There was matching information.  So she had to provide a driver's license and personal identifying information, such as date of birth, and all of those things matched to Defendant Turner on the pawn shop records.

Q.   Do you know how much the items were ultimately pawned for?

A.   I don't recall the amount.  I'd have to look at the pawn shop records.

COOK - CROSS/DOMINGUEZ

MR. ANTON:  Nothing further.  Thank you, Judge.

THE COURT:  Mr. Dominguez, cross-examination, sir.

MR. DOMINGUEZ:  Certainly, Judge.  Thank you.

Could we put on the spreadsheet?

MR. ANTON:  Sure.

MR. DOMINGUEZ:  So I can go -- thank you.

**CROSS-EXAMINATION**

BY MR. DOMINGUEZ:

Q.  Now, in line 2, we're referring to Steve Young.  That's the -- that's Count II of the indictment, is that correct?

A.  That's correct.

Q.  That's the one that was dismissed by the government?

A.  Yes.

Q.  Okay.  And when did you speak to Steve Young?

A.  I spoke to Steve Young on numerous occasions.  I don't recall the exact date.

Q.  When is the last time -- how's that -- the last time you spoke to Steve Young?

A.  I believe it was in May -- April or May.

Q.  May?  That's before the trial?

A.  I spoke to him before the trial as well.

Q.  Right.  So you spoke to him after the trial?

A.  Yes.  I tried to contact him multiple times.  I believe it was April was the -- April or May.  I don't recall the exact date, the last time I was able to get in contact with him.

Q.   And what was the nature of the conversation with him in April or May?

A.   Just to determine if he had, you know -- I mean, it was just to keep him updated.  I call and text all the victims to keep them updated on sentencing dates and things like that, just to keep them informed.

Q.   So he told you that he had received a fake wire in that conversation?

A.   In that conversation, no.  It was the conversation prior to trial.

Q.   Okay.  And then you testified that the items were not -- would not have been given until a receipt was received?

A.   In some instances, yes.

Q.   Okay.  So you're modifying that now?

A.   No.  That's -- no, in some instances, for example, like AAA Gold, he didn't ultimately give over the watch, even though he was sent the fake receipt for $61,000, but he did not ultimately provide the defendants with the watch because the payment hadn't been received into his account.

Q.   So nothing happened with that one.

A.   No.

Q.   Right.

And Mazal.

A.   Yes.

Q.   He gave the watch without receiving any receipt.

A.   He did.

Q.   And who did you speak to at Ocean Auto?

A.   I spoke with Andre Bush and then Miguel Rodriguez.

Q.   Do you speak to the owner?

A.   No.  I spoke with the salesman and then the manager.

Q.   Right.  You never spoke to the actual owner --

A.   I did not.

Q.   -- of the place?

        And on Ver Ver, we heard from him, testified at trial, and you never heard back regarding restitution?

A.   He had recovered all of his materials when the equipment was seized during the search warrant.

Q.   Right.  So he got $40,000 plus everything back.

A.   *(No response)*

Q.   Is that correct?

A.   No, that's not correct.  That $40,000, there is the fake wire transfer receipt amount.

Q.   He got a deposit, though.

A.   It wasn't $40,000.

Q.   How much was the deposit?

A.   I believe was $35,000.

Q.   Okay.  So he got 35,000 plus the equipment.

A.   Correct.

Q.   Okay.  So -- and Rockstar Jewelers.

A.   Yes.

Q.   That's the next one that -- we're skipping over Nikolenko

because we heard him testify at trial.  Those receipts that

he -- what was the fake wire for?

A.   It was for the purchase of Cartier glasses.

Q.   Right.  And did you determine how the receipts were being

forwarded by Ms. Turner?

A.   She was -- I'm not sure exactly how she was doing it,

whether she was downloading them or forwarding them from the

message, but she was sending those fake receipts to the

victims.

Q.   Right.  But you could also just cut and paste and copy.

You would just get a receipt, copy it, and then forward it in

that way.

A.   Sure.  You could.

Q.   So it would -- so every one of them would look irregular or

not real because she's basically copying the text and

forwarding the text to the individual.

A.   That's not accurate.  So if you look at the First Republic

receipts, the information that's contained on there is

incorrect.  It's not correct banking information.  So, for

example, like a BIC code, it was not the right number of

digits.  And some of them didn't even have any banking --

Q.   Well, you're talking generalities.  Let's talk about

specifics.

A.   Okay.

Q.   Okay?  So if we're going to go to Rockstar receipt, what was wrong with the receipt there?

A.   I would have to see it.  But regardless, the victim did not receive the money from those fake wire receipts.

          MR. ANTON:  Do you want me to pull it up?

          MR. DOMINGUEZ:  Yeah, please.

BY MR. DOMINGUEZ:

Q.   And his loss amount is nothing because he --

A.   He ultimately got $18,000.  He was paid in full, that's correct.

Q.   Right.

          MR. ANTON:  So you want --

BY MR. DOMINGUEZ:

Q.   And how was he paid?

A.   I don't recall in this instance.  Sometimes they were paid via Zelle.

Q.   I don't want you to guess.  I want you to tell me, how was he paid?

A.   I don't recall.

Q.   Okay.  So let's look at the fake receipt that you're talking about in this case.

          What is off about that one?

A.   So there's a BIC code on there.  This is a transfer that's domestic, so BIC codes are used in international bank transfers.  And in addition to that, the first four digits of a

BIC code should be the financial institution.  And First Republic is identified as "FRBB."  In this instance, there's a "B" missing.  It's just "FRB."

Q.   And did -- was there any conversation between Ms. Turner and whoever generated this to create a fake receipt?

A.   Yes.

Q.   What was specifically said, to create a fake receipt?

A.   No, that terminology wasn't used.  I don't recall in this exact instance, but in general, it's wire transfer information being sent to the accountant and amounts that should be on those receipts and sent back to the defendant.

Q.   Right.  So there's -- at no time was she asking for a fake receipt.  That's just what came back from the accountant.

A.   No, I believe she was asking for a fake receipt based off of all the other information and how many fake receipts were received.  In addition, she paid $50 via Zelle for each of these fake documents.  So I believe there was already an agreement to create these fake receipts.  She doesn't need to put in text to make a fake document when there's already the agreement and it's already been established.

Q.   Where was the agreement?  Do you have texts for that agreement?

A.   It's pretty clear in the text -- use this template, here's this wire transfer information, I'll pay you via Zelle, can you do this wire receipt for me, I'll give you $50.

Q.  I mean, when you ask an accountant to do anything, you're going to pay them every time.  I pay them every time.

THE COURT:  Is there a question, Mr. Dominguez?

BY MR. DOMINGUEZ:

Q.  I mean $50 to create a -- generate a payment to a company is not irregular.  Is it?

A.  *(No response)*

Q.  Is there anything irregular about paying $50 to make a payment --

A.  In these instances, yes, because the defendant was told by the victims that they were not paid.  So if I had an accountant who was not sending these wire transfers, and I'm paying them, I would stop paying them.  I wouldn't continue to converse with them and pay them over the course of two years when these wire receipts don't go through.

Q.  Right.  But then you just testified that this person got paid, but you don't know how.

A.  Correct.  I don't recall in this instance.

Q.  Right.  So -- but he got paid, so it could have been through this.

A.  No.  This is a fake receipt.

Q.  Right.  Well, you -- so you don't know how they got paid, but yet you're saying that this is a fake receipt.  And you know that they got paid because they told you they got paid.

THE COURT:  Is there a question, Mr. Dominguez?

COOK - CROSS/DOMINGUEZ

BY MR. DOMINGUEZ:

Q.  Is it correct that you don't know how they got paid at all if, in fact, this was just an error and then they sent another one correcting it and he got paid?

A.  Again, based off of the information over the course of all these victims and the conversations between the accountant, this is a fake document.

Q.  Right.

Do you know who had access to the Mamakingston Booking *(sic)* email?

A.  No, I do not.

Q.  Do you know how many people used that email --

A.  No.

Q.  -- in general, for the corporation, which is where some of these receipts were coming in through?

A.  *(No response)*

Q.  Isn't that correct?  You testified to that earlier.

A.  There was one, it was for California Entertainment, that came in through email.  The rest of these came through -- it's in those text messages between the defendant and the victims.

Q.  And do you know who else had access to Mama Kingston's phone?

MR. ANTON:  Judge, I'm going to object to relevance at this point.  This is not the underlying trial.  The defendant's guilt has already been established.  He's attempting to now

state these are not her receipts.

THE COURT:  You're probably right, Mr. Anton.  I'm going to let Mr. Dominguez have some latitude.

Overruled.

MR. DOMINGUEZ:  Judge, I'll move to the next -- if we could go back to the other exhibit.

MR. ANTON:  Which one do you want?

MR. DOMINGUEZ:  The --

MR. ANTON:  Spreadsheet?

MR. DOMINGUEZ:  Yeah, the spreadsheet.

BY MR. DOMINGUEZ:

Q.  So next person is --

A.  Alan and Co.?

Q.  Yeah, Alan and Co.  And that's -- yeah.  So this person here, what was that transaction?

A.  It was for jewelry.

Q.  And he got a fake receipt also?

A.  He got two fake receipts.

Q.  And he got paid in full?

A.  Correct.

Q.  And how was that payment made?

A.  So he actually retrieved the merchandise.  So he got his merchandise back, is how he was made whole.

Q.  Okay.  Do you know how he got the merchandise back?

A.  I don't recall who gave him the merchandise back.  No.

COOK - CROSS/DOMINGUEZ

Q.  Okay.  So let's go to the next -- and, again, what kind -- strike that -- go back to that one.

You reviewed this.  Again, this receipt is fake, why?

A.  Again, these receipts came from the conversation between Defendant Turner and the accountant.  I would have to look at each individual one.  But reviewing all of those receipts, the 67 of them, the formatting on all of them, you know, the banking information that was contained in there, they were all fraudulent.

Q.  Right.  But there were a lot of wires in this case that were not fraudulent.

A.  Correct.

Q.  Right?

A.  Yes.

Q.  So you can't just assume that every single wire that you found was fraudulent.  There were tons -- I mean they moved more than $700,000 a month through these accounts, with real wires, correct?

A.  Correct.

MR. DOMINGUEZ:  Okay.  Can we go back to the spreadsheet?

BY MR. DOMINGUEZ:

Q.  Approved Jets LLC, what is that?

A.  So that's a jet company.  So they have -- they do private charters for flights.

Q.   And what did -- they got a fake receipt?

A.   They got two fake receipts.

Q.   Okay.

MR. DOMINGUEZ:  Could we pull those up, please?

It's --

*(Discussion had off the record between counsel and client)*

BY MR. DOMINGUEZ:

Q.   And were these -- since you say -- why do you say they -- to be determined regarding the payment?  Were they paid?

A.   I haven't heard back from the victim.  So he doesn't believe he was paid.  He said he was going to check with the accountant that worked for his company and I haven't heard back from them.

Q.   So did he tell you that he got these fake receipts?

A.   He did.

Q.   Okay.  But he doesn't know if he got paid.

A.   He doesn't know if he was made whole.  He said he had to check with the accounting department.

Q.   So if he doesn't know -- okay.  So he's the one that knows he got these fake receipts because he saw them or he received them or did the accounting department get them?  Who got them?

A.   He received them via text message.

Q.   But he doesn't know if he got paid.  I mean, does that make sense to you?

A.   In some of these businesses, they -- it's not uncommon that people would have accountants that would deal in that accounting department, so, no, I didn't find that --

Q.   Bizarre.  And that you -- they did the chartered flight before getting paid?

A.   No.  The receipt was sent prior to the charter flight.

Q.   But he hadn't gotten any money, so -- but he still did the charter flight, supposedly.

A.   Correct.  I'm not sure if he was paid, so I wouldn't be able to tell you that.

Q.   Okay.

     MR. DOMINGUEZ:  Can we go to the next person in the....

     *(Discussion had off the record between counsel and client)*

BY MR. DOMINGUEZ:

Q.   The Royalty Motors, that was a Ferrari, correct?

A.   Yes.

Q.   And what did they get?  What fake receipt did they get?

A.   They got a fake receipt for 300,000 -- $306,840.

Q.   Who sent that?

A.   Defendant Turner.

Q.   Okay.  That was from the phone?

     MR. DOMINGUEZ:  Could we bring that up?

BY MR. DOMINGUEZ:

Q. Is it the same Republic Bank?

A. Yes.

Q. And they told you that it was a fake receipt?

A. They didn't tell me it was a fake receipt. They told me they were not paid, and I reviewed it and determined it's a fake receipt.

Q. Well, did they tell you they got this fake receipt?

A. Yes.

Q. They told you they got this receipt and then they weren't paid.

A. Yes.

Q. And how long was the car in their possession?

A. So they retained possession of it, because the -- this transfer obviously did not go through. So they worked payment -- payment plan with that -- that Royalty Motors company.

Q. So Royalty Motors got this receipt, then they worked out a payment plan?

A. After receiving the fake receipt, yes, when the money didn't go through.

Q. The fake receipt that you determined is a fake receipt.

A. Correct.

Q. Without actually checking with anybody else if it's a fake receipt.

A.   No, I've spoken with First Republic, and so they reviewed the other receipts in this trial.

Q.   But not these.

A.   Not these, but these follow the exact same format as the ones that had been reviewed previously by a bank representative.

Q.   So how is it that it turns out that they are not owed anything?

A.   Because they were eventually paid in full.

Q.   How were they paid?

A.   *(No response)*

Q.   With a fake receipt?

A.   No.  A fake receipt, the money didn't go through.

Q.   So how did they get paid?

A.   They were eventually paid.  I don't know if it was through -- I know there was an $80,000 down payment, and then I don't know in what subsequent payments, if it was 5,000 or what, but they were eventually made whole.

Q.   Okay.  Thank you.

          MR. DOMINGUEZ:  Could we go to the next person?

BY MR. DOMINGUEZ:

Q.   Bo Coates?  Bo Coates?

A.   Yes.

Q.   That's a jet ski?

A.   No, it was for a Can-Am, C-A-N-A-M, Can-Am.  It's a side by

COOK - CROSS/DOMINGUEZ

side.

Q. And what fake receipt did they get?  Bank Republic also?

A. Yes.

Q. And you determined it's a fake receipt?

A. Yes.  And the money did not go through.

Q. With the bank?

A. It was never initiated from the bank since it was a fake receipt.

Q. But you never asked them if it was from their bank.

A. I'm sorry, can you rephrase?

Q. You never verified with the bank that that was a fake receipt.

A. Again, it follows the same format.  And this one in fact doesn't even have the First Republic bank logo on it.  There's no bank logo.  And if you look at the amount --

Q. Right.

A. -- it just says "69,00 (sic)."

Q. So that would be something that if you literally cut and paste and forward, it would come out completely -- it doesn't even look like a receipt, correct?

A. It looks exactly the same as how the accountant sent it to the defendant.

Q. It doesn't even have a bank logo on it.  How could you say it looks the same?

A. If you pull up the text messages between the accountant,

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(305)301-3276

this is what was sent from the accountant to the defendant.

Q.   Right.  So it's basically somebody --

A.   Making fake receipts.

Q.   -- copying or pasting from another document, because there's not even a logo on this thing.  It doesn't even purport to be anything.

A.   It purports to be a wire transfer based off of -- it says account number, ABA, and it has an amount on it, so it's purporting to be a wire transfer.

Q.   Okay.  So you're saying that there are wires that have no logos from the banks or anything like that.

A.   Yes, because they were fake receipts.

Q.   Right.  And that's -- you think the business is going to accept that as payment, just so -- is that what you're saying?

A.   In some instances, yes.  There are some people who are not familiar with how bank wire transfer receipts should look, so in some instances, when they receive this, they think --

Q.   This is a company.  This is, you know, not --

A.   This is an individual.  Bo Coates was an individual who was selling at Can-Am.

Q.   Okay.  And then --

        MR. DOMINGUEZ:  If we could go back to --

BY MR. DOMINGUEZ:

Q.   So how was he eventually paid?

A.   So in this instance, he was not made whole, so he received

some wire transfers.

Q. Okay.

A. In this case, totalling $30,500, and he is still owed $38,500.

Q. Do you have those wire transfers that were -- where he was paid?

A. It would have been in -- I don't personally have those, no.

Q. They're not in her phone?

A. No.

Q. Okay.

A. Not that I saw.

Q. What bank were they from?

A. I don't know what bank they came from.

Q. So you have no idea how the person was paid.

A. It was not $69,000 that was purported on that fake wire transfer.

Q. Well, how did they receive the 30-something thousand dollars?

A. In increments, in various amounts over the course of several months, with the last payment being roughly October of 2024.

Q. Which would have been the date of the arrests, or close to it.

A. It was after that there were still some payments made.

Q. Yeah.

A.   Yeah.

Q.   And then we have the... the apartment -- the property where they were living at, which was a one-month late payment. Right?

A.   I don't know if it was a one-month late.

Q.   The 32,400 was --

MR. DOMINGUEZ:   For one month?

THE DEFENDANT:   Um-hum.

BY MR. DOMINGUEZ:

Q.   Yeah, it was one month.  Didn't you look at the lease to determine how much it was?

A.   I didn't look at the lease.  I looked at the fake wire transfer and saw that it was $32,400.

Q.   Did you know what it was for?

A.   Yes.

Q.   For one month rent.

A.   Sure.

Q.   Yeah.  And they eventually were paid.

A.   Correct.

Q.   And how were they paid?

A.   I'm not sure if it was through the online portal.  I wouldn't be able to tell you how.

Q.   Okay.  And where did that fake receipt come from?

A.   The accountant.

Q.   Supposedly?

A.   The accountant created the receipt, sent it to Defendant Turner, and Defendant Turner sent that to --

Q.   And did Defendant Turner ask for a fake receipt?

A.   Yes.

Q.   She did?

A.   Yes, based off of my review of the phone, all of the conversations between the accountant, it was -- the scheme was sending --

Q.   Okay.  Show me this conversation where she asked for a fake receipt.

A.   It doesn't say it in those exact terms.  It's her sending bank information.

Q.   So in the cases where the people actually got paid, right --

A.   Um-hum.

Q.   -- via wire, and those that you say are fake receipts, right?  What was the difference in the texting that made it -- that you knew -- so she says to the accountant, "Pay this for real" -- does it say "for real" in those cases?  How does she convey -- because according to you, every conversation she has with the accountant is to send the fake receipt.

A.   Correct.  I didn't see any conversations in my review of the accountant making a legitimate payment.

Q.   So everything that -- so how did they get paid?  All these cases that people got paid all these thousands and thousands of

dollars, how did they get paid?

A.   Not through that accountant.  There were other instances where Zelle payments were made.  And then we saw, right, based off of the bank records, there were some wires sent from the defendant's bank account to other individuals.

Q.   And who was making those wire transfers?

A.   I wouldn't be able to tell you.

Q.   Right.  It could have been the accountant.

A.   *(No response)*

Q.   Right?

A.   Potentially.

Q.   Right.  So what was the difference in the conversation where one was fake and one was real?

A.   Again, when I reviewed with the business account, I did not see anywhere where legitimate wires were asked to be sent in that text conversation.

Q.   Were you looking for that?  Because there literally were thousands and thousands of dollars sent in real transfers.  So there was no conversation at all; they just magically appeared.

A.   Not that I saw, not that accountant.

And in addition to that, the banking records show that for Eyes Above Water, that accountant didn't have access to that account.

Q.   So --

A.   The only two co-signers on there were Janice Turner and

Ronald Linvo *(phonetic)* from what I could see, not the accountant based in Atlanta.

Q. Right. And do you know who was the one that was sending those transfers?

A. I do not.

Q. Okay. Thanks.

MR. DOMINGUEZ: Let's go to the next person.

*(Discussion had off the record between counsel and client)*

BY MR. DOMINGUEZ:

Q. California Entertainer Coach? Do you know what that is? That's a tour bus?

A. Yes, that's a tour bus.

Q. And you're saying they got a fake receipt as well?

A. Correct.

Q. And did you -- who did you talk to there to find out if they got -- received a receipt?

A. The owner of the company.

Q. Okay. And did they eventually get paid?

A. Yes.

Q. And how did they get paid?

A. Via Zelle.

Q. And where did that payment come from?

A. I don't remember the exact Zelle account that it came from.

Q. Did you see that in Ms. Turner's phone or --

A.  No, I did not.

Q.  Okay.

     *(Discussion had off the record between counsel and client)*

BY MR. DOMINGUEZ:

Q.  Oh, yeah, Dream Watch.  So who did you talk to at Dream Watch?

A.  I spoke with the lawyer representing Dream Watch.

Q.  Okay.  And who at Dream Watch told you that they received a fake receipt?

A.  The attorney for Dream Watch confirmed that.

Q.  So that's double hearsay or triple.

     THE COURT:  Over -- sustained.  The objection's sustained.  She's not going to answer questions about what's hearsay and what's not.

     MR. DOMINGUEZ:  Okay.  I apologize.

BY MR. DOMINGUEZ:

Q.  So who did he find out from?

A.  She --

Q.  She, sorry.

A.  -- found out from her client.

Q.  Okay.  And -- so did you verify with the client that they in fact did receive it?

A.  No.  I verified with the attorney, not the client.

Q.  Okay.  And you're aware that this is a civil lawsuit.

A.   Yes, that's correct.

Q.   And who's the civil lawsuit against?

A.   Sean Kingston.

Q.   Right.  And was Ms. Turner included in that civil lawsuit?

A.   Her text messages are included in the exhibits within that civil complaint.

Q.   Well, but did they sue her?

A.   I believe it has listed Sean Kingston or Kisean Anderson and Does 1 through 20, so there were unnamed individuals that were also included in that civil complaint.

Q.   But they weren't sued.

A.   Sure.

Q.   Right?

A.   They're listed in that complaint.

Q.   Were they sued, do you know?

        MR. ANTON:  I'm going to object to any pending civil lawsuits that are ongoing.

        THE COURT:  Sustained.

BY MR. DOMINGUEZ:

Q.   Well, then -- well, you know that the matter's in controversy.  It's in a civil lawsuit.

        THE COURT:  Asked and answered.  She answered that, Mr. Dominguez.

BY MR. DOMINGUEZ:

Q.   And is Ms. Turner a defendant in that civil lawsuit, based

on your knowledge?

MR. ANTON:  Judge, again, objection.  Relevance.

THE COURT:  Overruled.  I'll let you do this one last time.  He asked it clearly.

Do you know, Agent?

THE WITNESS:  I do not.

*(Discussion had off the record between counsel and client)*

BY MR. DOMINGUEZ:

Q.  Okay.  Keisha Sewell?  What is that?

A.  So that was a receipt for $7,000 for reimbursement, because Keisha had paid Defendant Turner and Anderson $7,000.

Q.  For --

*(Discussion had off the record between counsel and client)*

BY MR. DOMINGUEZ:

Q.  She received a fake receipt?

A.  She did.

Q.  And did you review the receipt?

A.  I did.

Q.  Where was it from?

A.  Again, it was in the conversation.  Defendant Turner received it from the accountant and then subsequently sent it to Keisha Sewell.

Q.  What bank was that?

A.   I don't recall the exact bank.  I'd have to look at -- it's generally Bank of America or First Republic.  I don't recall in this instance if it was First Republic or Bank of America.

MR. ANTON:  Do you want me to pull it up?

MR. DOMINGUEZ:  Yes, please.

BY MR. DOMINGUEZ:

Q.   And this is First Republic again?

A.   Yes.

Q.   Okay.  And you determined from First Republic that this is fake?

A.   Again, the only ones that First Republic personally reviewed were the ones that were introduced during trial.  All the subsequent ones I compared to the template that First Republic had told me that that was incorrect.  So I personally reviewed these, but First Republic did not.

Q.   Right.  So we don't know.

A.   We do know.

Q.   First Republic would be the one to know.

A.   Again, based off of all the information, the text messages back and forth from the accountant, it's clear that this is also a fake receipt.

Q.   Right.  And what conversation -- show me the conversation where she asked for a fake receipt.

MR. ANTON:  Objection, Judge.  Asked and answered.

MR. DOMINGUEZ:  This is a different person.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(305)301-3276

THE COURT:  Yeah, that's overruled.  You can ask it, Mr. Dominguez.  Ask the question, again.

BY MR. DOMINGUEZ:

Q.  Show me the conversation where she asked for a fake receipt.

A.  She does not use those terms, "create a fake receipt."

Q.  Thank you.

MR. DOMINGUEZ:  Can we go to the next person?

BY MR. DOMINGUEZ:

Q.  Oh, by the way, sorry, they eventually got paid?

A.  Yes.

Q.  And how did they get paid?

A.  Via wire.

Q.  From where?

A.  Again, I don't recall the bank in that instance.

Q.  But it was a wire from the bank.

A.  Yes.

Q.  Have you seen that wire?

A.  No.

Q.  And how do you know it was a wire?

A.  The victim told me.

Q.  Okay.

*(Discussion had off the record between counsel and client)*

BY MR. DOMINGUEZ:

Q.  Gabriel Ramirez.  What is that for?

A.  This was for a car service in New York City.  He was driving Sean Kingston around.

Q.  Was he driving Ms. Turner as well?

A.  No.

Q.  Okay.  And he got a fake receipt, you said?

A.  Correct, for $3,944.25.

Q.  From where?

A.  Defendant Turner.

Q.  And what bank?

A.  Again, I -- there's so many of them here, you'd have to pull up each individual one for me to look.

Q.  And when you say "Defendant Turner," you're talking about the phone that's purported to belong to her.

A.  The phone that was seized from Defendant Turner during -- yes, during her arrest, yes.

Q.  You know if she has other phones as well.

A.  Correct.

Q.  And you know that this is a business phone that other people have access to.

A.  No, I don't have any evidence to support that claim.

Q.  But you don't know otherwise, is what I'm saying to you.

A.  Based off of all the text messages between other people on that phone, it was clear that Defendant Turner was the one who

was using the phone.

Q. It's clear that she was one of the persons using that phone, but you don't know.

A. I didn't find any evidence supporting that anybody else was using that phone.

Q. Well, what would the evidence be?

A. If there -- in text messages, you know, people calling her Janice, Mama Kingston. I didn't find anything else calling any other individual. It was always that name.

Q. Because the line is the Mama Kingston line.

A. No, I'm talking about when someone sends a text message to you, like, if I had texted you and said, you know, "Mr. Dominguez" or something like that, right, there's text messages saying, "Hey, Mama" or "Mama Kingston," indicating that she was the one using the phone.

Q. Right. Because that's what they refer to the business as --

THE COURT: That objection is sustained, Mr. Dominguez.

MR. DOMINGUEZ: That's fine. I'll move on, Judge. I'm spinning in circles here. I understand.

BY MR. DOMINGUEZ:

Q. So how did Gabriel get paid?

A. He -- in this instance, I'm not -- I don't recall exactly how he was paid, but he was made whole.

Q.  Okay.

        MR. DOMINGUEZ:  If we could just go to the next person.

BY MR. DOMINGUEZ:

Q.  Uriel Rosenblum?

A.  Yes.

Q.  What is that for?  Is that for luggage?

A.  It was for luxury bags, yes.

Q.  Right.  And they got a fake receipt as well.  Is that what your testimony is?

A.  Yes.

Q.  First Republic?

A.  Again, you'd have to pull it up.  There were some Bank of America, there were some First Republic.

Q.  It says "First Republic."  Did you verify with First Republic that it was fake?

A.  No.

Q.  Okay.  Did you find a conversation asking for a fake receipt?

A.  No.  Again, it was Defendant Turner sending the accountant wiring information and the amount.

Q.  Right.

A.  That should be on that receipt.

Q.  All right.  And then if we could go back and say -- how did this person eventually get paid?

A.   They returned -- they were able to recover their bags, so the bags were given back to them.

Q.   And who gave them back the bags?

A.   I don't recall.

Q.   Do you know if they even -- was it a store or -- where did they get this from?

A.   They got this from this individual.  I don't know if it was a store or if it just this individual was selling those bags.

Q.   Did you talk to this person?

A.   I did.

Q.   Uhm, did they say that they're a private person or are they a store or --

A.   No, I was it was a private individual.

Q.   Okay.  And he said he got this fake receipt, and he gave --

A.   He did, and he recovered the full amount.

Q.   Okay.

          MR. DOMINGUEZ:  If we could go to the next person.

BY MR. DOMINGUEZ:

Q.   Professional Audio -- Professional Audio Design?  What was that for?

A.   It was for audio equipment to be set up in one of the defendants' properties.

Q.   In Ms. Turner's property?

A.   Ms. Turner and Mr. Anderson, yes.

Q.   Which property was that?

A.   It was a property in Fort Lauderdale.

Q.   And Ms. Turner lived there?

A.   Yes.

Q.   What was the address?

A.   I don't recall the exact address.

Q.   Okay.  And who did this person deal with?

A.   Both Defendant Turner and Defendant Anderson.

Q.   Who purchased the equipment?

A.   Defendant Turner with a fake wire transfer receipt.

Q.   So she negotiated the purchase of this equipment?

A.   I don't know if she negotiated the purchase.  She was the one who sent the fake wire transfer receipt to the victim.

Q.   Did this person talk to or deal with Mr. Anderson?

A.   Yes.

Q.   Okay.  So they both went together to buy the equipment?

A.   So this individual came and installed this in the home.  I don't know -- your question as far as them meeting him, he came to their home.

Q.   Do you know who called him?

A.   I don't.

Q.   Did you ask?

A.   No.  I just asked him based off of circumstances, and he said he was dealing with both Defendant Turner and Defendant Anderson.

Q.   Right.  And he got a fake receipt.

A.   Correct.

Q.   And you determined from the bank that it was a fake receipt.

A.   No.   Again, this is my review of these records.

Q.   Okay.   And this person got paid.

A.   Yes.   They were made whole.

Q.   And how did they get paid?

A.   I don't recall.

Q.   You have no idea.

A.   I -- I don't know if it was via wire transfer or -- but he was eventually made whole.

THE COURT:   So at this point, Mr. Dominguez, the Court has given extremely wide latitude.   I note that for purposes of this sentencing, in the main, this dispute over loss amount goes to a single level, a single step on the loss table of two points.   So unless you think that you have cross that gets at -- to be very clear, the defense has conceded that the loss amount for guidelines purposes is $964,000.

MR. DOMINGUEZ:   Right.

THE COURT:   Which puts it at letter H.

MR. DOMINGUEZ:   Right.

THE COURT:   The government contends that it is above 1.5 million, which is letter I.   So at this point, given the voluminous testimony -- and it's fine, I wanted to make sure that you have full cross -- given the trial and given the

repetitive testimony, if you have other questions that go towards mitigation, you have the opportunity.  But I just want to make very clear, you know, what we're playing for in terms of the guidelines here, but you know your case better than me, sir.

MR. DOMINGUEZ:  Right.  No, Judge, then I'll proffer to the Court.  First of all, you hit the nail on the head regarding mitigation, which is, you know, part of the argument we're making, that most of these people were made whole.

THE COURT:  Yes, that's clear from the record, it's clear from your cross, it's clear from the answers of the agent consistently by both sides.  So I understand, and to put a very fine point on it --

MR. DOMINGUEZ:  Yeah.

THE COURT:  -- there are five vendors --

MR. DOMINGUEZ:  Yeah.

THE COURT:  -- or victims that were not made whole or to be determined entirely.

MR. DOMINGUEZ:  Right.

THE COURT:  The rest were either made entirely whole or partially made whole.

MR. DOMINGUEZ:  Right.

THE COURT:  And that's clear for the record.  There's no dispute on that.  So given that, any other questions you have for this witness regarding mitigation?

MR. DOMINGUEZ:  Judge, I would proffer that basically it's going to be the same testimony, that she never verified with the actual banks and such, and that there is no conversations between Ms. Kingston *(sic)* and this accountant asking for fake receipts at all.

THE COURT:  Well, there's the evidence that was submitted, which are the text messages and the inferences therefrom.

MR. DOMINGUEZ:  Right.

THE COURT:  But this witness has not testified at all that there was any other conversation between Ms. Turner and any accountant.  She hasn't testified to that today in any way.  So you have the text messages, they speak for themselves, and the inferences therefrom, and you're free to argue.  So I ask, again, if there's something about a vendor that we haven't done that you think especially goes towards mitigation, I want to make sure that you have the opportunity.

MR. DOMINGUEZ:  Right, right, right.

*(Discussion had off the record between counsel and client)*

MR. DOMINGUEZ:  I do have one question regarding --

*(Discussion had off the record between counsel and client)*

MR. DOMINGUEZ:  Scott King Gal *(sic)*, that's the last one, Judge.

COOK - CROSS/DOMINGUEZ

THE COURT:  Yes, sir.

MR. DOMINGUEZ:  I'll skip over all the others because they were made whole pretty much.

*(Discussion had off the record between counsel and client)*

MR. DOMINGUEZ:  See, the problem is that some of these people -- she doesn't even know who these people are.

THE COURT:  Sir, sir, you're asking questions of a witness based on evidence --

MR. DOMINGUEZ:  No, no, I'm asking -- I mean I'm saying my client doesn't even know.

THE COURT:  You can proffer whatever you wish in argument.  I want to make sure that we use the witness's time efficiently.

MR. DOMINGUEZ:  I under -- I just want to get --

*(Discussion had off the record between counsel and client)*

BY MR. DOMINGUEZ:

Q.  Menard Home Group, what is that?

A.  Menard Home Group, so that was a real estate group.

Q.  And what was that for?

A.  That was for the commission for a property that the defendants rented.

Q.  Who rented the property?

A.  Defendant Turner and Defendant Anderson.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(305)301-3276

Q. Her name is on the lease or she signed it or --

A. I don't have a copy of the lease.

Q. Did you see it?  Do you know -- I mean why do you say that Turner is on the lease?

A. I didn't say she was on the lease.

Q. Okay.  So who was actually -- who actually rented this property?

A. In speaking with the victim, it was Defendant Turner and Defendant Anderson.

Q. Okay.  And this is the commission.

A. Correct.

Q. That she was supposed to get for --

        *(Discussion had off the record between counsel and client)*

BY MR. DOMINGUEZ:

Q. -- a rental.

A. Yes.

Q. And where was this rental?

A. Fort Lauderdale.

Q. Were they renting or were they the owners of the property?

A. They were not the owners of the property.

        MR. ANTON:  Again, objection to relevance.

        THE COURT:  Sustained.

        MR. DOMINGUEZ:  Judge, if I may proffer, commissions are not paid by the renters.

COOK - CROSS/DOMINGUEZ

THE COURT:  No.  Mr. Dominguez, again, you have a witness --

MR. DOMINGUEZ:  I understand.

THE COURT:  -- you're going to ask relevant questions that go towards sentencing issues.  Whether they rent, whether they own ain't one of them.

MR. DOMINGUEZ:  Okay.  If we can go, I guess, to the last one, which is the last line, this Scott Gail or Gal Evans *(sic)*.

BY MR. DOMINGUEZ:

Q.  That's the -- the one that was 404(b) evidence, correct, that was outside the time period?

A.  Correct.  It was outside the charged conduct.

Q.  And this is -- you said that Ms. Turner is -- what was her involvement in this?

A.  So she -- again, these are the text messages directly referencing the making of that fake wire receipt.

Q.  Right.

A.  So it was her involvement in creating -- or in procuring that fake receipt.

Q.  What was the fake receipt?

A.  For Mr. Anderson.

MR. DOMINGUEZ:  Do we have the fake receipt there?

MR. ANTON:  Sure.

A.  For this fake receipt?  No.

Q.  No?

A.  No.  This one, the text messages between -- it was actually a WhatsApp chat.  This one was from Defendant Anderson, was the one who had sent this receipt.  So it was not on Defendant Turner's phone.

Q.  Right.  So you search her phone.

A.  Correct.

Q.  You did not find her sending this receipt.

A.  Not this one, no.  This one was for Mr. Anderson.

Q.  Right.  And this is the one where she's telling him, "Please don't do this," and he's begging her, "Please, please," you know, whatever, we saw the whole texting.

A.  No, she helped procure that fake receipt.

Q.  But she didn't send the fake receipt.

A.  No.  She helped procure the fake receipt.

Q.  How?

A.  If you look at the text messages, she says:  "Accountant's going to send screenshot and send to him" -- and "him" being the victim -- "accountant emailed new wire receipt screenshot and send to him."  Those are in those -- if you look at the text messages between her and Sean Kingston.

Q.  I did look at the text messages.  That doesn't mean that she's the one that had them generated.

THE COURT:  Mr. Dominguez.

MR. DOMINGUEZ:  Okay.  I understand.  We'll move on.

COOK - CROSS/DOMINGUEZ

BY MR. DOMINGUEZ:

Q.  So that's the one where we're talking about.  And that in fact came from Mr. Kingston's phone, not her phone.

A.  Correct.

Q.  Okay.  Thank you.

*(Discussion had off the record between counsel and client)*

BY MR. DOMINGUEZ:

Q.  This person made a police report, correct?

A.  Correct.

Q.  And that was still pending in California?

A.  Yes.  There were actually arrest warrants issued off of that case for both Defendant Turner and Defendant Anderson.

Q.  Are they pending still?

A.  Yes.

Q.  For Ms. Turner and Mr. Anderson.

A.  Correct, for grand theft for both of them.

Q.  And when were those issued?

A.  They were issued -- I believe it was July 26th, 2024.  It was after they were indicted on the federal charges.

Q.  And did you have anything to do with that?

A.  I did not.

Q.  Okay.  So after they were indicted in this case, they were charged with this offense in California.

A.  Correct.  However, the police report was made in January of

2023.

Q.  So this person reported this two years after?

A.  Correct.  If you look at the text messages between Defendant Turner and the victim, there's conversation that ensues for many months, even a year, of him asking for either the merchandise back or for him asking for payment back.  And that is included in those folders there.

THE COURT:  Mr. Dominguez, we are getting to the phase of blood and turnips.

MR. DOMINGUEZ:  Okay.

THE COURT:  One you cannot get from the other.

MR. DOMINGUEZ:  Okay.  I have no further questions, Judge, for this.

THE COURT:  Okay.  Mr. Anton, I know the redirect is going to be brief, but I want to give you the opportunity to redirect.

MR. ANTON:  Yes, Judge.  Thank you.  It will be very brief.

**REDIRECT EXAMINATION**

BY MR. ANTON:

Q.  So, Agent, I just want to confirm with you, the victims who you put in column A, you said they all received "fake receipts."  Did you have the opportunity to review the receipts that the defendant sent to these victims?

A.  Yes, all the ones that the defendant -- Defendant Turner

sent, yes.

Q. Okay. And at trial, you were qualified as an expert based upon your training and experience as an agent with the United States Secret Service responsible for the integrity of the U.S. banking system?

A. Correct.

Q. And did you review all of the receipts that the defendant sent to the victims you identified on this particular spreadsheet?

A. Yes. I reviewed every single one of those receipts individually.

Q. And how are you, independent of the bank, able to determine that these were in fact fake receipts?

A. Based off of the information that was purported on there, there were incorrect -- again, incorrect formatting, incorrect codes that were on there that shouldn't be on domestic wire transfers, and that was consistently seen throughout the receipts.

Q. And that's why they didn't work for payment, right?

A. Correct. Because they were fake.

Q. Right. And that's why victims then had to go back and forth with all these defendants time and time again to either get real payment from a legitimate bank or have their items repossessed or have the defendants arrested for theft.

A. Correct.

Q.   Okay.   So the only items that you put on your spreadsheet are the fake receipts, right?

A.   Yes.

Q.   And that's why there's a difference between an intended loss, which is the value of the fake receipt, versus the restitution owed.

A.   Yes.

Q.   Because some victims got their money back or were ultimately paid.

A.   Yes.

Q.   After the fake receipt didn't work because it was fake.

A.   Yes.

        MR. ANTON:   Nothing further, Judge.

        THE COURT:   Mr. Dominguez, any cross as to that redirect?

**RECROSS-EXAMINATION**

BY MR. DOMINGUEZ:

Q.   None of these receipts were verified with the bank.

A.   Correct.

        MR. DOMINGUEZ:   Thank you.   No further questions.

        THE COURT:   Okay.   You can step down, Agent.   Thank you.

        *(Witness excused)*

        THE COURT:   Let's do it this way.   I want to make sure that each side gets a full chance to present and allocute to

the Court.  We'll go until -- we'll go for about another ten minutes, and I'm going to resolve what I can resolve, and then we'll come back after the lunch break.  The evidentiary portion took longer than the Court anticipated, which is fine.  I wanted to make sure that both sides got their fair shot on this record.  But for now, let me continue with the sentencing hearing, but we'll take a break in about ten minutes.

I've reviewed the indictment.  I've reviewed the final PSR and all addenda.  I, of course, presided over all pretrial motions and the trial.  I've reviewed the attorney objections at Docket Entry 126, the government responses and objections at Docket Entries 127 and 142.  I reviewed Mr. Dominguez's responses to the government objections at Docket Entry 136, his sealed motion for downward departure at 133.  I've reviewed the sentencing memorandum at Docket Entry 141, the letters submitted in support of the defendant at Docket Entry 138.  I've also reviewed specific portions of the trial transcript prior to this sentencing hearing.  One of those portions was docketed at ECF 129.

That's what I've reviewed.

Mr. Dominguez, sir, is there anything else that I should review prior to sentencing?

MR. DOMINGUEZ:  There's one matter that I wanted to submit, but that would be done under seal later on.  But you wouldn't have reviewed it yet, no, of course not.

THE COURT:  Do you want to hand it up right now?  What is it that hasn't -- that you haven't submitted already?

MR. DOMINGUEZ:  Yeah, and it's the -- you'll understand why, but I'd like to address it under --

THE COURT:  Why don't you hand it up?

MR. DOMINGUEZ:  Sure.

THE COURT:  If you want me to submit it under -- if you want to submit it under seal, I would read it anyway.  Is it because of medical information?

MR. DOMINGUEZ:  It has some in there as well, but --

THE COURT:  Because the sealed motion for downward departure had some of that too, which is why --

MR. DOMINGUEZ:  Yeah, of course.

THE COURT:  -- I reviewed it under seal.

MR. DOMINGUEZ:  Yes, Judge, of course.

THE COURT:  So this is a new development, a new document.

MR. DOMINGUEZ:  And I didn't mean to sandbag the Court at all, but once you see it, you'll understand why I hadn't, and I want it under seal.

THE COURT:  You can hand it up.  Hand it to Ms. Shotwell.  It doesn't look long.

MR. DOMINGUEZ:  No, it's not, Judge.

MR. ANTON:  And, Judge, while that's being passed up, I noticed that you mentioned sealed Docket Entry Number 133, a

motion for downward variance.  I just wanted to state for the record, I haven't seen that motion.  It's highly odd that a motion for downward variance that's going to be offered to the Court hasn't been shown to the prosecution to respond.  But I don't know what's in it, so I don't know what they're arguing about, but --

THE COURT:  I didn't know that you hadn't seen it.

MR. ANTON:  I can't address it if I haven't seen it.

THE COURT:  I didn't know that you hadn't seen it.

You should show it to the prosecutor.

MR. DOMINGUEZ:  Of course.

THE COURT:  Except for there was medical information that was appended to that, which is why --

MR. DOMINGUEZ:  It's an actual record.

THE COURT:  Yes, there's actual medical records.  Don't show him the medical records.  But it's a downward variance/departure motion based on medical history and age; that's the summary of what it is.

You should -- over the break, since we're going to have a break, you should show him those portions which are not the medical records that you can at least verify with the Court.

But you're not going to see her medical records.  It's -- and, by the way, there's nothing in the medical records that are so explosive or determinative, but I'm going to let

Mr. Dominguez share the parts that are clearly to be shared with the government.  And if you believe, after reviewing those, that you need to see the underlying records, you'll let me know after the break.  Okay?

Let me just review this new document that's been handed up.

*(Pause)*

THE COURT:  No.  Mr. Dominguez --

MR. DOMINGUEZ:  Yes.

THE COURT:  -- I've reviewed this.  What's your basis for sealing this?  What in the world would be a basis for sealing this?

MR. DOMINGUEZ:  Well, it would only be until the codefendant gets sentenced.  I would ask just for a -- that it be withheld until then.

THE COURT:  No.  This is a letter submitted by the codefendant in support of his mother.

MR. DOMINGUEZ:  Yeah.

THE COURT:  There's -- I'm going to give you one last chance, because I take very seriously what you say to me, Mr. Dominguez.

MR. DOMINGUEZ:  Sure.

THE COURT:  And I want to give you every opportunity.

MR. DOMINGUEZ:  Sure.

THE COURT:  What is your basis for sealing this

letter, which is -- I'm going to describe it as a heartfelt letter to the Court about his feelings for his mother.  What's the basis for sealing that?

MR. DOMINGUEZ:  Judge, it's just -- in normal cases, I wouldn't do it.  But in this case, there's a tremendous amount of media.  They're sitting here in the courtroom, in fact, you know.  And it's something that I just -- as deference to his lawyer and him, I said that I would ask that it be sealed until his sentencing.  You know, I didn't want to step on anybody's parade, and I didn't want it in the media before he's sentenced.

THE COURT:  No, no, that motion is denied.

Now, if what you're saying to me is that you would not offer it at sentencing at all if it is not sealed?

MR. DOMINGUEZ:  Right.

THE COURT:  You want to withdraw it?

MR. DOMINGUEZ:  Let me discuss it with my client during the break.

THE COURT:  You can discuss it with her at the break and you'll decide.

MR. DOMINGUEZ:  Of course, of course.

THE COURT:  But this is going to be in the sunshine or it's not going to be considered.  There are exceptions under statutes for things like personal, medical, or victim information --

MR. DOMINGUEZ:  Yeah.

THE COURT:  -- that I will always hear from both sides.  But we'll take this up after the break.

MR. DOMINGUEZ:  Sure.

THE COURT:  But I am deeply skeptical, and you need to point to authority to seal it.  It's not appropriate to submit letters that are not -- in the publicity of this case, this -- the public has seen a lot in this case.  This letter that you're handing up to be filed under seal, there's nothing --

MR. DOMINGUEZ:  Okay.

THE COURT:  -- in terms of the -- you know, any concern of embarrassment or sensationalism.  This would not come close to what has been paraded through the trial about both defendants in this case.  So I will hear from you, Mr. Dominguez, because you're an officer of the Court --

MR. DOMINGUEZ:  Sure.

THE COURT:  -- if you want to make a renewed motion to seal.  But you have the tilt based on my review of the document, and it's not appropriate, it's not fair to the public, it's not fair to the Court, and it's not fair to the government to do things in the dark, unless there's a clear basis to overcome the common-law right of access.

So with that, I look forward to continuing the sentencing after the lunch break.  I'll see everybody at two o'clock.  Okay?

MR. DOMINGUEZ:  Thank you, Judge.

THE COURT:  Thank you very much.  Thanks to the government.

ROOM CLERK:  All rise.

*(The Judge exited the courtroom)*

*(Proceedings concluded at 11:58 a.m.)*

- - - - -

**WEDNESDAY, JULY 23, 2025, 2:01 P.M.**

*(The Judge is on the bench)*

*(The defendant entered the courtroom)*

THE COURT:  You ready, T?

ROOM CLERK:  Yes.

THE COURT:  Counsel, ready?

MR. DOMINGUEZ:  I need like two minutes.

THE COURT:  Okay.

MR. DOMINGUEZ:  I have to undo everything, Judge.

*(Pause)*

ROOM CLERK:  Recalling the matter of the United States vs. Janice Eleanor Turner, Case Number 24-Criminal-60126.

Counsel, please reannounce your appearances for the record, beginning with the government.

MR. ANTON:  Good afternoon again, Your Honor.  Marc Anton and Trevor Jones on behalf of the United States.

THE COURT:  Good afternoon.

MR. DOMINGUEZ:  Good afternoon, Your Honor.  Humberto Dominguez on behalf of Janice Turner, who's present.

THE COURT:  Good afternoon, Ms. Turner.

THE DEFENDANT:  Good afternoon.

THE COURT:  Good afternoon, Mr. Dominguez.

Okay.  So let's deal with the two documents that were being discussed towards the end.

First, Docket Entry 133, defendant's sealed motion for downward departure.

Mr. Dominguez, have you provided the copy minus the medical report to the government?

MR. DOMINGUEZ:  *(No response)*

THE COURT:  Mr. Dominguez?

MR. DOMINGUEZ:  I handed it to you.

MR. ANTON:  Yes.  He's asking you, though.

THE COURT:  Yes.

MR. DOMINGUEZ:  Oh, I did, Judge.  I'm sorry.  I thought you were asking --

THE COURT:  It's okay.

You have it?

MR. ANTON:  Yes, Judge.  He just provided it.

THE COURT:  All right.  Any objection to the medical portion being sealed and, therefore, the document being sealed, because the government has a copy of everything but the medical record?

MR. ANTON:  No objection at this point, Judge.

THE COURT:  Okay.  Thank you very much.

Now, with respect to this letter.  Mr. Dominguez, basis for sealing?

MR. DOMINGUEZ:  Judge, we'll go ahead and have the Court admit it in the record and put it on the record.

THE COURT:  Okay.  So it will be known for purposes of

this proceeding as Court Exhibit 1 for purposes of the sentencing proceeding.

*(Court Exhibit Number 1 marked for identification)*

THE COURT:  Have you provided a copy of it to counsel? Or is this the only copy?

MR. DOMINGUEZ:  This is the only copy.  I didn't want it floating around.

THE COURT:  No problem.  What I'm going to do is -- it -- I'm going to describe it.  It's going to be made public. It's a Court -- it's Court Exhibit 1.  It's a letter to me from Mr. Anderson asking for compassion and understanding with respect to the sentencing of his mother.  I'm going to have Ms. Shotwell hand it to one of my trusty interns, and they can go make some copies so that the government will have it, a copy will be returned to Mr. Dominguez, and it's going to be docketed, and it will be public.

*(Court Exhibit Number 1 admitted into evidence)*

MR. DOMINGUEZ:  Do you want me to file it or will the Court file it, because this is a Court exhibit?

THE COURT:  We'll take care of it.

MR. DOMINGUEZ:  Great.  Thank you, Your Honor. Appreciate that.

THE COURT:  Yeah.  If you can make those copies -- too sweet -- and just bring them back.  Thank you very much.

While that's happening -- that takes care of the

documents.  Mr. Dominguez, now, you've heard everything that I've reviewed, including that letter that will soon be made public.  Is there anything else that I should review, sir?

MR. DOMINGUEZ:  That's it, right?  Nothing to review?

*(Discussion had off the record between counsel and client)*

MR. DOMINGUEZ:  We have nothing further, Judge, after conferring with Ms. Turner.

THE COURT:  Of course.  Have you reviewed all of those documents that I named before the break with your client prior to sentencing?

MR. DOMINGUEZ:  Yes, Judge, absolutely.

THE COURT:  Okay.  Thank you very much.

Now, let me resolve the objections that remain in the PSR.

First, the first big heading of objections is loss amount, number of victims, which affects the offense level.  To set the table, Mr. Dominguez says that for purposes of this sentencing, there are four victims, a $964,000 loss, and therefore an offense level of 21, because there's a base level of 7, and there's an enhancement based on the loss table in 2B1.1(b)(1)(H) of 14 levels, which is for loss of more than $550,000.  The government argues that the loss amount exceeds $3 million, and so, therefore, there should be a 16-level enhancement, not a 14-level enhancement.

Mr. Anton, I'll hear from you, sir.

MR. ANTON:  Judge, in the instant case, quite honestly, all of the objections can be resolved with Your Honor making a determination of what is and what is not relevant conduct.

Relevant conduct in the Eleventh Circuit -- and, quite honestly, it's pretty uniform across all of federal law -- states that the Court broadly interprets the provisions of relevant conduct.  And that's *United States vs. Behr*, 93 F.3d 764, Eleventh Circuit, 1996.  Under 1B1.3 of the sentencing guidelines, relevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant," as well as all reasonably foreseeable acts and omissions of others in furtherance of jointly undertaken criminal activity that were part of the same course of conduct or common scheme or plan as the offense of conviction.

Conduct which was not charged in the indictment may also form the basis for relevant conduct calculations.  And that's *United States vs. Ignancio Munio*, 909 F.2d 436, Eleventh Circuit, 1990.  Additionally, conduct that was not identified in the indictment, that was not found by the jury, and that was not admitted by the defendant may also be considered as relevant conduct as long as the conduct is proven beyond -- I'm sorry -- conduct is proven by a preponderance of the evidence

at sentencing.  And that's *United States vs. Ghertler*, 605 F.3d 1256, also Eleventh Circuit, 2010.

What Agent Cook testified to is a course of conduct -- a course of fraudulent conduct that began as early as November 4th of 2021.  Your Honor specifically admitted the Scott Gal *(sic)* Evans and Kings Life Group transactions because that's the earliest that this scheme was hatched.  This is when the defendant and codefendant hatched a scheme knowingly to provide false and fake wire receipts to victims for the purchase of goods, services, jewelry, cars, whatever the defendants wanted.  And that began as early November 4th of 2021.

From that date forward, Defendant Turner provided and essentially flooded the market with fake wire receipts as payment for whatever either she or her codefendant wanted to purchase, regardless of whether or not they could pay for it. And the testimony was clear both at trial and here at the sentencing hearing that each time a victim wanted payment, there was usually a dispute over how quickly the payment would be received, and as part of that dispute and text threads between the defendant, Janice Turner, and victim sellers, they would ask for payment.  And each time, the victim sellers would provide Defendant Janice Turner with the proper payment information.  Each time, when they didn't have enough money to pay, they would -- "they" meaning Janice Turner and Kisean

Anderson -- would seek the assistance of what the defense is calling the accountant, who's not really necessarily an accountant, just essentially an unnamed and unindicted coconspirator, who would provide fake wire receipts back to Defendant Turner, at her request, in the amount that she requested, to the payee that she requested, for specific items. We have those text messages.  Your Honor has seen those text messages between Defendant Janice Turner and the individual who was procuring and preparing those fake documents.  Once they were sent back to Defendant Turner, again and again and again, Defendant Turner would provide them as proof of payment to the vendor, and would in fact get belligerent at times, indicating that "I've made payment, here's the receipt," again and again and again.

Now, some victims wised up and would not release certain items until they actually had monies that hit their own bank account.  Others believed the lies that Defendant Turner was spreading and on trust would release property.  But at the end of the day, each time Defendant Turner sent these wire receipts to these individuals, she was portraying them as payment.

That's why the intended loss in this case is accurately set at $3.125 million.

THE COURT:  And it's intended loss because of cases like *United States vs. Horn*, correct?

MR. ANTON:  That is correct, Judge.  Because each time they intended to -- or purported that these fake wire receipts were payment, it was their intent that they were going to use these receipts to get away with the purchase of the items in the amounts listed in that particular spreadsheet totalling $3.12 million.  Now, that number is different, and we can see that it's different, than an actual loss number or a restitution number.  And that number is different because in each particular case, some victims were wise to the scheme.  Some victims weren't necessarily wise to the scheme but were defrauded but sought the assistance of law enforcement.  Others, once they were defrauded, sought the assistance of civil attorneys and had to sue to get their property back.  Other times there was actual payment.

But in each case, at the initial stage of the purchase, the defendant portrayed these wire receipts as legitimate, with full knowledge, as the evidence has shown, that they were fake.  She knew they were fake, she admitted they were fake ultimately on the stand, she stipulated that they were fake in trial.  So I'm not really sure why the cross-examination went on and on and on about whether or not these were in fact fake receipts, because she admitted they were ultimately fake receipts.  At one point during her testimony, she even stated they were sent to buy some time.  They weren't really sent to buy some time; they were sent so

she could convince these unsuspecting victims that they had been paid and property could be released, and then once it was in the defendants' hands, they often wouldn't pay unless law enforcement was involved.

But nonetheless, Judge, the case law is very clear that because this was the same scheme over and over and over again, that happened as early as November 4th of 2021, that these victims should all be counted as relevant conduct. That's why the government believes there are 21 victims. That's why the government believes they're an intended fraud loss of $3.125 million. And that's why, also, the government believes that the applicable time period has been satisfied for the total offense level and the prior conviction needing to be within 15 years. Because once Your Honor makes the determination, which we believe you will, that this was in fact relevant conduct, and it dates back to as early as November 4th of 2021, the guidelines are extremely clear.

If Your Honor looks at Application Note 8 to 4A1.2 --

THE COURT:  We'll get to that in the second.  Let's not do the prior conviction yet.  Let's just do loss and victims.  And I think you've made a very good record on that, Mr. Anton.

Mr. Dominguez, on loss and on victims, you have the podium, sir.

MR. DOMINGUEZ:  Thank you, Judge.

Well, as it relates to loss in this case, as the cross-examination showed, yes, she admitted to a variety of documents that were fraudulent on the stand truthfully; she testified truthfully as to all those matters. But we also know from the evidence, and they omit, is the fact that there were many other receipts which were in fact real and were in fact received by people. So -- and that's my point of making the record, because in all these cases, the agent at no time checked with -- the veracity of those receipts with the banks. It's basically saying, trust me, I know better than anybody, even though she really doesn't even know how these receipts were generated, if they were just a cut and paste of an original receipt made to look similar, but when in fact it wasn't an original. So we don't know that. So that's lacking in the record.

Despite the fact that -- and, yeah, we -- that's why I admit to those other witnesses -- or, rather, other witnesses/victims that testified here as to that other loss amount, because she testified to the fact that those in fact were fakes. But we also know that from the bank records which they put in evidence, uhm, consistently 700,000, 600,000, $800,000 a month would come in, and they would go out. And now -- and they were going out to make payments. They weren't going out to anything other than that. And you saw that. And that's in evidence in the trial.

So I think from the record -- and I know Mr. Anton made a very good record -- my argument is that this record is not complete as it -- when it comes to proving up the relevant conduct as it relates to the additional alleged victims in this case.

And as I pointed out in my objection as well, the other one was the 404(b) evidence, which I believe was completely disconnected from this case, or the offense conduct in this case.  In fact, in that case, the receipt was not even sent by Ms. Turner as testified to by the agent.  It was him asking her to do it, and her saying, "Look, don't do it," and begging and pleading with him pretty much not to do it.  And, uhm, and that she didn't want to.  And that's in evidence, they brought that in.

But nonetheless, in that case, that receipt ultimately was forwarded by Mr. Kingston himself.  So I believe that the record here, as it relates to the loss amount being requested by the government, is incomplete.

I agree with the case law.  And as crazy as I think that guideline is regarding intended loss, and as unfair as it is, that, yeah, it is, it is what it is.  But that's why I went in detail through it as well, because I think there's very significant mitigation when it comes to that.  Because at the end of the day -- and the guidelines do not, do not account for the difference between somebody who actually gets something and

actually who doesn't.

THE COURT:  Well, on 3553(a) --

MR. DOMINGUEZ:  Yeah.

THE COURT:  -- you'll have a chance to address that at the very end.  But for purposes of the guidelines --

MR. DOMINGUEZ:  Yeah.

THE COURT:  -- sir, is there anything else you wish to apprize the Court of?

MR. DOMINGUEZ:  I -- well --

THE COURT:  On loss and victims.  We're going to do the others.  I just want to do it one at a time on loss and victim enhancement.

MR. DOMINGUEZ:  I don't believe the rental property was a valid victim in this case.  It was a late payment made. It was -- they had been living there forever.  It was an extraordinary situation.  And that case, it truly was outside anything that they were doing here.

The other thing I really object to, and I ask the Court to look at carefully, is that Mr. Anton keeps saying "she."  Judge, there is nothing that Ms. Turner got out of this other than trouble.  None of these watches were for her, none of these things were for her, none of this.  So there was actually nothing in it for her, except that, yeah, she made a huge mistake of helping out her son.

THE COURT:  Again, that to me is -- that sounds in

3553(a), but for purposes of the guidelines --

MR. DOMINGUEZ:  Right.

THE COURT:  -- what we're talking about right now and giving you a chance on --

MR. DOMINGUEZ:  Right.

THE COURT:  -- is loss amount and victims.

MR. DOMINGUEZ:  Right.  And I think that the other thing the Court should look at closely is that their bank representations regarding the -- that the receipts were utilized at the point of initial purchase.  You heard in testimony that's not true.  In fact, most of the ones that testified here, they were used later on, not at the point of initial purchase.  So the other ones that are -- they're basically getting the merchandise and then expecting payment later I think shouldn't be counted as well.  So I appreciate the Court's time.

THE COURT:  We'll do the others.  Thank you, Mr. Dominguez, on this.

So on this, I'm going to find that the 2B1.1(b)(1)(I) enhancement, the one the government argues for, the 16-point enhancement, applies of intended loss of more than 1.5 million. I think Mr. Dominguez rightly points out that there are differences in interactions with the various vendors.  It is simply different to go to a landlord and send a fake wire receipt.  That's not right.  In fact, it probably under the law

is enough for fraudulent intent. But it is different when, as the facts came out at sentencing, that it's a landlord, that the lateness of the payment is far different than what Ocean Auto dealt with.

But the government wins on this argument primarily because of the law, because of cases like *Horn*. It is intended loss, and the government only needs the Court to find by a preponderance of the evidence that in this chart, four of them are conceded by the defense, because they have to, because of the jury verdict and because Mr. Dominguez is a credible officer of the Court.

So the government only needs the evidence to show that of all of these, that approximately $600,000 of intended loss is proved by a preponderance of the evidence. As one example of that, the Dream Watch transactions alone, proven by only a preponderance of the evidence, gets the government to its enhancement. It has more than done that.

I want to state for the record that I have sat through the trial and the sentencing hearing. I completely credit Agent Cook. I don't have to completely credit her, but I do. She testified credibly. I saw her demeanor. She conceded things that she did not know. And to credit this witness at this sentencing for purposes of 1B1.3, intended loss under *Horn*, and the modus operandi of those text messages of conforming to the trial evidence.

For all of those reasons, the Court does not have to find the government's intended loss figure of $3.1 million. And, in fact, the guidelines specifically say that an approximation is all that is necessary, and that to a dollar the Court doesn't have to find a loss figure. And I don't. Because there are some small dollar transactions that Mr. Dominguez, for example, pointed out in cross-examination that are different, they are different than the trial evidence. But as a good example, on the watch transactions of over $916,000 and the testimony of Agent Cook at sentencing, that's more than enough. And it is the Court's finding that just on those transactions, what is in the record is not touched by the cross-examination and is more than a preponderance because of the exhibits that the Court has reviewed from the trial, as well as sat here through the sentencing hearing.

So for all those reasons, I'm going to apply an intended loss amount of greater than $1.5 million. In fact, if you did the math, it would exceed $2 million easily of intended loss, but I need not do that for purposes of the guidelines.

So you have your record, Mr. Dominguez.

With respect to victims, the Court does the same. I credit the agent. It is more than ten victims. And so that -- for purposes of the guidelines, that enhancement will be applied as well, and Mr. Dominguez has his record.

Let me finally say that all of this is for purposes of

the guidelines.  Mr. Dominguez has the arguments that he still needs to make and will be given the chance to make under 3553.

Okay.  That's the biggest heading of objections that the Court has ruled upon.  Now let's move to obstruction, 3C1.1.

Mr. Jones.

MR. JONES:  Yes, Your Honor.  I'm not going to overbake this.  The law is well settled that obstruction can include perjury during trial.  What is perjury?  We have the statement made under oath that is false and is material and given with the willful intent to provide false testimony and not a result of mistake, confusion, or faulty memory.

In a fraud case, one of the major elements is intent to defraud.  It's in the brain.  And that's a fact.  It's a fact at issue.  Ms. Turner came on the stand, as Your Honor even referenced after the trial, and told the jury she had no intent to defraud in this case, notwithstanding all the evidence showing the false records, the repeated behavior of sending this over and over and over again to defraud the victims, and with that, she perjured herself over and over again in this case.

Again, I'm just going to rest on that.

THE COURT:  Thank you, Mr. Jones.  It's nice to see that at least one of the two of you were taught that you stand when you make arguments.  I'm sure that there's a problem with

Mr. Anton's leg.  But I won't hold it against him.

Thank you, Mr. Jones.

Mr. Dominguez, sir, on obstruction.

MR. DOMINGUEZ:  Judge, I seriously disagree.  At no time did she say, "I didn't have the intent to defraud."  On the contrary, she admitted to the fraudulent documents.  The key of her testimony was, and it is ample from the evidence, is they sought delay, she sought delay for her son to get his payments in and to go ahead and make good on it.  And you could see over and over again they made good on the payments eventually when the money came in.

You know, they're very public figures.  They can't hide under a rock and not make these payments.  They're going ultimately be found, they're going to ultimately have to make the payments.  I know -- they're basically saying that I was suborning perjury, which is not the case at all.

THE COURT:  They're not saying that at all, sir.  I want to be very clear.  It was obvious to the Court that before she testified --

MR. DOMINGUEZ:  Yeah.

THE COURT:  -- you asked for extra time --

MR. DOMINGUEZ:  Yes.

THE COURT:  -- to speak to your client.  They are not suggesting at all that you suborned anything, and they wouldn't do that.  Mr. Jones is way too classy to ever suggest that

without evidence.  And I want to make very clear, you did no such thing.  The defendant made choices to testify after being counseled, and she testified for a long time on direct and cross.

MR. DOMINGUEZ:  Right.

THE COURT:  So I just want this record to be unmistakably clear.

MR. DOMINGUEZ:  Right.

THE COURT:  Mr. Dominguez did nothing wrong.  And the statements of the defendant at trial are hers --

MR. DOMINGUEZ:  Okay.

THE COURT:  -- and not yours, sir.

MR. DOMINGUEZ:  I understand that, Judge, and I appreciate the Court's clarifying that part.  But I -- you know, we took great lengths to take the stand and say, "Listen, yes, I sent these fakes."  She basically admitted to sending those fakes and testified to the fact that she's really covering for her son, trying to make delayed payments just at -- you know, you can see it over and over and over again.

And I believe, honestly, that, you know, they're splitting hairs regarding whether or not she admitted it.  And as I pointed out, four times, four times in his closing argument, Mr. Anton referred to her testimony as saying that she had admitted it.  And I pointed it out in my response to their objection.

And I don't -- I mean I know the Court read it, so I don't need to point out those four specific events. But if you get up as an officer of the Court and say that she admitted it four times and basically gave your case in your hand and now you're saying, "Oh, but she lied." So I don't think you can have it both ways, Judge. In fairness, I really don't think that would be a fair call to make.

THE COURT: Thank you, Mr. Dominguez.

I'm going to apply the enhancement under 3C1.1, the two points. I'm going to do so for much of the reasons that I stated after trial.

First of all, I completely agree with Mr. Jones and his statement of the law. The incongruity of the testimony on the -- I'm going to put it in quotes -- the "just buying time" defense was flatly rejected by the jury. It had to be. And Mr. Jones is right, there's plenty of case law in the Eleventh Circuit that that alone would justify application of the enhancement.

But I don't have to just rely on that, and I don't. There were multiple moments during the testimony on cross, separate and apart from the "just buying time" defense, which itself at parts was not credible and, as I stated, could satisfy an obstruction enhancement. That is not the reason why I'm applying the enhancement. There were multiple moments of the cross, including pages 59 to 62, 68 to 71, 72 to 75, 82 to

84, 85 to 86, and 88 to 89 -- that's of the trial transcript of the cross-examination, Docket Entry 129 -- where there were smaller things that she said at first either on direct or earlier in the cross that Mr. Anton brought out that she could not, when brought out, refute and had to concede.  I won't go through them all.  But Mr. Dominguez is doing his level best with a really clear case of obstruction.  She was ten feet away from me.  I made the point at the time that I remanded her.  And I even stated, one can understand the motive in the context of a joint trial for why she did it, because it created a kind of defense in her mind that would never have been present without those lies.

So for all those reasons, and for what is patent on the record, I'm going to apply the enhancement.

That takes us to the last big heading.  And, of course, I will deal with anything that counsel wants to take up after this.  But the last big heading is the criminal history category and the prior conviction.

Mr. Dominguez, in his papers basically says -- he doesn't basically say it, he says it, he says it very well -- that at paragraph 60 of the PSR, that the three points awarded for guidelines purposes because of the 2005 conviction for bank fraud before, just down the hallway, Judge Dimitrouleas, and the sentence that was imposed in 2006 should not count because of her date of release from custody in comparison to the

15 years which the government now wants to argue, the conduct starts in 2021, in November of 2021.

So to be very clear, in paragraph 60, Defendant Turner is released from custody March of 2007.  So even though the superseding indictment charges conduct beginning on or about April 11th, 2023, the government's view is, as stated in parts of the guidelines, that because relevant conduct goes back as far as November of 2021, that conviction and sentence should count for guideline purposes, give her three points, and therefore put her in criminal history category Roman Numeral II.

Mr. Dominguez, in sum -- and he'll get his chance to clarify -- says, no, says she was released, and she was released in March of 2007, and the conduct starts in April of 2023, as charged in the indictment.  And so, therefore, it's out.

Mr. Anton, I'll hear from you, sir.

MR. ANTON:  Judge, the guidelines are very clear.  As the commentary of 4A1.2 Application Note 8 states, applicable time period:  "Section 4A1.2(d)(2) and (e) establishes the time period within which prior sentences are counted.  As used in Section 4A1.2(d)(2) and (e), the term," quote, "commencement of the instant offense includes any relevant conduct."  And it says "see 1B1.3."

But, Judge, in the instant case, Your Honor has made

105

the finding that the relevant conduct began on November 4th of 2021, when the defendants hatched this plan and course of conduct to, as defense claims, delay payments through the use of false wire receipts.  And that conduct occurred over and over and over again.  But they hatched their scheme back in November of 2021.  That's the relevant conduct date that Your Honor should use to consider the applicable time period.  And the application notes to the guideline states that relevant conduct is to be included in determining when the applicable commencement of the instant offense date is to be calculated.

THE COURT:  So let me stop you, Mr. Anton, and I'll let you continue.  But so that the record is clear, I do find by a preponderance that the relevant conduct starts on or about November 4th, 2021.  I do find that.

However, it's a little closer of a question, because even with that finding, and even with the citation that you cite -- and you're looking at Application Note 1, correct?

MR. ANTON:  Eight.

THE COURT:  Sorry, 8.

MR. ANTON:  It's on page --

THE COURT:  Yes, 8 of 4A1.2, and you're correct, you read it correctly.  The issue there, though, is that's in the commentary; it is not in the guideline itself.  In *Horn*, and in *Dupree*, and in those cases that created the issue starting from *Kaiser*, they moved it, and *Horn* doesn't help you here, because

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(305) 301-3276

*Horn* pointed to 1B1.3(a), which had the object language, which did all the work in *Horn* to allow the government to prevail, as it has here on my finding.

The issue legally here is tougher, right?  Because we have a *Kaiser* kind of problem with Application Note 8, because it's not in the guideline itself, and so aren't I forced as a Court to read -- let me get it right, instead of getting it quick -- under (e):  "Any prior sentence of imprisonment exceeding one year and one month that was imposed within 15 years of the defendant's commencement of the instant offense is counted"?

"Instant offense" is sometimes defined the way it is in Application Note 8, but in other places in the guidelines, it is not defined.  "Instant offense" stands on its own.

So I'd like the government's best argument -- I think you're just going to point to Application Note 8, but there's a *Kaiser/Dupree* kind of argument here, isn't there, that I simply say within 15 years of the defendant's commencement of the instant offense?

MR. DOMINGUEZ:  Right.

THE COURT:  And that's plain language.  And that is not the same thing as relevant conduct.  And it just so happens that your argument is in a commentary note and not in the guideline itself.  I want to make sure that you don't see something else, Mr. Anton, or if there's any argument that you

wish to make.

MR. ANTON:  Well, Judge, the government does believe that it is part of the instant offense.  Obviously, the testimony and the text exchange that occurred back in November of 2021 was relevant to the case, it was admitted evidence in this case, it was brought before the jury to prove intent.  And, in fact, it was the beginning of the offense.  Without the defendant's knowledge and plan and intent in this particular case, the underlying offense could not have been completed.  And as early as November of 2021, the defendant knew that she was creating false receipts and procured false receipts, and she had a guy who could do it for her, she had a codefendant who would knowingly use these receipts, and she was a willing participant in it.  The exact beginning or charge of an offense time in a count of conviction, in this case a conspiracy, is not -- should not necessarily be relied upon by Your Honor as determinative of what is the instant offense.

I think if we just took a broad reading of what happened here, the offense is, the defendant procured fake receipts to pay for items and tricked people into thinking that they had been paid when, in fact, they had been not paid.  And that occurred as early as November of 2021.  Your Honor found as such, that the offense conduct essentially, relevant conduct or otherwise, began as early as 2021.  And the government feels that for not only those reasons, but for the commentary reasons

that simply just assist the Court in determining what the definition of "instant offense" is, that it should be a guide for the Court.  It might not be legally binding on Your Honor, but it is definitional in nature to assist the Court in defining when an instant offense begins.

So for those reasons, Judge, the government believes that it's within the 15-year time period, as outlined by not only the commentary but by the offense conduct as alluded to at trial, and, therefore, the criminal history category II is the appropriate category in this case.

THE COURT:  Mr. Anton, thank you.

And so that the argument is crystal clear before, Mr. Dominguez, if you wish to add anything, in 1B1.3, differently than Chapter 2 and differently than Chapter 3, for Chapter 4 offenses -- and this is 1B1.3(b), it says:

"Chapter 4 and 5.  Factors in Chapters 4 and 5
   that establish the guideline range shall be determined
   on the basis of the conduct and information specified
   in the respective guidelines."

So I think the best way -- and it's very consistent with what Mr. Anton just said -- is that that sentence means I can look, and should look, and as a matter of law need to look to the commentary note of the Chapter 4 guideline.

But I've made my record that I think it is a much closer question and could present a *Kaiser* type of issue, and

Mr. Anton does not have the benefit of what he had in *Horn* and *Dupree*.

So, Mr. Dominguez, any record you wish to make on the application of the prior conviction, sir?

MR. DOMINGUEZ:  The old saying, Judge, don't remove victory from the jaws of -- or don't remove defeat from the jaws of victory.

THE COURT:  I think that you show how experienced you are.

I'm not going to apply the prior conviction for guidelines purposes.  I want to say one other thing, though, and this is part of Chapter 4, which is that I am allowed to consider it as an upward departure, and I would because there's another guideline that says that if the criminal history level is such, and there is a conviction out there that is substantially similar -- I'm paraphrasing the guideline -- I can consider it for purposes of upward departure.

I'm not going to do that for guidelines purposes.  I'm not going to apply it for guidelines purposes.  I think there's a very big fact here.  One is that November 2021 conduct, that conduct, which by a preponderance is relevant conduct, elongates the time period in a way that it is really an outlier by nine months, that conduct.  That's one thing.

Secondly and importantly, she had no violation of supervised release when she got out on the prior conviction.

So there's no pulling in, there's no revocation issue which would bring closer into the 15-year period that conviction.

Most importantly, I certainly consider it for 3553(a) purposes.  It is a prior conviction.  It is a bank fraud.  It is similar in some respects.  And the narrative of paragraph 60 was not objected to, it could not seriously be objected to, and I consider the narrative for 3553(a).  But for purposes of the guidelines, the government has their record, I do not apply it for purposes of the guidelines.

And so, therefore, when you add all of this up, she is a criminal history category of I, and she is an offense level of 27.  It's a base of 7, it's a 16-level enhancement for the loss, it's two points for the victims, it's two points for obstruction, and that makes her a 27.  And a 27 offense level, criminal history category I, puts her in an advisory guideline range of 70 to 87 months.

Mr. Anton, any objection to the calculation?

MR. ANTON:  Nothing other than the objections stated previously.

THE COURT:  Yep, you're preserved.

Mr. Dominguez, any objection to the calculation?

MR. DOMINGUEZ:  No, Judge, just preserve my previous --

THE COURT:  You're preserved.

Okay.  Having done that, is there anything else in the

PSR with respect to objections, even if it's not guideline specific, that we need to take up, Mr. Dominguez, for correction or modification?

MR. DOMINGUEZ:  I think most of it has been taken care of.  There was -- as you know, I filed a series of objections, because they kept -- the way that the facts were presented, it seemed that it was -- Ms. Turner was somehow buying these watches for herself or in joint custody of these watches, which she -- none of these things were for her.  So the way it reads, yeah, she's a member of this conspiracy as found by the jury, but it's -- doesn't even seem credible to assert that she had -- you know, was trying to get these watches for herself or any of these properties for herself.  These were all things that, you know, Sean wanted for himself.  And, yeah, she admitted the offense, but the way it reads, it reads -- and it really doesn't affect the guidelines, so I don't want to spend a lot of time on it, Judge, but you know the case, you heard the facts.

THE COURT:  Yeah, I don't see any language that's left -- you know, sometimes somebody says, you know, there's one sentence in here that it actually doesn't have anything to do with anything, and it just, you know, kind of dirties her up.  I'm happy to hear you on that kind of stuff, but given my rulings on loss, victims, criminal history category, and obstruction, I just want to make sure if there's anything

outside of that for the government or the defense, I'll consider it.

MR. DOMINGUEZ:  No, Judge.  That's fine.

THE COURT:  Okay.  That's fine.

Mr. Anton?

MR. ANTON:  Not as it deals with the PSI, no, Judge.

THE COURT:  Okay.

Are there any statutory victims who wish to be heard?

MR. ANTON:  Not today, Your Honor, no.

THE COURT:  Okay.  I'd ask the government for their view of the appropriate sentence and any argument they wish to make.

MR. ANTON:  Judge, in the instant case, the government feels that the appropriate sentence would have been a sentence at the high end of the guideline range had Your Honor determined that she was a criminal history category II, so the government feels that a sentence of 97 months is the appropriate sentence in the instant case.

Your Honor heard the testimony.  What we have here is a defendant who, despite what defense claims, certainly benefited from this particular scheme.  She was not objecting when she was taking fancy airplane rides in private jets that she couldn't pay for.  She surely wasn't objecting when she was living in a 32-and-a-half thousand dollar a month house that they couldn't afford.  She wasn't objecting when she was

driving around in all of these fancy Maybachs and other cars that they couldn't afford.  So to say that she didn't benefit in any way is quite the misnomer.  Clearly, Defendant Sean Kingston, or Kisean Anderson, had a pension for fine jewelry and living above their means, but that's not to say that this defendant was any less culpable than her son.

Judge, this is the type of scheme that epitomizes who this defendant is.  As Your Honor is aware, back in 2005, the defendant began her criminal career with a federal conviction for bank fraud, where she applied for car loans using stolen names, Social Security numbers, and dates of birth, and a fake -- and a driver's license of an unsuspecting identity theft victim.  It wasn't just for one car, it wasn't just for two cars, it was for three high-end vehicles that she falsely applied for loans for under stolen identities.  That ultimately landed her in federal prison for 16 months and an order of restitution in the amount of $131,000 and change, but that clearly did not deter her criminal conduct going forward. Because, as Your Honor is aware, she just simply changed her scheme.

But at the point of really who she is, she's a thief, Judge, that's just her nature.  She was living above her means. They wanted to purchase items that they simply couldn't afford, and they figured they would trick unsuspecting victims into accepting wire transfer receipts as payment when she knew, and

114

her codefendant knew, that they were fake.  Sometimes she got away with it.  Other times she was bully enough to get away with it, because victims gave up, but other victims were a bit more savvy and sued and then were the subject of lengthy civil lawsuits.

Other victims sought the assistance of police.  And thankfully in this particular matter, search warrants were executed and some victim property was recovered.  But it is not because she was duped in any way.  It's not because she always had an intent to pay.  She paid for perhaps what she could when she wanted to, but certainly she was not paying the purchase price legitimately, and she figured she could get away with whatever she could get away with at the hands of these unsuspecting victims.

Judge, this is a defendant who has shown no remorse, who continues to essentially deceive.  She has not admitted her criminal conduct.  She has not allocuted to this Court that what she has done is wrong.  And, in fact, Your Honor found that even on the stand, she obstructed justice by lying multiple occasions.  Judge, this is a defendant who deserves the high end of the guideline range, because she is quite simply a thief, not only as indicated by her conviction back in paragraph 60, but there are other additional arrests.  She was convicted of insurance fraud in 2007, adjudicated guilty and sentenced to 90 days in jail.  This is just who she is, Judge.

I understand the defense is going to make some motion for a downward variance or some sort of downward departure based upon her age or mental health or physical condition, whatever it may be.  But this is the type of crime that doesn't involve much.  She was committing this crime essentially from behind a phone.  She had no trouble enjoying the spoils of her crime, and she should not now be given credit for any particular infirmity or sickness as a mitigating factor.

She loved living the high life.  She loved living on Sean Kingston's coattails.  She had no complaints when she was flying all over the country to concerts in private jets and fancy cars and living the lifestyle that she thought she was entitled to.

The problem is, it was, as Your Honor has seen, a house of cards.  The defendants are left with no assets, nothing in the bank, no cars.  Her codefendant son is essentially couch surfing with no stable residence, because they have nothing.

And that's what this case really is about.  It's about fake receipts.  It's about the allusion.  And in this particular case, Judge, a sentence at the high end of the guideline range, as would have been calculated with a criminal history category II, of 97 months is the appropriate sentence.

THE COURT:  Thank you, Mr. Anton.

Mr. Dominguez, before I give you your opportunity,

sir, I just want to clean up one last thing, because I don't think I was perfectly clear on the not applying the prior conviction. So that I am clear, under cases like *Kaiser*, which then begot *Dupree*, and because *Horn* does not apply here, the *Kaiser* problem for this Court, I'm erring on the side of applying what the plain meaning of "instant offense" means regardless of the commentary. I think that's what I meant by the *Kaiser* problem. That's why "instant offense" here, what I didn't say is, is that the conspiracy charges a conspiracy beginning in April 11th, 2023, until on or about March 29th, 2024.

So that *Kaiser* problem, maybe the Eleventh Circuit, if the government takes me up, will tell me it's in my discretion, maybe they'll tell me that I read it wrong, but it is clear to this Court that "instant offense" means the offense that was charged, not the relevant conduct offense. And what we're then left with is Mr. Anton's very excellent argument, which is preserved, that because the commentary note says "relevant conduct," that I should go past the guideline.

I don't think that's true after cases like *Kaiser*. I think if "instant offense" has a plain meaning, you stop there. *Horn* changed it, for the reasons that I said, on loss. And that is not applicable in this Court's view because of what 1B1.3(b) says, because then we're just left with the commentary.

Thank you for letting me make that record, Mr. Dominguez. Now, I'll ask you, sir, for your view of the appropriate sentence and any argument you wish to make.

MR. DOMINGUEZ: Judge, great, thank you for the opportunity to be heard on this matter.

As you know, I requested for a sentence of 30 months, based on, you know, my objections as well as all the 3553 factors. And if I can go into -- first of all, I want to respond to a couple things Mr. Anton said. And I'm not really sure what's the succussation with Ms. Turner regarding -- she -- the airplane was -- she didn't fly in those airplanes. The airplane was to move Mr. Kingston to his various gigs that he had, as well as she doesn't drive. It wasn't her cars. She was only a passenger. And all those -- it is amply clear, amply clear that all these things, all these toys, all these little whatever trinkets you want to call them, very expensive trinkets, by the way, were for Mr. Kingston, not for her.

She's a simple woman. That has nothing -- none of it has to do with her. It has nothing to do with guilt or innocence, Judge. But I'm saying, you know, it defies logic that they would even argue that she was enjoying the spoils of him wearing some Richard Mille watch that cost an exorbitant amount and caused her such stress in her life that she, you know, has suffered a myriad of ailments because of the stress being caused by this living style that Mr. Kingston engaged in.

So I just wanted to say that.

Now, one of the things that struck me in this case, as preparing for sentence, were the letters that are part of the record. Because, you know, when you go to trial, you get a sense of the person you're with, and, you know, a lot of bad things, and people are attacked in criminal and generally, so you leave here with the sense like, you know, who's this person, right? And I really didn't get to know who she is and what type of person she is until I read these letters. And let me tell you, Judge, I did not talk to any of these people ahead of time. They gave me the letters the way they are. I didn't touch them. I put them right in and I filed them.

And I was highly impressed by a couple factors. She is -- she was and always was actively involved in the community, helping the less fortunate, feeding people, you know, in skid row, feeding people at Christmastime, and having events for the homeless, and things of that nature.

And you could see -- and plus, not just that, but she also helped people who were down and out, the people who had -- who lost everything or had extreme despair or had suffered losses where they felt that they couldn't go forward. But she helped them, and she helped them by providing a place to stay, encouragement, meals and food, and things of that nature. So to me it really showed the -- you know, there is another side of Ms. Turner.

And the fact that all these people came and poured their love out for her, I think is significant. And I think that it's something that, you know, obviously the Court should take into consideration.

I also wanted to point out that in mitigation, all right, you -- I respect the Court's findings, obviously, with the losses and all that stuff, but it's -- I've had cases, you've had cases where people -- intended loss is seven million and walked away with seven million. And then you have a case like this where they walk away with next to nothing in compared to the loss. And the fact that the guidelines do not -- and I am flabbergasted -- the guidelines do not address that difference, because in my book, it's not the same. It's not the same that a person who walks away with that amount of money as someone who got very little out of it. It's really -- it's a different -- and I think that that's a factor that you can consider, because it really -- and it should be, it should be considered in the guidelines, and it isn't. You know, I could see why you want to cover intended loss, but I could also see the guidelines as well, but, you know, application note whatever, you should consider. And I think that that is -- in the amount of loss here, and you look at the amount of restitution, it -- there's a staggering difference between the two. And I think that that is significant, significant mitigation for this Court to consider.

Remember, you've already applied all sorts of enhancements for her, so at this point, I think that that's one that weighs heavily in her favor, as well as the letters and the type of work that she's done to help people.

And then the other thing is -- and I don't think I need to get into it, because I know that the Court has looked at my sealed motion, you know, I don't want to put it on the record here in front of everyone, and I know you've given that due consideration.  Part of it -- well, one is age, obviously.  And the other part it has to do with losing contact with her family and being apart from all her family.  Not just in prison, but facing, especially in today's day and age, certain deportation to Jamaica.  So she's going to be removed from being with her son, her daughter, her grandchild.

They're both here, by the way.  They didn't want to address the Court.  You read Fadima's *(phonetic)* letter, she wrote you one as well.  And, you know, that's a real human factor here, Judge, because these people, as you know, don't get the benefits of many of today's First Step Act and things of that type of nature.  Basically, you know, you're deportable, you don't get all these programs, you don't get the drug programs, you don't get any of those benefits.

Then you go into immigration custody, and then you're launched into a different country, and then you're away from the people that -- your whole family.  And, you know, that's

the law, that's the sad state of affairs. And I know that -- I think it's something that the Court should take into consideration as well, because it does affect the way people do time.

So those are my primary arguments. And then the last thing I have is to have Ms. Turner address the Court.

THE COURT: Thank you very much, Mr. Dominguez --

MR. DOMINGUEZ: I appreciate it.

THE COURT: -- for all your work on the case.

Ms. Turner, you don't have to say anything if you don't want to, but if you wish to say anything on your behalf before sentence is imposed, you may do so now.

MR. DOMINGUEZ: I want you -- stand up. Can you stand?

THE COURT: If it's uncomfortable for you to stand, you don't have to.

MR. DOMINGUEZ: I think she can, Judge. It's a little bit tough, but she can do it.

THE DEFENDANT: Your Honor, I'm truly sorry. I -- I'm not the same woman I was 20 years ago. It's mistaken *(sic)* me. I'm a different woman. I was just -- my intention was just to keep my son afloat in this difficult industry. They have used him, they have abused him. The half has never been told. These receipts were given after he got the goods, and he said that you -- they were gonna call TMZ. And I tried to help him.

I got nothing from it but this. I am begging, pleading with you for my mercy, mercy for me and my son. Thank you.

THE COURT: Thank you, Ms. Turner.

I guess the last thing that I will do before I pronounce sentencing is -- we haven't really spoken about restitution. Given everything that happened at the sentencing hearing, given, for instance, Court Exhibit 1, and given that there's been really no briefing on it, and given the varied estimates and arguments already just on things like guideline loss, I'm going to set the matter down for a restitution hearing in 90 days, unless the parties work it out.

Ms. Shotwell, if you could just put that date on the record.

ROOM CLERK: Judge, that would be Thursday, October 16th, at two p.m.

THE COURT: Thank you.

October 16th at two p.m., unless the parties contact me about restitution.

Let me say a couple of things in advance of that, because it does go to an aspect of sentencing for Ms. Turner.

It is clear from Exhibit 1 that there's a lot of vendors or victims that have been made whole, so there's no restitution owed. But then there's a very big dividing line, once you get down on Government's Exhibit 1, you get down to Dream Watch.

For restitution purposes, the government and Mr. Dominguez are going to have to brief the Court, because the restitution statutes and who is included in restitution is different than relevant conduct.  And I've made findings on relevant conduct.  But tipping my hand -- and that's why we're in part doing this 90 days out -- I'm going to need to see the law on why every victim listed on Government's Exhibit 1, from number 14, all the way down to 22, why they even are included under the restitution statutes for restitution.

The government will provide that, Mr. Dominguez will provide his own arguments, but that's important, because it is simply enough for now for the Court to say that relevant conduct under the guidelines is very different than being considered due restitution under the statutes.  So we'll take that up with briefing and at the restitution hearing, unless the parties work it out, at the date announced by Ms. Shotwell.

Just one moment.

*(Pause)*

THE COURT:  So the Court has considered the statements of all the parties, the presentence report, which contains the advisory guideline range, and all the statutory factors set forth in 18 U.S.C. Section 3553(a).  It is the finding of the Court that the defendant is not able to pay a fine, so no fine will be imposed.

On the 3553(a) factors, beyond what I've said so far,

let me identify a few of the things that go into my sentence.

First, there are confounding variables here.  First, Mr. Dominguez is right, attempted loss is different than actual loss, the guidelines treats them the same.  It is one of the many reasons why this Court, as well as many others, does not slavishly follow the loss table in 2B1.1.

At the end of the day, as I think these attorneys might have heard me say before in other cases, the Honorable Jed Rakoff has it right, sentencing is ultimately moral, it is not a grid.  And 2B1.1 drives the numbers here massively.  I would never in any fraud case, let alone this one, that has the discrepancy pointed out by Mr. Dominguez of intended loss versus actual loss.  There is a deep moral difference.  When judges sentence people like Sam Bankman-Fried, Judge Kaplan considers the fact of what he knows at the time as what has been recovered, what has not been recovered.  In this case, it is simply a fact that a lot has been recovered, even on the government's figures, taken in their fullness, it is one-third the actual loss versus the intended loss.  That's a reason why I will not follow the loss table, and I will vary downwards from the guideline range.

There's other factors, though, that are confounding and argue to go up.  And the big one here is obstruction.  In the guidelines, no matter what kind of obstruction you do, if you lie on a Pretrial Services Report at the very beginning of

125

the case, or you do what Ms. Turner did, which is lie for pretty close to an hour ten feet away from me, you get the same two points. That's also not right. There are different kinds of obstruction. This was the kind of obstruction that one rarely sees, even with defendants who testify, even with defendants who lie. This might have come from a motive that is consistent with Ms. Turner's allocution, which is trying to help her son, to keep her son in the background. But it has to be accounted for in this sentence.

Let me state unequivocally, my sentence would be far less had she not made that intentional choice to try to deceive a jury, to try to deceive this Court. And I said it at the time, it is rare that you see a prosecutor being given the kinds of opportunities that Mr. Anton was given on cross-examination and, boy, was that shown. And the fact that she admitted it, as Mr. Dominguez says, in other ways just shows how incoherent and all over the place the testimony was, and how even someone intending to deceive could not, you could not over the course of this conduct and having to testify about it with things that Mr. Anton put right in front of her.

And so the obstruction is a confounding factor that argues for a higher sentence here.

Finally, I note that there's all different kinds of frauds. In the end of the day, the fact that many victims recuperated here does not change the basic thrust of the

government's story.  And they largely have it right.  This is a defendant who was an enabler, the proof showed that.  She allowed her son and his coterie, who afforded all of them a life that scarcely few Americans can imagine, they pressed it, they leveraged it.

They did more than that.  They got so far out of -- so far out over their skis that they -- that this defendant provided fake wire transfer records to double-digit victims to keep it going, when actually, as was told by the trial and two excellent attorneys, one of whom is in the gallery today, they in front of the jury were put in the position, these attorneys, of saying they provided hundreds of thousands of dollars in legitimate money.  They had millions.  And yet, immediately after the jury verdict, what is clear is that this entire group, enabled by Defendant Turner, was pressing it to the detriment of legitimate businesses.

I won't soon forget that salesman who basically said that her conduct almost cost him his job, and all he did was to try to spot her and her son a car, and then it was off to the races.  And four people are sitting there on Thanksgiving evening not able to see their families because of just wanton lies and wanton leveraging their status as celebrities.  That's the endemic fact in the case.

With that said, I am mindful of the fact that avoiding unwarranted sentencing disparities are important in this case.

I am considering for purposes of 3553(a), although I did not consider it for guidelines purposes, that this is not the defendant's first rodeo.  She was convicted of that bank fraud, and she got a 16-month sentence by Judge Dimitrouleas.  But years later, that did not deter her from conduct that actually lasted longer and was more for moral purposes the kind of offense that the law has to speak to.

For all those reasons, I will vary but not as much as I would have without those confounding factors.

Ms. Turner, please rise to be sentenced.

It is the judgment of the Court that the defendant, Janice Eleanor Turner, is committed to the Bureau of Prisons to be imprisoned for 60 months as to each of Counts I, III, IV, V, and VI, to be served concurrently.

It is further ordered that pursuant to Title 18, United States Code, Section 3664(d)(5), the victims' losses are not yet ascertainable, therefore, the Court shall set a date for the final determination of the victims' losses not to exceed 90 days after sentencing.  And Ms. Shotwell has stated the date.

Once restitution is determined, payment shall be made as follows during the period of incarceration:  One, if the defendant earns wages in a federal prison industries UNICOR job, that the defendant must pay 50 percent of wages earned towards the financial obligations imposed by this judgment in a

criminal case; two, if the defendant does not work in a UNICOR job, then the defendant must pay a minimum of $25 per quarter toward the financial obligations imposed in this order.

Upon release from incarceration, the defendant shall pay restitution at the rate of 10 percent of monthly gross earnings until such time as the Court may alter that payment schedule in the interests of justice.

The United States Bureau of Prisons, the United States Probation Office, and the United States Attorney's Office shall monitor the payment of restitution and report to the Court any material change in the defendant's ability to pay.

These payments do not preclude the government and subsequently the United States Probation Office from using any other anticipated or unexpected financial gains, assets, or income of the defendant to satisfy the restitution obligations.

Restitution shall be made payable to the clerk, United States Courts, and forwarded to the clerk's office, Financial Section, 400 North Miami Avenue, Room 8N09, Miami, Florida, 33128.  The restitution will be forwarded by the clerk of the court to the victims.

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of three years as to each of Counts I, III, IV, V, and VI, all such terms to run concurrently.

Within 72 hours of release from the custody of the

Bureau of Prisons, the defendant shall report in person to the probation office in the district where released.

While on supervised release, the defendant shall comply with all the mandatory and standard conditions of supervision as referenced in part F of the PSR.  The defendant shall also comply with the following special conditions: Cooperating with immigration during removal proceedings, financial disclosure requirement, self-employment restriction, and unpaid restitution, fines, or special assessments as noted in part F of the Presentence Investigation Report.

It is further ordered that the defendant shall pay immediately to the United States the mandatory statutory special assessment of $100 as to each of Counts I, III, IV, V, and VI, for a total of $500.

In sum, 60 months' imprisonment, restitution to be determined, three years' supervised release, and a $500 special assessment.

Mr. Dominguez, sir, now that sentence has been imposed, do you or the defendant object to the Court's findings of fact or to the manner in which sentence was pronounced?

MR. DOMINGUEZ:  Nothing as to the manner in which the sentence was pronounced, and objections only as to those previously made and preserved.

THE COURT:  Yes, sir.

Ms. Turner, you have the right to appeal the

130

conviction and sentence just imposed.  I advise you that any notice of appeal must be filed within 14 days after the entry of the judgment.  If you are unable to pay the cost of an appeal, you may apply for leave to appeal in forma pauperis, which simply means without payment of the cost.  Do you understand that, Ms. Turner?

THE DEFENDANT:  Yes, sir.

MR. DOMINGUEZ:  I have a question.

THE COURT:  Yes, sir.

MR. DOMINGUEZ:  Will that start running from the time of the restitution hearing?  Because I think that's going to be part of the final judgment.  Or does it start now?

THE COURT:  No, no, she's been in.  I mean, it's going to take a while for the BOP to do the calculation, but she's going to get credit for --

MR. DOMINGUEZ:  Yeah, I know.  But what I'm saying is -- no, the time for appeal, does that -- shouldn't that start from the time of --

THE COURT:  It's from the time my judgment is entered, and my judgment is going to be entered before the restitution hearing.

MR. DOMINGUEZ:  Okay.

THE COURT:  And then it will be amended when there is a restitution hearing, if there is one.

MR. DOMINGUEZ:  Understood.

THE COURT:  Okay?

MR. DOMINGUEZ:  Now I understand, yeah.

THE COURT:  Okay.  There's a passport here.  The probation office has the possession of the passport, of the defendant's Jamaican passport.  What's the government's position?

MR. ANTON:  Judge, I ask that probation continue holding the passport.

THE COURT:  Okay.  Any objection?

MR. DOMINGUEZ:  I don't see why, but okay.  I guess if they want it --

THE DEFENDANT:  The phone.

THE PROBATION OFFICER:  Your Honor, Elizabeth Robbert for U.S. Probation.  We would ask to return that to immigration, to ICE.

THE COURT:  Any objection, Mr. Dominguez?

MR. DOMINGUEZ:  No, I don't have any objection to that, no.

THE COURT:  Okay.  It will be returned to ICE.

MR. DOMINGUEZ:  And --

THE COURT:  Any recommendations in terms of the facility?

MR. DOMINGUEZ:  Judge, I -- requesting south Florida, but, you know, the reality is they may or may not follow it.

THE COURT:  I will make the recommendation.  You want

Southern District of Florida?

MR. DOMINGUEZ:  Yes, Judge, if possible.

THE COURT:  Okay.  I'll make the recommendation in my judgment.

MR. DOMINGUEZ:  And the other thing is that for health reasons -- and you did this last time, and it really worked out spectacular -- if you could ask -- and it's true -- that the marshals transfer her to FDC, because the --

THE COURT:  Immediately.

MR. DOMINGUEZ:  Yeah.  Well, it's tomorrow, I think the run, and that would be great.

THE COURT:  I'm not going to force them to do anything.

MR. DOMINGUEZ:  No, of course not.

THE COURT:  But I'm certainly going to request of the marshals to put her in the FDC as soon as possible.

MR. DOMINGUEZ:  Right.

THE COURT:  I don't know if she'll make the run tomorrow, but I'm requesting this excellent court security officer to relay that information.  Thank you, sir.

MR. DOMINGUEZ:  I appreciate it.  They did so last time with due diligence.

THE COURT:  Anything else?

MR. DOMINGUEZ:  No, Judge.  I appreciate it.

THE COURT:  Anything from the government?

133

MR. ANTON:  No, Your Honor.  Thank you.

THE COURT:  Okay.  I thank you, Counsel.

That's the sentence of the Court.

Best of luck to you, Ms. Turner.

We are adjourned.

THE DEFENDANT:  Thank you, sir.

MR. DOMINGUEZ:  Thank you, Judge.

*(Discussion had off the record)*

THE COURT:  Yeah, the deputy is going to give Court Exhibit 1, the letter, to the government and the defense so that they have it for their file.  I have it for mine.

Thanks very much.

THE COURT REPORTER:  Take care, Judge.

THE COURT:  Thanks.

Take care, Counsel.

MR. ANTON:  Thank you, Your Honor.

MR. DOMINGUEZ:  Thank you, Judge.  Nice seeing you.

*(The Judge exited the courtroom)*

*(Proceedings concluded at 3:16 p.m.)*

- - - - -

134

**INDEX OF WITNESSES**

| GOVERNMENT'S WITNESS | PAGE |
|---|---|

**Amanda Cook**

| | |
|---|---|
| Direct by Mr. Anton | 4 |
| Voir Dire by Mr. Dominguez | 10 |
| Direct by Mr. Anton (Continued) | 15 |
| Cross by Mr. Dominguez | 35 |
| Redirect by Mr. Anton | 74 |
| Recross by Mr. Dominguez | 76 |

- - - - -

**INDEX OF EXHIBITS**

| COURT EXHIBIT | MARKED | ADMITTED |
|---|---|---|
| 1 | 86 | 86 |

| GOVERNMENT'S EXHIBIT | MARKED | ADMITTED |
|---|---|---|
| 1 | 8 | 14 |
| 2 | 9 | 14 |

- - - - -

**C E R T I F I C A T E**

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript from the record of proceedings in the above-entitled matter.

_____/s/Francine C. Salopek_____     9-24-2025_____
Francine C. Salopek, RMR-CRR                 Date
Official Court Reporter

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(305)301-3276

MR. ANTON: [50]
MR. DOMINGUEZ: [142]
MR. JONES: [1]  99/7
ROOM CLERK: [7]  3/4 4/9 4/12 83/4 84/5 84/11 122/14
THE COURT REPORTER: [1] 133/13
THE COURT: [173]
THE DEFENDANT: [8]  3/15 3/17 52/8 84/22 121/19 130/7 131/12 133/6
THE PROBATION OFFICER: [1] 131/13
THE WITNESS: [10]  4/15 11/21 11/24 12/7 12/14 12/19 13/3 13/7 13/9 58/6

**$**

$1,167,700 [1]  29/10
$1.5 [1]  98/17
$1.5 million [1]  98/17
$100 [1]  129/13
$131,000 [1]  113/17
$133,000 [4]  31/13 31/13 33/2 33/4
$18,000 [1]  39/9
$2 [1]  98/18
$2 million [1]  98/18
$25 [1]  128/2
$3 [2]  28/4 87/24
$3 million [2]  28/4 87/24
$3,125,601.92 [1]  28/5
$3,944.25 [1]  61/8
$3.1 [1]  98/2
$3.1 million [1]  98/2
$3.12 [1]  91/6
$3.12 million [1]  91/6
$3.125 [2]  90/23 92/11
$3.125 million [2]  90/23 92/11
$30,500 [1]  51/3
$306,840 [1]  46/20
$32,400 [1]  52/13
$35,000 [1]  37/21
$38,500 [1]  51/4
$40,000 [3]  37/13 37/16 37/19
$50 [4]  40/16 40/25 41/5 41/8
$500 [2]  129/14 129/16
$550,000 [1]  87/23
$600,000 [1]  97/13
$61,000 [1]  36/17
$69,000 [1]  51/15
$7,000 [2]  58/11 58/12
$700,000 [1]  44/17
$80,000 [1]  48/16
$800,000 [1]  93/22
$916,000 [1]  98/10
$964,000 [2]  66/18 87/19

**-**

-- of [1]  37/8
-- that [1]  82/2

**/**

/s/Francine [1]  134/23

**1**

1.5 million [2]  66/23 96/21
10 [1]  134/4
10 percent [1]  128/5
10:30 [2]  1/8 3/1
11:58 [1]  83/6
11th [2]  104/6 116/10
1256 [1]  89/2
126 [1]  77/11
127 [1]  77/12
129 [2]  77/19 103/2
133 [3]  77/14 78/25 85/1
133,000 [1]  32/16
136 [1]  77/13
138 [1]  77/16
14 [4]  87/22 123/8 134/12 134/12
14 days [1]  130/2
14-level [1]  87/25
141 [1]  77/15
142 [1]  77/12
14th [2]  29/16 29/22
15 [1]  134/4
15 years [4]  92/14 104/1 106/10 106/18
15-year [2]  108/7 110/2
1500 [1]  2/7
16 months [1]  113/16
16-level [2]  87/24 110/12
16-month [1]  127/4
16-point [1]  96/20
16th [2]  122/15 122/17
17 [5]  6/8 6/13 6/14 7/3 18/2
18 [1]  127/15
18 U.S.C. Section 3553 [1]  123/22
1990 [1]  88/21
1996 [1]  88/10
1B1.3 [7]  88/10 97/23 104/24 106/1 108/13 108/15 116/24

**2**

20 [1]  57/9
20 years [1]  121/20
2005 [2]  103/22 113/8
2006 [1]  103/24
2007 [3]  104/4 104/14 114/24
2010 [1]  89/2
2021 [21]  13/1 29/15 29/20 31/21 32/6 32/21 89/5 89/12 92/7 92/17 104/2 104/2 104/8 105/2 105/6 105/14 107/5 107/10 107/22 107/24 109/20
2022 [2]  12/14 13/1
2023 [6]  12/8 12/12 74/1 104/6 104/15 116/10
2024 [10]  12/8 12/12 20/15 22/2 24/9 29/16 29/22 51/21 73/19 116/11
2025 [4]  1/7 3/1 84/1 134/23
21 [2]  87/20 92/9
22 [3]  30/3 30/8 123/8
22nd [1]  8/11

**23 [3]**  1/7 3/1 84/1
24-60126-CR-DSL [1]  1/4
26th [1]  73/19
27 [3]  110/12 110/14 110/14
28 [1]  134/20
2906 [1]  25/1
29th [1]  116/10
2:01 [1]  84/1
2:35:20 p.m [1]  24/10
2B1.1 [4]  87/22 96/19 124/6 124/10

**3**

30 months [1]  117/6
30-something [1]  51/17
300,000 [1]  46/20
301-3276 [1]  2/11
3010 [1]  2/10
305 [1]  2/11
32,400 [4]  22/18 25/2 25/3 52/6
3276 [1]  2/11
33 [2]  6/21 11/19
33128 [1]  128/19
33156 [1]  2/8
33308 [1]  2/10
33394 [1]  2/5
35 [1]  134/5
35,000 [1]  37/22
3553 [9]  95/2 96/1 99/2 110/3 110/7 117/7 123/22 123/25 127/1
3664 [1]  127/16
39th [1]  2/10
3:16 [1]  133/19
3C1.1 [2]  99/5 102/9

**4**

400 North [1]  128/18
404 [3]  30/21 71/11 94/7
41 [1]  30/18
436 [1]  88/20
4610 [3]  22/20 23/18 24/15
4610 Southwest [1]  19/5
4610SWR [3]  18/6 19/3 23/16
4A1.2 [5]  92/18 104/19 104/20 104/22 105/21
4th [11]  29/15 29/20 31/21 32/6 32/21 89/5 89/11 92/7 92/16 105/1 105/14

**5**

5,000 [1]  48/17
50 percent [1]  127/24
500 [1]  2/4
59 [1]  102/25
5:32 p.m [1]  22/2

**6**

60 [5]  103/21 104/3 110/5 114/23 129/15
60 months [1]  127/13
600,000 [1]  93/21
60126 [2]  3/6 84/13
605 F.3d 1256 [1]  89/2
62 [1]  102/25

## 6

**67 [1]** 44/7
**68 [1]** 102/25
**69,00 [1]** 49/17

## 7

**70 [1]** 110/16
**700,000 [1]** 93/21
**71 [1]** 102/25
**72 [1]** 102/25
**72 hours [1]** 128/25
**74 [1]** 134/5
**75 [1]** 102/25
**753 [1]** 134/19
**76 [1]** 134/6
**764 [1]** 88/10
**7th [2]** 20/15 24/9

## 8

**82 [1]** 102/25
**84 [1]** 103/1
**85 [1]** 103/1
**86 [3]** 103/1 134/10 134/10
**87 months [1]** 110/16
**88 [1]** 103/1
**89 [1]** 103/1
**8:42 [1]** 31/21
**8N09 [1]** 128/18
**8th [1]** 22/2

## 9

**9-24-2025 [1]** 134/23
**90 days [4]** 114/25 122/11 123/6
 127/19
**909 F.2d 436 [1]** 88/20
**9100 [1]** 2/7
**93 F.3d 764 [1]** 88/10
**97 months [2]** 112/17 115/23

## A

**a.m [3]** 1/8 3/1 83/6
**AAA [1]** 36/15
**ABA [1]** 50/8
**abetted [1]** 88/12
**ability [1]** 128/11
**above [6]** 22/16 54/22 66/22 113/5
 113/22 134/22
**above-entitled [1]** 134/22
**absolutely [1]** 87/12
**abused [1]** 121/23
**accept [1]** 50/14
**accepting [1]** 113/25
**access [5]** 42/9 42/21 54/22 61/21
 82/22
**according [2]** 11/10 53/20
**account [10]** 24/10 24/23 36/19 50/8
 54/5 54/14 54/23 55/24 90/17 94/24
**accountant [39]**
**Accountant's [1]** 72/17
**accountants [1]** 46/2
**accounted [1]** 125/9
**accounting [4]** 20/24 45/19 45/22
 46/3

**accounts [1]** 44/17
**accurate [1]** 38/18
**accurately [1]** 90/23
**accused [1]** 21/5
**across [1]** 88/7
**Act [1]** 120/19
**actively [1]** 118/14
**activity [1]** 88/15
**acts [2]** 88/11 88/14
**add [2]** 108/13 110/10
**added [1]** 15/21
**addenda [1]** 77/9
**addition [4]** 5/25 39/25 40/16 54/21
**address [8]** 65/4 65/5 78/4 79/8 95/4
 119/12 120/16 121/6
**adjourned [1]** 133/5
**adjudicated [1]** 114/24
**admission [1]** 14/7
**admit [2]** 85/24 93/17
**admitted [18]** 14/25 86/17 88/23 89/5
 91/18 91/22 93/2 100/6 101/16
 101/21 101/24 102/3 107/5 111/15
 114/16 125/16 134/9 134/11
**advance [1]** 122/19
**adventure [1]** 11/17
**advise [1]** 130/1
**advisory [2]** 110/15 123/21
**affairs [1]** 121/1
**affect [2]** 111/16 121/3
**affects [1]** 87/17
**affirmatively [1]** 11/22
**afford [3]** 112/25 113/2 113/23
**afforded [1]** 126/3
**afloat [1]** 121/22
**afternoon [6]** 84/16 84/18 84/19
 84/21 84/22 84/23
**age [4]** 79/17 115/3 120/9 120/12
**agent [18]** 4/4 4/20 4/22 8/16 11/18
 15/6 30/12 58/5 67/11 74/21 75/3
 76/21 89/3 93/8 94/10 97/20 98/10
 98/22
**Agent Amanda [1]** 4/4
**Agent Cook [5]** 4/20 11/18 89/3
 97/20 98/10
**aggregate [1]** 28/7
**agree [2]** 94/19 102/12
**agreement [4]** 40/18 40/20 40/21
 40/22
**aided [1]** 88/12
**ailments [1]** 117/24
**airplane [3]** 112/22 117/11 117/12
**airplanes [1]** 117/11
**Alan [2]** 43/13 43/14
**albeit [1]** 30/7
**alleged [1]** 94/4
**allocute [1]** 76/25
**allocuted [1]** 114/17
**allocution [1]** 125/7
**allow [1]** 106/2
**allowed [7]** 10/21 11/9 18/15 18/16
 23/6 109/12 126/3
**alluded [1]** 108/8
**allusion [1]** 115/20

**almost [1]** 126/18
**alone [3]** 97/15 102/17 124/11
**alter [1]** 128/6
**although [1]** 127/1
**Amanda [4]** 4/4 4/11 4/15 134/3
**ambush [1]** 8/11
**amended [1]** 130/23
**AMERICA [5]** 1/6 4/23 59/2 59/3
 63/14
**America vs. Janice [1]** 4/23
**Americans [1]** 126/4
**amount [28]**
**amounts [6]** 8/25 24/22 26/6 40/10
 51/19 91/5
**ample [1]** 100/7
**amply [2]** 117/14 117/15
**Anderson [23]** 4/23 19/7 30/19 31/3
 32/7 33/8 33/13 57/8 58/12 64/24
 65/7 65/13 65/24 69/25 70/9 71/22
 72/3 72/9 73/13 73/16 86/11 90/1
 113/4
**Andre [1]** 37/3
**annotated [1]** 24/9
**announce [1]** 3/7
**announced [1]** 123/16
**answer [1]** 56/14
**answers [1]** 67/11
**anticipated [2]** 77/4 128/14
**Anton [37]**
**Anton's [3]** 11/22 100/1 116/17
**anybody's [1]** 81/9
**apartment [1]** 52/2
**apologize [1]** 56/16
**appeal [5]** 129/25 130/2 130/4 130/4
 130/17
**appearances [3]** 2/1 3/7 84/14
**appended [1]** 79/13
**applicable [5]** 92/12 104/19 105/7
 105/9 116/23
**application [10]** 92/18 102/17 104/19
 105/8 105/17 106/5 106/13 106/16
 109/4 119/20
**applied [4]** 98/24 113/10 113/15
 120/1
**applies [1]** 96/21
**apply [8]** 98/16 102/9 103/14 109/10
 109/19 110/8 116/4 130/4
**applying [3]** 102/24 116/2 116/6
**appreciate [6]** 86/22 96/15 101/14
 121/8 132/21 132/24
**apprize [1]** 95/8
**approach [1]** 8/13
**Approved [1]** 44/23
**approximately [1]** 97/13
**approximation [1]** 98/4
**April [7]** 35/19 35/24 35/24 36/2
 104/6 104/14 116/10
**April 11th [2]** 104/6 116/10
**aren't [1]** 106/6
**argue [4]** 68/14 104/1 117/21 124/23
**argued [1]** 13/17
**argues [3]** 87/23 96/20 125/22
**arguing [1]** 79/5

## A

**argument [15]** 20/10 21/13 67/8 69/13 94/2 97/5 101/23 106/15 106/17 106/23 106/25 108/12 112/11 116/17 117/3
**arguments [5]** 99/1 99/25 121/5 122/9 123/11
**arrest [2]** 61/17 73/12
**arrested [1]** 75/24
**arrests [2]** 51/22 114/23
**ascertainable [1]** 127/17
**aspect [1]** 122/20
**assert [1]** 111/11
**assessment [2]** 129/13 129/17
**assessments [1]** 129/9
**assets [2]** 115/15 128/14
**assist [2]** 108/1 108/4
**assistance [4]** 90/1 91/11 91/12 114/6
**Assistant [1]** 2/3
**associated [1]** 17/9
**assume [1]** 44/15
**Atlanta [1]** 55/2
**attachment [1]** 22/5
**attacked [1]** 118/6
**attempted [2]** 13/14 124/3
**attempting [1]** 42/25
**attorney [3]** 56/11 56/24 77/10
**Attorney's [2]** 2/3 128/9
**attorneys [5]** 2/3 91/13 124/7 126/10 126/11
**audio [3]** 64/19 64/19 64/21
**authenticated [1]** 8/7
**authentication [1]** 23/9
**authority [1]** 82/6
**Auto [2]** 37/2 97/4
**Avenue [1]** 128/18
**avoiding [1]** 126/24
**awarded [1]** 103/21
**aware [5]** 10/19 32/22 56/25 113/8 113/19

## B

**background [1]** 125/8
**bags [5]** 63/8 64/1 64/2 64/3 64/8
**bank [37]**
**banking [5]** 38/20 38/22 44/8 54/21 75/5
**Bankman [1]** 124/15
**Bankman-Fried [1]** 124/15
**banks [3]** 50/11 68/3 93/9
**barrage [1]** 20/18
**base [2]** 87/20 110/12
**basic [1]** 125/25
**basis [9]** 23/3 80/10 80/11 80/25 81/3 82/22 85/22 88/19 108/18
**began [6]** 32/20 89/4 89/11 105/1 107/24 113/9
**begging [3]** 72/11 94/12 122/1
**beginning [7]** 3/8 84/15 104/5 107/7 107/14 116/10 124/25
**begins [1]** 108/5
**begot [1]** 116/4

**behavior [1]** 99/18
**behind [1]** 115/6
**Behr [1]** 88/9
**believe [18]** 13/24 29/16 30/17 35/19 35/23 37/21 40/14 40/17 45/12 57/8 73/19 80/2 92/15 94/7 94/16 95/13 101/20 107/2
**believed [1]** 90/17
**believes [4]** 92/9 92/10 92/12 108/6
**belligerent [1]** 90/12
**belong [1]** 61/15
**bench [2]** 3/2 84/2
**beneficiary [1]** 23/18
**benefit [2]** 109/1 113/2
**benefited [1]** 112/21
**benefits [2]** 120/19 120/22
**beyond [3]** 11/17 88/24 123/25
**BIC [4]** 38/21 39/23 39/24 40/1
**biggest [1]** 99/3
**binding [1]** 108/3
**birth [2]** 34/21 113/11
**Bizarre [1]** 46/4
**blood [1]** 74/9
**blue [2]** 19/20 20/2
**Bo [3]** 48/22 48/22 50/19
**book [1]** 119/13
**Booking [1]** 42/10
**Bookings [3]** 19/23 19/25 22/3
**BOP [1]** 130/14
**Boulevard [2]** 2/4 2/7
**boy [1]** 125/15
**brain [1]** 99/14
**break [10]** 77/3 77/7 79/19 79/20 80/4 81/18 81/19 82/3 82/24 87/10
**brief [3]** 74/15 74/18 123/2
**briefing [2]** 122/8 123/15
**broad [1]** 107/18
**broadly [1]** 88/8
**broke [2]** 18/5 18/22
**Broward [1]** 2/4
**bully [1]** 114/2
**Bureau [3]** 127/12 128/8 129/1
**bus [2]** 55/12 55/13
**Bush [1]** 37/3
**business [6]** 24/10 24/23 50/13 54/14 61/20 62/16
**businesses [2]** 46/1 126/16
**buy [4]** 20/25 65/15 91/24 91/25
**buying [3]** 102/14 102/21 111/7

## C

**C-O-O-K [1]** 4/15
**calculated [2]** 105/10 115/22
**calculation [3]** 110/17 110/21 130/14
**calculations [1]** 88/19
**California [4]** 42/18 55/11 73/11 73/24
**call [6]** 22/1 26/1 36/4 102/7 117/16 121/25
**called [1]** 65/19
**calling [4]** 3/4 62/7 62/8 90/2
**calls [1]** 21/9
**Can-Am [3]** 48/25 48/25 50/20

**car [5]** 47/13 61/3 113/10 113/13 126/19
**cards [1]** 115/15
**career [1]** 113/9
**carefully [1]** 95/19
**cars [7]** 6/18 89/10 113/1 113/14 115/12 115/16 117/13
**Cartier [1]** 38/4
**category [9]** 103/18 104/10 108/9 108/10 110/11 110/15 111/24 112/16 115/23
**category I [1]** 110/15
**category II [3]** 108/9 112/16 115/23
**caused [3]** 88/13 117/23 117/25
**celebrities [1]** 126/22
**cell [13]** 5/7 5/10 5/16 6/3 7/5 9/17 9/19 9/21 13/25 15/10 16/3 16/12 16/13
**certify [1]** 134/19
**chance [7]** 30/22 76/25 80/20 95/4 96/4 99/2 104/12
**Chapter [6]** 108/14 108/14 108/15 108/16 108/23 109/12
**Chapter 2 [1]** 108/14
**Chapter 3 [1]** 108/14
**Chapter 4 [4]** 108/15 108/16 108/23 109/12
**Chapters [1]** 108/16
**Chapters 4 [1]** 108/16
**characterization [1]** 12/18
**charge [1]** 107/14
**charged [7]** 13/14 17/17 71/13 73/24 88/18 104/15 116/16
**charges [3]** 73/20 104/5 116/9
**chart [1]** 97/8
**charter [2]** 46/6 46/8
**chartered [2]** 17/23 46/4
**charters [1]** 44/25
**chat [2]** 24/20 72/3
**check [2]** 45/12 45/19
**checked [1]** 93/9
**checking [1]** 47/24
**chief [2]** 5/5 9/22
**choice [1]** 125/11
**choices [1]** 101/2
**Christmastime [1]** 118/16
**circles [1]** 62/21
**Circuit [6]** 88/6 88/10 88/21 89/2 102/17 116/12
**circumstances [2]** 16/5 65/22
**citation [1]** 105/16
**cite [1]** 105/17
**City [1]** 61/3
**civil [10]** 56/25 57/2 57/4 57/6 57/10 57/16 57/21 57/25 91/13 114/4
**claim [1]** 61/22
**claiming [1]** 17/15
**claims [2]** 105/3 112/20
**clarify [1]** 104/13
**clarifying [1]** 101/14
**classy [1]** 100/25
**clean [1]** 116/1
**clear [31]**

**C**

**clerk [2]** 128/16 128/19
**clerk's [1]** 128/17
**client [22]** 22/15 45/7 46/15 55/9 56/4 56/21 56/22 56/24 58/8 58/15 60/24 68/20 68/23 69/5 69/11 69/17 70/14 73/7 81/17 87/6 87/10 100/23
**close [3]** 51/22 82/13 125/2
**closely [1]** 96/8
**closer [3]** 105/15 108/25 110/2
**closing [1]** 101/22
**co [3]** 43/13 43/14 54/25
**co-signers [1]** 54/25
**Coach [1]** 55/11
**Coates [3]** 48/22 48/22 50/19
**coattails [1]** 115/10
**coconspirator [1]** 90/4
**code [5]** 38/21 39/23 40/1 127/16 134/20
**codefendant [10]** 31/21 32/7 33/13 80/14 80/17 89/8 89/15 107/12 114/1 115/16
**codefendants [2]** 30/18 31/15
**codes [2]** 39/24 75/16
**column [19]** 16/8 16/10 16/11 16/14 16/18 16/22 16/22 25/16 25/25 26/5 26/9 27/4 27/23 28/13 28/13 28/15 28/24 28/25 74/22
**column A [7]** 16/8 25/16 25/25 26/5 26/9 27/4 74/22
**column B [1]** 16/10
**column C [2]** 16/14 27/23
**column D [2]** 16/18 28/13
**column E [3]** 16/22 16/22 28/24
**columns [2]** 26/4 26/17
**columns A [1]** 26/17
**commanded [1]** 88/12
**commencement [4]** 104/22 105/10 106/10 106/18
**commentary [9]** 104/19 105/23 106/23 107/25 108/8 108/23 116/7 116/18 116/25
**commission [2]** 69/22 70/10
**commissions [1]** 70/24
**committed [2]** 88/12 127/12
**committing [1]** 115/5
**common [2]** 82/22 88/16
**common-law [1]** 82/22
**community [1]** 118/15
**company [6]** 41/5 44/24 45/13 47/17 50/18 55/18
**compared [2]** 59/13 119/10
**comparison [1]** 103/25
**compassion [1]** 86/11
**compilation [1]** 27/20
**compile [1]** 28/14
**compiled [1]** 25/12
**complaint [3]** 57/6 57/10 57/14
**complaints [1]** 115/10
**complete [1]** 94/3
**completed [1]** 107/9
**comply [2]** 129/4 129/6
**comprise [1]** 18/22

**computer [1]** 1/25
**concede [1]** 103/5
**conceded [3]** 66/17 97/9 97/21
**concern [1]** 82/12
**concerning [2]** 6/1 26/16
**concerts [1]** 115/11
**concluded [2]** 83/6 133/19
**concurrently [2]** 127/14 128/24
**condition [1]** 115/3
**conditions [2]** 129/4 129/6
**conduct [52]**
**conducted [1]** 6/4
**conferring [1]** 87/8
**confirm [3]** 6/10 26/10 74/21
**confirmation [1]** 18/9
**confirmed [2]** 28/21 56/11
**conforming [1]** 97/25
**confounding [4]** 124/2 124/22 125/21 127/9
**confusion [1]** 99/12
**connect [2]** 12/17 13/20
**connection [6]** 12/4 12/6 12/8 13/5 13/8 13/9
**consideration [3]** 119/4 120/9 121/3
**consistent [3]** 21/10 108/20 125/7
**consistently [3]** 67/12 75/17 93/21
**conspiracy [5]** 13/14 107/15 111/10 116/9 116/9
**contact [5]** 26/25 35/23 35/25 120/10 122/17
**contacted [1]** 16/2
**contacting [1]** 15/11
**contain [1]** 18/7
**contained [13]** 5/15 7/10 9/15 10/17 10/19 10/20 13/3 17/5 23/15 25/19 25/24 38/19 44/8
**containing [2]** 6/9 9/10
**contains [4]** 9/8 12/15 18/8 123/20
**contends [1]** 66/22
**context [1]** 103/9
**continued [3]** 15/4 29/22 134/4
**continuing [1]** 82/23
**continuously [1]** 26/25
**contrary [1]** 100/6
**controversy [1]** 57/21
**convenience [1]** 9/25
**convenient [2]** 9/25 10/2
**conversation [18]** 36/1 36/8 36/9 36/9 40/4 44/4 53/9 53/20 54/12 54/16 54/19 58/22 59/22 59/22 60/4 63/18 68/11 74/4
**conversations [7]** 25/15 25/20 29/4 42/6 53/7 53/22 68/4
**converse [1]** 41/13
**convey [1]** 53/20
**convicted [3]** 17/17 114/24 127/3
**conviction [18]** 6/1 88/17 92/13 92/20 103/18 103/22 104/8 107/15 109/4 109/10 109/15 109/25 110/2 110/4 113/9 114/22 116/3 130/1
**convince [1]** 92/1
**Cook [9]** 4/4 4/11 4/15 4/20 11/18 89/3 97/20 98/10 134/3

**Cooperating [1]** 129/7
**copies [2]** 86/14 86/23
**copy [12]** 9/19 10/14 12/2 38/11 38/12 70/2 85/3 85/17 86/4 86/5 86/6 86/14
**copying [2]** 38/16 50/4
**Coral [1]** 33/20
**corporation [1]** 42/14
**correction [1]** 111/3
**correspondence [1]** 9/11
**corresponds [1]** 25/6
**coterie [1]** 126/3
**couch [1]** 115/17
**counsel [24]** 3/7 7/15 7/24 13/4 45/6 46/14 55/8 56/3 58/7 58/14 60/23 68/19 68/22 69/4 69/16 70/13 73/6 84/6 84/14 86/4 87/5 103/16 133/2 133/15
**counsel's [1]** 3/25
**counseled [2]** 88/12 101/3
**count [4]** 35/10 103/24 104/9 107/15
**Count II [1]** 35/10
**counted [4]** 92/8 96/15 104/21 106/11
**country [2]** 115/11 120/24
**counts [4]** 6/1 127/13 128/23 129/13
**Counts I [3]** 127/13 128/23 129/13
**court [79]**
**Court's [7]** 32/14 96/16 98/11 101/14 116/23 119/6 129/19
**courtroom [4]** 81/6 83/5 84/3 133/18
**Courts [1]** 128/17
**cover [1]** 119/19
**covering [1]** 101/18
**CR [1]** 1/4
**crazy [1]** 94/19
**create [6]** 23/25 40/5 40/7 40/18 41/5 60/6
**created [7]** 8/23 15/9 18/9 25/21 53/1 103/10 105/24
**creating [2]** 71/19 107/11
**creation [1]** 31/10
**credible [3]** 97/10 102/22 111/11
**credibly [1]** 97/21
**credit [6]** 97/19 97/20 97/22 98/22 115/7 130/15
**crime [3]** 115/4 115/5 115/7
**criminal [17]** 3/6 84/13 88/15 103/17 104/10 108/9 109/14 110/11 110/15 111/24 112/16 113/9 113/18 114/17 115/22 118/6 128/1
**cross [23]** 14/4 14/8 14/14 29/25 30/9 30/23 35/2 35/7 66/16 66/25 67/11 76/14 91/21 93/2 98/7 98/13 101/4 102/20 102/25 103/2 103/4 125/15 134/5
**cross-examination [10]** 14/4 29/25 35/2 35/7 91/21 93/2 98/7 98/13 103/2 125/15
**CRR [2]** 2/9 134/24
**crystal [1]** 108/12
**culpable [1]** 113/6
**custody [5]** 103/25 104/4 111/8

**C**

custody... [2]  120/23 128/25
cut [3]  38/11 49/18 93/12

**D**

Dadeland [1]  2/7
Dainty [1]  31/23
dark [1]  82/21
data [1]  18/23
date [18]  8/24 12/9 16/10 16/21 29/13 34/21 35/16 35/25 51/22 89/13 103/25 105/6 105/10 122/12 123/16 127/17 127/20 134/24
dates [4]  10/21 36/5 92/16 113/11
daughter [1]  120/14
David [1]  1/15
dealt [1]  97/4
deceive [4]  114/16 125/11 125/12 125/18
decide [1]  81/20
deep [1]  124/13
deeply [1]  82/5
defeat [1]  109/6
defendant [123]
defendant's [21]  5/15 6/3 6/16 9/17 15/10 15/23 16/3 16/12 19/17 21/17 24/1 29/19 42/24 54/5 85/1 106/10 106/18 107/8 127/3 128/11 131/5
defendants [16]  16/17 26/25 27/7 27/14 28/12 28/20 36/18 69/23 75/22 75/24 82/14 89/11 105/2 115/15 125/5 125/6
defendants' [2]  64/22 92/3
defense [16]  3/25 12/25 13/2 13/4 13/21 66/17 90/1 97/9 102/15 102/21 103/11 105/3 112/1 112/20 115/1 133/10
deference [1]  81/7
defies [1]  117/20
defined [2]  106/12 106/14
definition [1]  108/2
definitional [1]  108/4
defraud [4]  99/14 99/17 99/19 100/5
defrauded [3]  27/12 91/11 91/12
delay [3]  100/8 100/8 105/3
delayed [1]  101/18
demand [1]  21/15
demeanor [1]  97/21
denied [1]  81/12
department [3]  45/19 45/22 46/3
departure [7]  77/14 78/12 79/17 85/2 109/13 109/17 115/2
deportable [1]  120/21
deportation [1]  120/13
deposit [2]  37/18 37/20
deputy [1]  133/9
describe [8]  5/14 6/6 6/13 15/8 18/15 18/16 81/1 86/9
deserves [1]  114/20
Design [1]  64/19
despair [1]  118/20
despite [2]  93/16 112/20
detail [1]  94/22

deter [2]  113/18 127/5
determination [3]  88/4 92/15 127/18
determinative [2]  79/25 107/17
determine [10]  6/3 22/9 22/21 23/23 29/6 33/15 36/3 38/5 52/11 75/12
determined [12]  6/14 45/10 47/6 47/22 49/4 59/9 66/2 67/18 108/17 112/16 127/21 129/16
determining [2]  105/9 108/1
detriment [1]  126/16
development [1]  78/16
difference [7]  53/17 54/12 76/4 94/25 119/13 119/23 124/14
differences [1]  96/23
difficult [1]  121/22
digit [1]  126/8
digits [2]  38/22 39/25
diligence [1]  132/22
Dimitrouleas [2]  103/23 127/4
dire [6]  10/7 10/8 10/9 14/3 14/7 134/4
direct [6]  4/18 15/4 101/3 103/3 134/3 134/4
directly [1]  71/16
dirties [1]  111/22
disagree [1]  100/4
disclosure [1]  129/8
disconnected [1]  94/8
discrepancy [1]  124/12
discretion [1]  116/13
discuss [2]  81/17 81/19
discussed [1]  84/25
discussing [1]  31/12
discussion [22]  7/15 7/24 19/15 19/16 20/7 31/14 31/19 45/6 46/14 55/8 56/3 58/7 58/14 60/23 68/19 68/22 69/4 69/16 70/13 73/6 87/5 133/8
dismissed [1]  35/12
disparities [1]  126/25
dispute [4]  66/14 67/24 89/19 89/20
district [5]  1/1 1/2 1/16 129/2 132/1
dividing [1]  122/23
DIVISION [1]  1/3
Docket [8]  77/11 77/12 77/13 77/15 77/16 78/25 85/1 103/2
docketed [2]  77/19 86/16
document [12]  17/14 18/13 18/14 23/25 24/14 40/19 42/7 50/4 78/17 80/5 82/19 85/16
documents [17]  6/9 7/22 8/1 9/9 9/12 9/15 9/24 9/24 23/7 29/18 40/17 84/24 87/1 87/10 90/9 93/3 100/6
Does 1 [1]  57/9
dollar [3]  98/4 98/6 112/24
dollars [5]  32/15 51/18 54/1 54/18 126/12
domestic [2]  39/24 75/16
Dominguez [65]
Dominguez's [1]  77/12
double [2]  56/12 126/8
double-digit [1]  126/8
dovetails [1]  8/8

download [1]  7/9
downloading [1]  38/8
downward [8]  77/14 78/11 79/1 79/3 79/16 85/2 115/2 115/2
downwards [1]  124/21
Dream [7]  56/6 56/6 56/8 56/9 56/11 97/15 122/25
drive [4]  7/21 9/8 10/14 117/13
driver's [2]  34/20 113/12
drives [1]  124/10
driving [3]  61/4 61/5 113/1
drug [1]  120/22
DSL [1]  1/4
duped [1]  114/9
Dupree [4]  105/24 106/17 109/2 116/4

**E**

earliest [2]  29/14 89/7
early [9]  29/20 32/20 89/4 89/11 92/7 92/16 107/10 107/22 107/24
earned [1]  127/24
earnings [1]  128/6
earns [1]  127/23
easier [1]  10/3
easily [1]  98/18
ECF [1]  77/19
ECF 129 [1]  77/19
efficiently [1]  69/14
Eight [1]  105/18
ELEANOR [5]  1/9 3/5 4/23 84/12 127/12
elements [1]  99/13
Eleventh [6]  88/6 88/10 88/20 89/2 102/16 116/12
Elizabeth [1]  131/13
elongates [1]  109/22
email [4]  20/24 42/10 42/12 42/19
emailed [1]  72/19
emailing [1]  32/5
embarrassment [1]  82/12
employment [1]  129/8
enabled [1]  126/15
enabler [1]  126/2
encouragement [1]  118/23
endemic [1]  126/23
enforcement [2]  91/11 92/4
engaged [1]  117/25
enhancement [14]  87/21 87/25 87/25 95/12 96/20 96/21 97/17 98/23 102/9 102/18 102/23 102/24 103/14 110/12
enhancements [1]  120/2
enjoying [2]  115/6 117/21
ensue [1]  20/10
ensues [1]  74/5
Entertainer [1]  55/11
Entertainment [1]  42/18
entirely [2]  67/18 67/20
entitled [3]  24/16 115/13 134/22
Entries [1]  77/12
Entries 127 [1]  77/12
entry [10]  30/16 30/17 77/11 77/13 77/15 77/16 78/25 85/1 103/2 130/2

**E**

**Entry 126 [1]** 77/11
**Entry 129 [1]** 103/2
**Entry 133 [1]** 85/1
**Entry 136 [1]** 77/13
**Entry 138 [1]** 77/16
**Entry 141 [1]** 77/15
**epitomizes [1]** 113/7
**equipment [6]** 37/11 37/22 64/21
 65/8 65/10 65/15
**erring [1]** 116/5
**error [1]** 42/3
**especially [2]** 68/16 120/12
**Esq [1]** 2/6
**essentially [6]** 89/14 90/3 107/23
 114/16 115/5 115/17
**establish [1]** 108/17
**established [3]** 23/3 40/20 42/25
**establishes [1]** 104/20
**estate [1]** 69/20
**estimates [1]** 122/9
**Evans [4]** 30/3 30/13 71/9 89/6
**Evans-Kings [1]** 30/3
**evening [1]** 126/21
**events [2]** 102/2 118/17
**everybody [1]** 82/24
**everyone [1]** 120/8
**evict [1]** 21/25
**eviction [1]** 20/14
**evidence [41]**
**evidentiary [3]** 5/4 5/11 77/3
**examination [15]** 4/18 10/9 14/4 15/4
 29/25 35/2 35/7 74/19 76/16 91/21
 93/2 98/7 98/13 103/2 125/15
**exceed [2]** 98/18 127/19
**exceeding [1]** 106/9
**exceeds [1]** 87/23
**excellent [3]** 116/17 126/10 132/19
**exceptions [1]** 81/23
**excerpts [1]** 11/4
**exchange [1]** 107/4
**excluded [2]** 12/14 13/16
**excused [1]** 76/23
**executed [1]** 114/8
**exhibit [36]**
**Exhibit 1 [17]** 8/22 11/25 12/3 12/4
 12/15 14/23 15/7 18/23 28/3 29/5
 86/1 86/10 122/7 122/21 122/24
 123/7 133/10
**Exhibit 2 [7]** 9/2 9/7 14/23 18/3 18/22
 25/20 25/24
**Exhibit 41 [1]** 30/18
**exhibits [8]** 11/15 13/15 14/7 14/15
 30/4 57/5 98/14 134/8
**Exhibits 1 [1]** 11/15
**exited [2]** 83/5 133/18
**exorbitant [1]** 117/22
**expecting [1]** 96/14
**expensive [1]** 117/16
**experience [1]** 75/3
**experienced [1]** 109/8
**expert [2]** 11/5 75/2
**explain [5]** 12/6 15/14 15/21 28/25

 30/15
**explosive [1]** 79/25
**extra [1]** 100/21
**extraordinary [1]** 95/16
**extreme [1]** 118/20
**extremely [2]** 66/13 92/17
**Eyes [2]** 22/16 54/22

**F**

**F.2d [1]** 88/20
**F.3d [2]** 88/10 89/2
**facility [1]** 131/22
**facing [1]** 120/12
**fact [42]**
**factor [4]** 115/8 119/16 120/18
 125/21
**factors [7]** 108/16 117/8 118/13
 123/21 123/25 124/22 127/9
**facts [3]** 97/2 111/6 111/18
**Fadima's [1]** 120/16
**fairness [1]** 102/6
**fake [138]**
**fakes [3]** 93/20 101/16 101/17
**false [7]** 89/9 99/10 99/11 99/18
 105/4 107/11 107/11
**falsely [1]** 113/14
**families [1]** 126/21
**family [3]** 120/11 120/11 120/25
**fancy [3]** 112/22 113/1 115/12
**faulty [1]** 99/12
**favor [1]** 120/3
**FDC [2]** 132/8 132/16
**February [3]** 20/15 22/2 24/9
**February 7th [2]** 20/15 24/9
**February 8th [1]** 22/2
**federal [5]** 73/20 88/7 113/9 113/16
 127/23
**feeding [2]** 118/15 118/16
**feelings [1]** 81/2
**fell [1]** 27/18
**Ferrari [1]** 46/17
**figure [2]** 98/2 98/5
**figured [3]** 27/15 113/24 114/12
**figures [2]** 100/12 124/18
**figuring [1]** 16/24
**file [7]** 22/13 25/4 32/24 33/3 86/18
 86/19 133/11
**filed [4]** 82/9 111/5 118/12 130/2
**files [2]** 32/25 34/11
**final [3]** 77/8 127/18 130/12
**finally [3]** 16/22 98/25 125/23
**financial [6]** 40/1 127/25 128/3
 128/14 128/17 129/8
**findings [3]** 119/6 123/4 129/19
**fine [12]** 7/25 30/10 32/13 62/20
 66/24 67/13 77/4 112/3 112/4 113/4
 123/23 123/23
**fines [1]** 129/9
**fit [1]** 30/1
**flabbergasted [1]** 119/12
**flatly [1]** 102/15
**flight [4]** 17/24 46/4 46/6 46/8
**flights [1]** 44/25

**floating [1]** 86/7
**flooded [1]** 89/14
**Floor [1]** 2/4
**FLORIDA [8]** 1/2 1/7 2/5 2/8 2/10
 128/18 131/23 132/1
**fly [1]** 117/11
**flying [1]** 115/11
**focus [1]** 30/2
**folder [6]** 18/6 18/7 22/12 23/15 24/5
 25/25
**folders [8]** 7/10 9/25 10/2 18/4 18/21
 25/15 25/19 74/7
**food [1]** 118/23
**force [1]** 132/12
**forced [1]** 106/6
**foregoing [1]** 134/20
**foreseeable [1]** 88/14
**forget [1]** 126/17
**form [1]** 88/19
**forma [1]** 130/4
**format [3]** 7/3 48/4 49/13
**formatting [2]** 44/7 75/15
**former [1]** 8/12
**FORT [6]** 1/3 1/7 2/5 2/10 65/1 70/19
**fortunate [1]** 118/15
**forwarded [4]** 38/6 94/16 128/17
 128/19
**forwarding [2]** 38/8 38/17
**foundation [1]** 11/17
**FR [4]** 22/4 22/9 24/17 25/4
**FR-wire [3]** 22/4 24/17 25/4
**FR-wire.pdf [1]** 22/9
**Francine [3]** 2/9 134/23 134/24
**fraud [8]** 92/10 99/13 103/23 110/4
 113/10 114/24 124/11 127/3
**frauds [1]** 125/24
**fraudulent [13]** 8/24 12/9 14/10 16/4
 16/10 29/13 44/9 44/11 44/16 89/4
 93/3 97/1 100/6
**FRB [1]** 40/3
**FRBB [1]** 40/2
**free [1]** 68/14
**Fried [1]** 124/15
**front [4]** 12/1 120/8 125/20 126/11
**fullest [1]** 13/22
**fullness [1]** 124/19
**furtherance [1]** 88/15

**G**

**Gables [1]** 33/20
**Gabriel [2]** 61/2 62/23
**Gai [1]** 30/3
**Gail [1]** 71/8
**gains [1]** 128/14
**Gal [4]** 30/13 68/24 71/8 89/6
**gallery [1]** 126/10
**general [2]** 40/9 42/14
**generalities [1]** 38/23
**generate [1]** 41/5
**generated [4]** 29/20 40/5 72/23 93/12
**Gentlemen [1]** 3/11
**gets [7]** 8/7 8/7 66/16 76/25 80/14
 94/25 97/16

**G**

Ghertler [1]  89/1
ghost [1]  21/3
ghosting [1]  21/5
gigs [1]  117/12
glasses [1]  38/4
Gold [1]  36/16
gonna [1]  121/25
goods [2]  89/10 121/24
gotten [1]  46/7
government [46]
government's [30]
Government's 1 [1]  8/18
Government's 2 [1]  9/3
grand [1]  73/17
grandchild [1]  120/14
great [4]  86/21 101/15 117/4 132/11
greater [1]  98/17
grid [1]  124/10
gross [1]  128/5
Ground [1]  23/1
group [7]  30/3 30/13 69/19 69/20
 69/20 89/6 126/15
guide [1]  108/2
guideline [19]  94/20 104/9 105/8
 105/23 106/6 106/24 108/17 108/23
 109/14 109/16 110/15 111/1 112/15
 114/21 115/22 116/19 122/9 123/21
 124/21
guidelines [30]
guilt [2]  42/25 117/19
guilty [1]  114/24

**H**

hairs [1]  101/21
half [2]  112/24 121/23
hallway [1]  103/23
hand [8]  4/10 78/1 78/5 78/21 78/21
 86/13 102/4 123/5
handed [2]  80/6 85/7
handing [1]  82/9
hands [2]  92/3 114/13
happy [1]  111/23
hatched [4]  89/7 89/8 105/2 105/5
he'll [1]  104/12
head [1]  67/7
heading [4]  87/16 99/3 103/15
 103/17
health [2]  115/3 132/5
hear [6]  23/10 82/2 82/14 88/1
 104/17 111/23
heard [12]  37/9 37/10 38/2 45/11
 45/13 87/1 96/10 111/17 112/8
 112/19 117/5 124/8
hearing [12]  1/14 77/7 77/18 89/18
 97/19 98/15 122/7 122/11 123/15
 130/11 130/21 130/24
hearsay [4]  23/2 23/7 56/12 56/15
heartfelt [1]  81/1
heavily [1]  120/3
help [4]  105/25 120/4 121/25 125/8
helped [5]  72/13 72/15 118/19
 118/22 118/22

helping [2]  95/24 118/15
here's [2]  40/23 90/13
hereby [1]  134/19
hers [1]  101/10
Hey [1]  62/14
hide [1]  100/13
high [6]  34/9 112/15 113/14 114/21
 115/9 115/21
high-end [2]  34/9 113/14
higher [1]  125/22
highly [2]  79/2 118/13
history [10]  79/17 103/17 104/10
 108/9 109/14 110/11 110/15 111/24
 112/16 115/23
hit [2]  67/7 90/16
hold [1]  100/1
holding [1]  131/8
home [4]  65/16 65/18 69/19 69/20
homeless [1]  118/17
honestly [3]  88/3 88/7 101/20
Honor [28]
Honorable [2]  1/15 124/9
Honorable Jed [1]  124/9
Horn [10]  90/25 97/6 97/24 105/23
 105/25 106/1 106/2 109/1 116/4
 116/22
hour [1]  125/2
hours [1]  128/25
house [2]  112/24 115/15
how's [1]  35/17
huge [1]  95/24
hum [2]  52/8 53/15
human [1]  120/17
Humberto [4]  2/6 2/6 3/12 84/19
hundreds [1]  126/12

**I**

I'd [9]  30/2 30/3 30/6 32/16 34/24
 59/1 78/4 106/15 112/10
I'll [17]  13/11 29/25 30/2 40/24 40/25
 43/5 58/3 62/20 67/6 69/2 82/24 88/1
 104/17 105/11 112/1 117/2 132/3
I'm [57]
I've [14]  48/1 77/8 77/8 77/10 77/14
 77/17 77/20 80/10 87/2 90/13 108/24
 119/7 123/4 123/25
ICE [2]  131/15 131/19
idea [2]  51/14 66/9
identical [1]  17/16
identification [4]  8/17 8/20 9/5 86/3
identified [10]  16/8 25/25 26/5 26/9
 26/16 27/4 29/5 40/2 75/8 88/21
identify [2]  15/25 124/1
identifying [1]  34/20
identities [1]  113/15
identity [1]  113/12
Ignancio [1]  88/20
II [5]  35/10 104/11 108/9 112/16
 115/23
III [3]  127/13 128/23 129/13
image [2]  23/16 24/25
imagine [2]  8/4 126/4
immediately [4]  22/1 126/13 129/12

132/9
immigration [3]  120/23 129/7 131/15
imposed [8]  103/24 106/9 121/12
 123/24 127/25 128/3 129/19 130/1
impressed [1]  118/13
imprisoned [1]  127/13
imprisonment [3]  106/8 128/21
 129/15
in forma [1]  130/4
in limine [1]  13/15
incarceration [2]  127/22 128/4
include [2]  5/7 99/9
included [8]  5/20 57/4 57/5 57/10
 74/7 105/9 123/3 123/8
includes [2]  88/11 104/23
including [2]  87/2 102/25
incoherent [1]  125/17
income [1]  128/15
incomplete [1]  94/18
incongruity [1]  102/13
incorrect [5]  38/20 59/14 75/15
 75/15 75/15
increments [1]  51/19
independent [1]  75/12
INDEX [2]  133/21 134/8
indicated [7]  16/10 25/3 25/16 27/23
 28/3 30/12 114/22
indicating [2]  62/14 90/12
indicted [2]  73/20 73/23
indictment [6]  35/10 77/8 88/18
 88/22 104/5 104/15
individual [16]  5/18 7/10 17/13 32/4
 34/10 38/17 44/6 50/19 50/19 61/13
 62/9 64/7 64/8 64/13 65/16 90/8
individually [1]  75/11
individuals [5]  6/14 15/22 54/5 57/9
 90/20
induced [1]  88/13
industries [1]  127/23
industry [1]  121/22
inferences [2]  68/7 68/14
infirmity [1]  115/8
information [31]
informed [1]  36/6
initial [4]  20/25 91/15 96/10 96/13
initially [2]  27/4 28/21
initiated [1]  49/7
innocence [1]  117/20
inquire [1]  32/16
installed [1]  65/16
instance [10]  18/2 39/15 40/2 40/9
 41/18 50/25 59/3 60/15 62/24 122/7
instances [7]  16/6 36/13 36/15 41/10
 50/15 50/17 54/2
instant [23]  4/5 5/12 21/11 25/13
 29/18 88/2 104/23 104/25 105/10
 106/10 106/12 106/14 106/19 107/3
 107/17 108/2 108/5 112/13 112/18
 116/6 116/8 116/15 116/21
instead [1]  106/7
institution [1]  40/1
instructions [5]  7/11 23/17 23/23
 25/1 25/6

**I**

**insurance [1]** 114/24
**integrity [1]** 75/4
**intended [22]** 8/25 16/14 28/9 28/11 32/16 76/4 90/22 90/24 91/2 92/10 94/20 96/21 97/6 97/13 97/23 98/2 98/17 98/18 119/8 119/19 124/13 124/20
**intending [1]** 125/18
**intent [9]** 91/3 97/1 99/11 99/13 99/17 100/5 107/6 107/8 114/10
**intention [1]** 121/21
**intentional [1]** 125/11
**interactions [1]** 96/23
**interested [1]** 32/14
**interests [1]** 128/7
**international [1]** 39/24
**interns [1]** 86/13
**interprets [1]** 88/8
**introduced [18]** 5/4 5/22 6/21 7/4 8/5 9/22 10/4 10/11 10/17 11/5 11/20 12/5 12/7 12/10 15/7 15/17 31/8 59/12
**investigation [4]** 4/25 5/3 33/17 129/10
**investigative [1]** 4/22
**invite [2]** 30/1 30/7
**involvement [2]** 71/15 71/19
**irregular [3]** 38/15 41/6 41/8
**issue [6]** 99/15 105/22 105/24 106/4 108/25 110/1
**issued [3]** 73/12 73/18 73/19
**issues [1]** 71/5
**item [3]** 30/6 30/12 34/15
**itemization [1]** 34/12
**itemized [1]** 18/3
**items [24]** 5/4 5/7 5/11 9/15 14/10 16/16 16/20 16/25 17/19 17/21 28/1 28/12 29/3 33/4 34/14 34/23 36/11 75/23 76/1 90/6 90/16 91/4 107/20 113/23
**IV [3]** 127/13 128/23 129/13

**J**

**jail [1]** 114/25
**Jamaica [1]** 120/13
**Jamaican [1]** 131/5
**JANICE [23]** 1/9 3/5 3/13 4/23 5/7 5/17 5/19 9/9 9/10 17/2 20/1 21/24 30/18 32/1 54/25 62/8 84/12 84/20 89/21 89/23 89/25 90/8 127/12
**January [1]** 73/25
**jaws [2]** 109/6 109/7
**Jed [1]** 124/9
**jet [2]** 44/24 48/24
**jets [3]** 44/23 112/22 115/11
**jeweler [1]** 31/13
**Jewelers [1]** 37/24
**jewelry [5]** 6/18 17/22 43/16 89/10 113/4
**job [3]** 126/18 127/24 128/2
**joint [2]** 103/10 111/8
**jointly [1]** 88/15

**Jones [9]** 2/2 3/10 84/17 99/6 99/23 100/2 100/25 102/12 102/16
**Judge [89]**
**Judge Dimitrouleas [2]** 103/23 127/4
**Judge Kaplan [1]** 124/15
**judges [1]** 124/14
**judgment [7]** 127/11 127/25 130/3 130/12 130/19 130/20 132/4
**July [5]** 1/7 3/1 8/11 73/19 84/1
**July 22nd [1]** 8/11
**July 26th [1]** 73/19
**jury [9]** 88/22 97/10 99/16 102/15 107/6 111/10 125/12 126/11 126/14
**justice [2]** 114/19 128/7
**justify [1]** 102/17

**K**

**Kaiser [9]** 105/25 106/5 106/17 108/25 116/3 116/5 116/8 116/12 116/20
**Kaiser/Dupree [1]** 106/17
**Kaplan [1]** 124/15
**keep [8]** 31/17 32/4 36/4 36/5 36/6 121/22 125/8 126/9
**keeps [1]** 95/19
**Keisha [3]** 58/10 58/12 58/24
**key [1]** 100/7
**kinds [3]** 125/3 125/14 125/23
**King [1]** 68/24
**Kings [3]** 30/3 30/13 89/6
**Kingston [14]** 31/22 57/3 57/8 61/4 62/8 62/10 62/14 68/4 72/21 94/16 113/4 117/12 117/17 117/25
**Kingston's [3]** 42/21 73/3 115/10
**Kisean [7]** 4/23 19/7 30/19 33/8 57/8 89/25 113/4
**knowingly [2]** 89/8 107/13
**knowledge [4]** 23/3 58/1 91/17 107/8
**knows [2]** 45/20 124/15

**L**

**lacking [1]** 93/14
**landed [1]** 113/16
**landlord [10]** 19/21 20/16 20/18 21/15 21/23 22/3 22/7 25/7 96/24 97/2
**landlord's [1]** 20/3
**language [3]** 106/1 106/21 111/19
**LAPD [5]** 32/23 32/25 33/3 33/16 34/10
**largely [1]** 126/1
**lasted [1]** 127/6
**late [3]** 52/3 52/5 95/14
**lateness [1]** 97/3
**latest [1]** 29/14
**latitude [2]** 43/3 66/13
**LAUDERDALE [6]** 1/3 1/7 2/5 2/10 65/1 70/19
**launched [1]** 120/24
**law [16]** 2/6 82/22 88/7 91/11 92/3 92/5 94/19 96/25 97/6 99/8 102/13 102/16 108/22 121/1 123/7 127/7

**lawsuit [5]** 56/25 57/2 57/4 57/21 57/25
**lawsuits [2]** 57/17 114/5
**lawyer [2]** 56/8 81/8
**lead [1]** 4/22
**learn [1]** 26/15
**lease [7]** 27/17 52/10 52/12 70/1 70/2 70/4 70/5
**leave [2]** 118/7 130/4
**leg [1]** 100/1
**legally [2]** 106/4 108/3
**legitimate [8]** 22/22 22/23 53/23 54/15 75/23 91/17 126/13 126/16
**legitimately [1]** 114/12
**Leibowitz [1]** 1/15
**lengths [1]** 101/15
**lengthy [1]** 114/4
**letter [11]** 66/20 66/23 80/16 81/1 81/2 82/8 85/21 86/10 87/2 120/16 133/10
**letters [6]** 77/15 82/7 118/3 118/9 118/11 120/3
**letting [1]** 117/1
**levels [1]** 87/22
**leveraged [1]** 126/5
**leveraging [1]** 126/22
**license [2]** 34/20 113/12
**lied [1]** 102/5
**life [6]** 30/3 30/13 89/6 115/9 117/23 126/4
**lifestyle [1]** 115/12
**limine [1]** 13/15
**limited [1]** 10/24
**line 2 [1]** 35/9
**line 22 [2]** 30/3 30/8
**line 3 [1]** 15/16
**lines [1]** 12/16
**Linvo [1]** 55/1
**list [1]** 15/22
**Listen [1]** 101/15
**listening [1]** 11/6
**literally [2]** 49/18 54/17
**LLC [4]** 18/6 22/16 22/20 44/23
**loans [2]** 113/10 113/15
**logic [1]** 117/20
**logo [4]** 49/14 49/15 49/23 50/5
**logos [1]** 50/11
**losing [1]** 120/10
**loss [57]**
**losses [4]** 118/21 119/7 127/16 127/18
**lost [1]** 118/20
**love [1]** 119/2
**loved [2]** 115/9 115/9
**luck [1]** 133/4
**luggage [1]** 63/7
**lunch [2]** 77/3 82/24
**luxury [1]** 63/8
**lying [1]** 114/19

**M**

**magically [1]** 54/19
**main [1]** 66/14

**M**

**major [1]** 99/13
**majority [1]** 34/9
**Mama [5]** 42/21 62/8 62/10 62/14 62/14
**Mamakingston [4]** 19/23 19/25 22/3 42/9
**manager [7]** 19/14 19/20 21/3 21/5 22/14 23/20 37/5
**manager's [1]** 19/16
**mandatory [2]** 129/4 129/12
**manner [2]** 129/20 129/21
**manufacturer [1]** 26/2
**Marc [3]** 2/2 3/9 84/16
**March [5]** 29/16 29/22 104/4 104/14 116/10
**March 14th [2]** 29/16 29/22
**March 29th [1]** 116/10
**Mark [2]** 24/10 24/23
**marked [7]** 8/16 8/19 9/4 12/3 86/3 134/9 134/11
**market [1]** 89/14
**marshals [2]** 132/8 132/16
**massively [1]** 124/11
**matched [3]** 7/3 34/15 34/21
**matching [2]** 26/6 34/19
**material [2]** 99/10 128/11
**materials [1]** 37/11
**math [1]** 98/18
**matter [9]** 3/4 77/23 84/11 108/22 114/7 117/5 122/10 124/24 134/22
**matter's [1]** 57/20
**matters [1]** 93/4
**Maybachs [1]** 113/1
**Mazal [1]** 36/23
**meals [1]** 118/23
**mean [17]** 16/18 17/4 21/8 28/11 30/20 31/11 36/3 41/1 41/5 44/16 45/24 69/10 70/3 72/22 78/18 102/1 130/13
**meaning [3]** 89/25 116/6 116/21
**means [7]** 21/9 108/21 113/5 113/22 116/6 116/15 130/5
**meant [1]** 116/7
**mechanical [1]** 1/24
**media [2]** 81/6 81/10
**medical [12]** 78/9 79/12 79/15 79/16 79/17 79/21 79/23 79/24 81/24 85/4 85/15 85/17
**meeting [1]** 65/17
**member [1]** 111/10
**memorandum [1]** 77/15
**memory [1]** 99/12
**Menard [2]** 69/19 69/20
**mental [1]** 115/3
**merchandise [7]** 28/19 43/22 43/23 43/24 43/25 74/6 96/14
**mercy [2]** 122/2 122/2
**message [4]** 17/5 38/9 45/23 62/11
**messages [42]**
**Miami [3]** 2/8 128/18 128/18
**microphone [1]** 4/14
**Miguel [1]** 37/3

**Mille [1]** 117/22
**million [12]** 28/4 66/23 87/24 90/23 91/6 92/11 96/21 98/2 98/17 98/18 119/8 119/9
**millions [1]** 126/13
**mindful [1]** 126/24
**mine [1]** 133/11
**minimum [1]** 128/2
**minus [1]** 85/3
**minutes [3]** 77/2 77/7 84/7
**mirror [4]** 10/15 13/3 13/6 14/18
**misnomer [1]** 113/3
**missing [1]** 40/3
**mistake [2]** 95/24 99/12
**mistaken [1]** 121/20
**mitigating [1]** 115/8
**mitigation [7]** 67/2 67/8 67/25 68/16 94/23 119/5 119/25
**modification [1]** 111/3
**modifying [1]** 36/14
**modus [1]** 97/24
**mom [2]** 31/22 32/8
**moment [6]** 11/18 12/22 18/12 18/12 23/4 123/17
**moments [2]** 102/20 102/24
**money [15]** 16/19 16/24 29/2 29/12 33/3 39/4 46/7 47/20 48/13 49/5 76/8 89/24 100/11 119/14 126/13
**monies [1]** 90/16
**monitor [1]** 128/10
**month [10]** 44/17 52/3 52/5 52/7 52/10 52/16 93/22 106/9 112/24 127/4
**monthly [1]** 128/5
**months [9]** 51/20 74/5 109/23 110/16 112/17 113/16 115/23 117/6 127/13
**months' [1]** 129/15
**moral [3]** 124/10 124/13 127/6
**morning [11]** 3/9 3/11 3/12 3/14 3/15 3/16 3/17 3/18 4/20 21/21 21/24
**Mosquera [2]** 24/10 24/23
**mother [3]** 80/17 81/2 86/12
**motion [12]** 13/15 77/14 78/11 79/1 79/2 79/3 79/17 81/12 82/17 85/1 115/1 120/7
**motions [1]** 77/10
**motive [2]** 103/9 125/6
**Motors [3]** 46/17 47/16 47/18
**move [6]** 11/15 43/5 62/20 72/25 99/4 117/12
**moved [3]** 13/14 44/16 105/25
**Mr [6]** 134/3 134/4 134/4 134/5 134/5 134/6
**Mr. [110]**
**Mr. Anderson [6]** 64/24 65/13 71/22 72/9 73/16 86/11
**Mr. Anton [31]**
**Mr. Anton's [3]** 11/22 100/1 116/17
**Mr. Dominguez [58]**
**Mr. Dominguez's [1]** 77/12
**Mr. Jones [6]** 99/6 99/23 100/2 100/25 102/12 102/16
**Mr. Kingston [4]** 94/16 117/12

117/17 117/25
**Mr. Kingston's [1]** 73/3
**Ms. [37]**
**Ms. Kingston [1]** 68/4
**Ms. Shotwell [5]** 78/22 86/13 122/12 123/16 127/19
**Ms. Turner [28]**
**Ms. Turner's [3]** 55/25 64/23 125/7
**multiple [5]** 20/15 35/23 102/20 102/24 114/20
**Munio [1]** 88/20
**myriad [1]** 117/24

**N**

**nail [1]** 67/7
**name [5]** 4/13 4/14 22/15 62/9 70/1
**named [1]** 87/10
**names [1]** 113/11
**narrative [2]** 110/5 110/7
**nature [6]** 36/1 108/4 113/22 118/17 118/23 120/20
**NE [1]** 2/10
**necessary [1]** 98/4
**negotiated [2]** 65/10 65/11
**nice [2]** 99/23 133/17
**Nikolenko [1]** 38/1
**nine [1]** 109/23
**nine months [1]** 109/23
**none [6]** 76/18 95/21 95/21 95/22 111/9 117/18
**normal [1]** 81/4
**North [1]** 128/18
**note [12]** 66/13 92/18 104/19 105/17 106/5 106/13 106/16 106/23 108/23 116/18 119/20 125/23
**Note 1 [1]** 105/17
**Note 8 [5]** 92/18 104/19 106/5 106/13 106/16
**noted [1]** 129/9
**notes [1]** 105/8
**notice [1]** 130/2
**noticed [1]** 78/25
**notwithstanding [1]** 99/17
**November [18]** 29/15 29/20 31/21 32/6 32/21 89/5 89/11 92/7 92/16 104/2 104/8 105/1 105/6 105/14 107/4 107/10 107/22 109/20
**November 4th [11]** 29/15 29/20 31/21 32/6 32/21 89/5 89/11 92/7 92/16 105/1 105/14
**number [24]** 3/6 8/17 8/19 8/23 9/4 9/16 11/16 16/2 28/2 29/9 29/11 31/25 38/21 50/8 78/25 84/13 86/3 86/17 87/17 91/6 91/7 91/8 91/8 123/8
**Number 1 [2]** 8/17 11/16
**Number 133 [1]** 78/25
**number 14 [1]** 123/8
**Number 2 [1]** 9/16
**Number 24-Criminal-60126 [2]** 3/6 84/13
**numbers [10]** 14/25 16/15 16/16 34/8 34/10 34/13 34/14 34/15 113/11

**N**

numbers... **[1]**  124/10
Numeral **[1]**  104/11
Numeral II **[1]**  104/11
numerous **[2]**  17/11 35/15

**O**

o'clock **[1]**  82/25
oath **[1]**  99/10
object **[7]**  22/24 22/25 42/23 57/16 95/18 106/1 129/19
objected **[2]**  110/6 110/6
objecting **[4]**  3/25 112/21 112/23 112/25
objection **[15]**  7/16 23/9 58/2 59/24 62/18 70/22 85/15 85/19 94/6 101/25 110/17 110/21 131/9 131/16 131/17
objection's **[2]**  23/11 56/13
objections **[12]**  77/10 77/11 77/13 87/14 87/16 88/3 99/3 110/18 111/1 111/5 117/7 129/22
obligations **[3]**  127/25 128/3 128/15
obstructed **[1]**  114/19
obstruction **[12]**  99/4 99/8 100/3 102/23 103/7 110/14 111/25 124/23 124/24 125/4 125/4 125/21
obvious **[1]**  100/18
occasions **[2]**  35/15 114/20
Ocean **[2]**  37/2 97/3
October **[3]**  51/20 122/15 122/17
October 16th **[2]**  122/15 122/17
odd **[1]**  79/2
offense **[33]**
offenses **[1]**  108/15
offer **[1]**  81/14
office **[8]**  2/3 2/6 128/9 128/9 128/13 128/17 129/2 131/4
officer **[4]**  82/15 97/11 102/3 132/20
Official **[2]**  2/9 134/24
Oh **[4]**  56/6 60/10 85/10 102/5
omissions **[2]**  88/12 88/14
omit **[1]**  93/5
one-month **[2]**  52/3 52/5
one-third **[1]**  124/19
ongoing **[1]**  57/17
online **[1]**  52/21
operandi **[1]**  97/24
opinion **[2]**  29/6 29/17
opportunities **[1]**  125/14
opportunity **[11]**  6/2 7/6 13/22 16/7 67/2 68/17 74/15 74/23 80/23 115/25 117/5
order **[4]**  27/1 29/16 113/16 128/3
ordered **[2]**  127/15 129/11
organized **[1]**  10/3
original **[2]**  93/13 93/14
outlier **[1]**  109/22
outlined **[1]**  108/7
overbake **[1]**  99/8
overcome **[1]**  82/22
overruled **[6]**  18/16 23/5 23/11 43/4 58/3 60/1
owed **[11]**  9/1 16/23 16/24 28/24 29/7

29/12 33/4 48/7 51/3 76/6 122/23
owner **[4]**  21/25 37/4 37/6 55/18
owners **[2]**  70/20 70/21

**P**

p.m **[6]**  22/2 24/10 84/1 122/15 122/17 133/19
page **[3]**  24/9 105/20 134/2
pages **[1]**  102/25
pages 59 **[1]**  102/25
papers **[1]**  103/19
parade **[1]**  81/10
paraded **[1]**  82/13
paragraph **[4]**  103/21 104/3 110/5 114/23
paragraph 60 **[4]**  103/21 104/3 110/5 114/23
paraphrasing **[1]**  109/16
part **[15]**  5/3 11/18 67/8 88/16 89/20 101/14 107/3 109/12 118/3 120/9 120/10 123/6 129/5 129/10 130/12
part F **[2]**  129/5 129/10
partially **[1]**  67/21
participant **[1]**  107/14
parties **[4]**  122/11 122/17 123/16 123/20
parts **[5]**  10/17 10/19 80/1 102/22 104/6
passed **[1]**  78/24
passenger **[1]**  117/14
passport **[4]**  131/3 131/4 131/5 131/8
paste **[3]**  38/11 49/19 93/12
pasting **[1]**  50/4
patent **[1]**  103/13
Paul **[1]**  4/23
pauperis **[1]**  130/4
Pause **[3]**  80/7 84/10 123/18
pawn **[8]**  33/20 34/3 34/4 34/13 34/14 34/16 34/22 34/24
pawned **[7]**  33/6 33/23 34/14 34/16 34/17 34/18 34/23
pay **[20]**  27/25 33/12 40/24 41/2 41/2 41/14 53/18 89/16 89/25 92/3 107/20 112/23 114/10 123/23 127/24 128/2 128/5 128/11 129/11 130/3
payable **[1]**  128/16
payee **[1]**  90/6
payment **[50]**
payments **[12]**  26/16 48/17 51/24 54/3 93/23 100/9 100/10 100/13 100/15 101/18 105/3 128/12
pdf **[4]**  19/9 22/5 22/13 24/18
pending **[3]**  57/16 73/11 73/14
pension **[1]**  113/4
people **[27]**
percent **[2]**  127/24 128/5
perfectly **[1]**  116/2
perhaps **[1]**  114/10
period **[13]**  12/8 12/11 12/12 13/13 71/12 92/12 104/20 104/21 105/7 108/7 109/22 110/2 127/22
perjured **[1]**  99/20
perjury **[3]**  99/9 99/9 100/16

permissible **[1]**  10/22
person **[25]**  25/21 41/16 43/12 43/14 46/12 48/20 51/14 55/7 59/25 60/8 63/3 63/25 64/9 64/11 64/17 65/6 65/13 66/5 73/9 74/2 118/5 118/8 118/9 119/14 129/1
personal **[2]**  34/20 81/24
personally **[3]**  51/7 59/11 59/14
persons **[1]**  62/2
phase **[1]**  74/8
phone **[46]**
phones **[1]**  61/18
phonetic **[2]**  55/1 120/16
physical **[1]**  115/3
picture **[1]**  24/22
place **[3]**  37/8 118/22 125/17
plain **[3]**  106/21 116/6 116/21
Plaintiff **[1]**  1/7
plan **[5]**  47/16 47/19 88/17 105/2 107/8
playing **[1]**  67/3
pleading **[2]**  94/12 122/1
plenty **[1]**  102/16
plus **[3]**  37/13 37/22 118/18
podium **[1]**  92/24
point **[17]**  42/24 66/12 66/23 67/13 82/6 85/19 91/23 93/7 96/10 96/12 96/20 102/2 103/8 106/16 113/21 119/5 120/2
pointed **[6]**  94/6 98/7 101/22 101/24 106/1 124/12
points **[8]**  66/16 96/22 102/10 103/21 104/9 110/13 110/13 125/3
police **[5]**  32/25 33/16 73/9 73/25 114/6
populate **[1]**  16/11
populated **[2]**  16/12 28/25
portal **[1]**  52/21
portion **[3]**  20/2 77/4 85/16
portions **[4]**  7/12 77/17 77/18 79/20
portrayed **[1]**  91/16
portraying **[1]**  90/20
position **[2]**  126/11 131/6
possession **[5]**  33/9 33/13 47/13 47/14 131/4
Potentially **[1]**  54/11
poured **[1]**  119/1
preclude **[1]**  128/12
preparing **[2]**  90/9 118/3
preponderance **[7]**  88/25 97/8 97/14 97/16 98/13 105/13 109/21
present **[5]**  3/13 76/25 84/20 103/11 108/25
presented **[1]**  111/6
presentence **[2]**  123/20 129/10
presently **[1]**  3/2
preserve **[1]**  110/22
preserved **[4]**  110/20 110/24 116/18 129/23
presided **[1]**  77/9
pressed **[1]**  126/4
pressing **[1]**  126/15
pretrial **[2]**  77/9 124/25

**P**

**prevail [1]** 106/2
**price [1]** 114/12
**primarily [1]** 97/5
**primary [1]** 121/5
**prison [3]** 113/16 120/12 127/23
**Prisons [3]** 127/12 128/8 129/1
**private [6]** 17/23 44/24 64/11 64/13 112/22 115/11
**probation [6]** 128/9 128/13 129/2 131/4 131/7 131/14
**problem [8]** 69/6 86/8 99/25 106/5 115/14 116/5 116/8 116/12
**proceeding [4]** 21/25 23/5 86/1 86/2
**proceedings [5]** 1/24 83/6 129/7 133/19 134/21
**process [1]** 20/14
**procure [4]** 32/1 32/19 72/13 72/15
**procured [3]** 88/13 107/11 107/19
**procuring [2]** 71/19 90/9
**produced [2]** 1/25 5/25
**Professional [2]** 64/19 64/19
**proffer [6]** 13/12 13/18 67/6 68/1 69/12 70/24
**programs [2]** 120/21 120/22
**pronounce [1]** 122/5
**pronounced [2]** 129/20 129/22
**proof [4]** 20/21 29/20 90/11 126/2
**proper [2]** 23/21 89/23
**properties [2]** 64/22 111/13
**property [18]** 19/4 19/14 27/16 27/17 52/2 64/23 64/25 65/1 69/22 69/24 70/7 70/20 70/21 90/18 91/13 92/2 95/13 114/8
**prosecution [1]** 79/4
**prosecutor [2]** 79/10 125/13
**prove [1]** 107/6
**proved [1]** 97/14
**proven [3]** 88/24 88/25 97/15
**provide [9]** 34/19 36/18 89/9 89/23 90/4 90/11 99/11 123/10 123/11
**provided [16]** 8/8 9/18 12/24 13/2 13/4 13/21 14/20 23/19 25/7 25/21 85/3 85/14 86/4 89/13 126/8 126/12
**provides [1]** 31/24
**providing [1]** 118/22
**proving [1]** 94/3
**provisions [1]** 88/8
**PSI [1]** 112/6
**PSR [5]** 77/9 87/15 103/21 111/1 129/5
**public [6]** 82/8 82/20 86/9 86/16 87/3 100/12
**publicity [1]** 82/7
**pull [10]** 15/25 18/14 19/9 31/4 39/5 45/4 49/25 59/4 61/13 63/13
**pulling [2]** 24/5 110/1
**purchase [15]** 6/18 27/8 28/12 31/17 38/4 65/10 65/11 89/10 89/16 91/4 91/16 96/10 96/13 113/23 114/11
**purchased [2]** 17/19 65/8
**purchasing [1]** 16/17
**purport [1]** 50/5

**purported [12]** 22/19 25/6 26/2 26/16 27/24 28/22 33/1 33/12 51/15 61/15 75/14 91/2
**purportedly [1]** 16/17
**purporting [1]** 50/9
**purports [1]** 50/7
**purposes [25]** 13/16 66/13 66/18 85/25 86/1 87/18 95/5 96/1 97/23 98/19 98/23 98/25 103/22 104/9 109/11 109/17 109/18 109/19 110/4 110/7 110/9 123/1 127/1 127/2 127/6
**pursuant [3]** 14/1 127/15 134/19
**puts [2]** 66/20 110/15

**Q**

**qualified [1]** 75/2
**quarter [1]** 128/2
**question [11]** 11/23 26/18 30/1 41/3 41/25 60/2 65/17 68/21 105/15 108/25 130/8
**questions [13]** 11/13 12/24 14/22 30/4 30/8 32/14 56/14 67/1 67/24 69/8 71/4 74/12 76/20
**quick [1]** 106/8
**quickly [1]** 89/19
**quote [3]** 6/15 24/2 104/22
**quotes [1]** 102/14

**R**

**races [1]** 126/20
**raise [1]** 4/9
**Rakoff [1]** 124/9
**Ramirez [1]** 61/2
**Ranches [9]** 19/5 19/14 19/21 21/4 22/14 22/20 23/18 23/20 24/15
**range [8]** 29/13 108/17 110/16 112/15 114/21 115/22 123/21 124/21
**rank [1]** 23/6
**rare [1]** 125/13
**rarely [1]** 125/5
**rate [1]** 128/5
**reach [2]** 16/8 26/9
**reached [1]** 6/10
**read [7]** 78/8 102/1 105/22 106/7 116/14 118/9 120/16
**reading [1]** 107/18
**reads [3]** 111/9 111/15 111/15
**ready [3]** 3/3 84/4 84/6
**reaffirms [1]** 32/7
**reality [1]** 131/24
**reannounce [1]** 84/14
**reasons [11]** 98/1 98/16 102/10 103/13 107/25 107/25 108/6 116/22 124/5 127/8 132/6
**recall [19]** 11/20 11/23 30/17 31/2 34/24 35/16 35/24 39/15 39/19 40/8 41/18 43/25 59/1 59/2 60/15 62/24 64/4 65/5 66/8
**Recalling [1]** 84/11
**receipt [101]**
**receipts [94]**
**receive [6]** 27/4 33/1 39/4 50/17 51/17 56/23

**received [26]** 6/8 6/11 8/3 14/24 16/4 16/19 16/20 26/10 26/14 28/21 29/2 33/2 36/7 36/12 36/19 40/16 45/21 45/23 50/25 55/17 56/9 58/17 58/23 74/22 89/20 93/7
**receiver [1]** 22/19
**receiving [2]** 36/25 47/20
**recipients [1]** 6/14
**recognize [2]** 8/18 9/3
**recommendation [2]** 131/25 132/3
**recommendations [1]** 131/21
**record [57]**
**recorded [1]** 1/24
**records [18]** 34/3 34/4 34/7 34/13 34/22 34/25 54/4 54/21 66/4 79/15 79/16 79/21 79/23 79/24 80/3 93/20 99/18 126/8
**recover [2]** 5/11 64/1
**recovered [9]** 16/18 28/14 32/15 37/11 64/15 114/8 124/16 124/17 124/18
**RECROSS [2]** 76/16 134/6
**RECROSS-EXAMINATION [1]** 76/16
**recuperated [1]** 125/25
**redirect [5]** 74/14 74/16 74/19 76/15 134/5
**refer [1]** 62/16
**referenced [2]** 99/16 129/5
**referencing [3]** 30/19 30/23 71/17
**referred [1]** 101/23
**referring [2]** 19/6 35/9
**refute [1]** 103/5
**reimbursement [1]** 58/11
**rejected [1]** 102/15
**relaxed [1]** 23/6
**relay [1]** 132/20
**release [10]** 90/15 90/18 103/25 109/25 128/4 128/21 128/22 128/25 129/3 129/16
**released [5]** 92/2 104/4 104/13 104/14 129/2
**relevance [5]** 24/11 30/6 42/23 58/2 70/22
**relevant [28]**
**relied [1]** 107/16
**rely [1]** 102/19
**remain [2]** 4/9 87/14
**remainder [1]** 21/13
**remanded [1]** 103/8
**remember [2]** 55/24 120/1
**remorse [1]** 114/15
**removal [1]** 129/7
**remove [2]** 109/5 109/6
**removed [1]** 120/13
**renewed [1]** 82/17
**rent [6]** 17/23 19/4 19/16 20/3 52/16 71/5
**rental [3]** 70/16 70/18 95/13
**rented [3]** 69/23 69/24 70/6
**renters [1]** 70/25
**renting [2]** 19/4 70/20
**repeated [1]** 99/18
**repetitive [1]** 67/1

**R**

**rephrase [2]**  26/18 49/10
**report [10]**  32/24 33/3 73/9 73/25 85/4 123/20 124/25 128/10 129/1 129/10
**Reporter [3]**  2/9 2/9 134/24
**reports [2]**  32/24 33/16
**repossessed [1]**  75/24
**represent [1]**  29/11
**representations [1]**  96/9
**representative [1]**  48/6
**represented [1]**  27/24
**representing [1]**  56/8
**Republic [20]**  7/2 22/4 38/18 40/2 47/2 48/1 49/2 49/14 59/2 59/3 59/7 59/9 59/11 59/14 59/15 59/18 63/12 63/14 63/15 63/16
**request [2]**  90/5 132/15
**requested [4]**  90/6 90/6 94/17 117/6
**requesting [2]**  131/23 132/19
**requirement [1]**  129/8
**residence [1]**  115/17
**resolve [3]**  77/2 77/2 87/14
**resolved [1]**  88/3
**respective [1]**  108/19
**respond [2]**  79/4 117/9
**responding [1]**  21/9
**response [10]**  21/17 21/19 22/7 37/14 41/7 42/16 48/11 54/9 85/5 101/24
**responses [2]**  77/11 77/13
**rest [3]**  42/19 67/20 99/22
**restitution [31]**
**restriction [1]**  129/8
**result [6]**  4/25 5/10 7/5 27/20 29/4 99/12
**retained [1]**  47/14
**retrieved [1]**  43/22
**return [1]**  131/14
**returned [3]**  64/1 86/15 131/19
**review [18]**  5/10 7/5 29/17 29/18 33/16 34/4 34/6 53/6 53/22 58/19 66/4 74/23 75/7 77/22 80/5 82/18 87/3 87/4
**reviewed [24]**  14/13 34/6 34/8 44/3 47/6 48/1 48/5 54/14 59/12 59/15 75/10 77/8 77/8 77/10 77/12 77/14 77/17 77/20 77/25 78/14 80/10 87/2 87/9 98/14
**reviewing [3]**  32/25 44/6 80/2
**revocation [1]**  110/1
**Richard [1]**  117/22
**rides [1]**  112/22
**rise [2]**  83/4 127/10
**RMR [2]**  2/9 134/24
**RMR-CRR [1]**  134/24
**Robbert [1]**  131/13
**rock [1]**  100/13
**Rockstar [2]**  37/24 39/1
**rodeo [1]**  127/3
**Rodriguez [1]**  37/3
**Roman [1]**  104/10
**Ronald [1]**  55/1

**Room [1]**  128/18
**Room 8N09 [1]**  128/18
**Rosenblum [1]**  63/5
**row [1]**  118/16
**Royalty [3]**  46/17 47/16 47/18
**ruled [1]**  99/4
**rules [1]**  23/6
**rulings [1]**  111/24

**S**

**sad [1]**  121/1
**salesman [2]**  37/5 126/17
**Salopek [3]**  2/9 134/23 134/24
**Sam [1]**  124/14
**sandbag [1]**  78/18
**sat [3]**  11/6 97/18 98/15
**satisfied [1]**  92/12
**satisfy [2]**  102/23 128/15
**savvy [1]**  114/4
**saw [9]**  24/14 45/21 51/11 52/13 54/3 54/20 72/12 93/24 97/21
**scarcely [1]**  126/4
**schedule [1]**  128/7
**scheme [12]**  32/19 53/7 88/16 89/7 89/8 91/9 91/10 92/6 105/5 112/21 113/7 113/20
**scope [1]**  10/24
**Scott [5]**  30/3 30/13 68/24 71/8 89/6
**screen [3]**  15/6 20/2 22/11
**screenshot [2]**  72/18 72/19
**scrolling [2]**  20/7 31/17
**seal [7]**  77/24 78/8 78/14 78/20 82/6 82/9 82/18
**sealed [9]**  77/14 78/11 78/25 81/8 81/14 85/1 85/16 85/16 120/7
**sealing [5]**  80/11 80/12 80/25 81/3 85/22
**Sean [10]**  31/1 31/4 31/21 57/3 57/8 61/4 72/21 111/14 113/3 115/10
**search [9]**  10/20 10/21 10/25 11/9 11/10 14/1 37/12 72/6 114/7
**second [2]**  10/7 92/19
**Secret [2]**  4/4 75/4
**Section [6]**  104/20 104/22 123/22 127/16 128/18 134/19
**Section 3664 [1]**  127/16
**Section 4A1.2 [2]**  104/20 104/22
**security [2]**  113/11 132/19
**seek [1]**  90/1
**sees [1]**  125/5
**segregate [1]**  7/9
**seize [1]**  5/3
**seized [5]**  5/16 13/25 29/18 37/12 61/16
**seizure [1]**  9/21
**self [1]**  129/8
**self-employment [1]**  129/8
**sellers [2]**  89/21 89/22
**selling [2]**  50/20 64/8
**send [11]**  17/12 17/14 22/3 24/10 24/21 53/21 72/14 72/18 72/18 72/20 96/24
**sending [10]**  32/5 38/9 41/12 53/8

53/11 55/3 63/20 72/8 99/19 101/16
**sends [1]**  62/11
**sensationalism [1]**  82/12
**sense [3]**  45/25 118/5 118/7
**sentence [27]**
**sentenced [4]**  80/14 81/11 114/25 127/10
**sentences [1]**  104/21
**sentencing [36]**
**serial [5]**  34/8 34/10 34/13 34/14 34/15
**series [1]**  111/5
**seriously [3]**  80/20 100/4 110/6
**served [1]**  127/14
**service [3]**  4/4 61/3 75/4
**services [2]**  89/10 124/25
**settled [1]**  99/8
**seven [2]**  119/8 119/9
**seven million [2]**  119/8 119/9
**Seventh [1]**  2/4
**Sewell [2]**  58/10 58/24
**shall [11]**  108/17 127/17 127/21 128/4 128/9 128/16 128/21 129/1 129/3 129/6 129/11
**share [1]**  80/1
**shared [1]**  80/1
**she'll [1]**  132/18
**shop [6]**  34/3 34/4 34/14 34/16 34/22 34/25
**shot [1]**  77/5
**Shotwell [5]**  78/22 86/13 122/12 123/16 127/19
**shown [4]**  79/4 91/17 114/15 125/15
**sic [8]**  13/15 42/10 49/17 68/4 68/24 71/9 89/6 121/20
**sickness [1]**  115/8
**side [6]**  19/20 48/25 49/1 76/25 116/5 118/24
**sides [3]**  67/12 77/5 82/3
**signed [1]**  70/1
**signers [1]**  54/25
**similarity [1]**  23/8
**simple [1]**  117/18
**single [5]**  17/3 44/15 66/15 66/15 75/10
**situation [1]**  95/16
**skeptical [1]**  82/5
**ski [1]**  48/24
**skid [1]**  118/16
**skip [1]**  69/2
**skipping [1]**  38/1
**skis [1]**  126/7
**slavishly [1]**  124/6
**small [1]**  98/6
**smaller [1]**  103/3
**Social [1]**  113/11
**son [12]**  95/24 100/8 101/18 113/6 115/16 120/14 121/22 122/2 125/8 125/8 126/3 126/19
**soon [3]**  87/2 126/17 132/16
**sorted [1]**  10/2
**sorts [1]**  120/1
**sought [5]**  91/11 91/12 100/8 100/8

**S**

**sought... [1]** 114/6
**sounds [1]** 95/25
**south [1]** 131/23
**SOUTHERN [2]** 1/2 132/1
**Southwest [9]** 19/5 19/14 19/20 21/3 22/14 22/20 23/18 23/20 24/15
**special [5]** 4/3 129/6 129/9 129/13 129/16
**specific [10]** 6/1 16/6 18/4 18/21 25/9 29/4 77/17 90/6 102/2 111/2
**specifics [2]** 30/15 38/24
**specified [1]** 108/18
**spectacular [1]** 132/7
**spell [1]** 4/14
**spend [1]** 111/16
**spinning [1]** 62/21
**splitting [1]** 101/21
**spoils [2]** 115/6 117/21
**spoke [8]** 35/15 35/18 35/21 35/22 37/3 37/5 37/6 56/8
**spoken [2]** 48/1 122/5
**spot [1]** 126/19
**spreading [1]** 90/18
**spreadsheet [20]** 7/7 8/23 12/3 15/9 15/19 16/7 18/23 25/12 25/19 27/21 30/3 30/13 32/15 35/4 43/9 43/10 44/21 75/9 76/1 91/5
**stable [1]** 115/17
**stack [4]** 6/20 8/5 11/19 12/5
**stage [1]** 91/15
**staggering [1]** 119/23
**stand [9]** 91/19 93/3 99/15 99/24 101/15 114/19 121/13 121/14 121/15
**standard [1]** 129/4
**standing [1]** 4/9
**stands [1]** 106/14
**starting [1]** 105/24
**starts [3]** 104/2 104/14 105/13
**state [6]** 4/13 43/1 79/1 97/18 121/1 125/10
**stated [8]** 12/20 91/24 102/11 102/22 103/9 104/6 110/18 127/19
**statement [2]** 99/10 102/13
**statements [2]** 101/10 123/19
**states [25]** 1/1 1/6 1/16 3/5 3/10 4/4 4/22 75/4 84/12 84/17 88/8 88/9 88/20 89/1 90/25 104/19 105/8 127/16 128/8 128/8 128/9 128/13 128/17 129/12 134/20
**States vs [2]** 3/5 84/12
**States vs. Behr [1]** 88/9
**States vs. Ghertler [1]** 89/1
**States vs. Horn [1]** 90/25
**States vs. Ignancio [1]** 88/20
**status [1]** 126/22
**statutes [4]** 81/24 123/3 123/9 123/14
**statutory [3]** 112/8 123/21 129/12
**stay [1]** 118/22
**stenography [1]** 1/24
**step [5]** 33/7 66/15 76/21 81/9 120/19

**Steve [4]** 35/9 35/14 35/15 35/18
**stipulated [1]** 91/19
**stolen [2]** 113/10 113/15
**stop [3]** 41/13 105/11 116/21
**store [3]** 64/5 64/8 64/12
**story [1]** 126/1
**Street [1]** 2/10
**stress [2]** 117/23 117/24
**struck [1]** 118/2
**stuff [3]** 8/8 111/23 119/7
**style [1]** 117/25
**subject [2]** 13/15 114/4
**submit [4]** 77/24 78/7 78/8 82/6
**submitted [6]** 12/17 23/8 68/7 77/16 78/2 80/16
**suborned [1]** 100/24
**suborning [1]** 100/16
**subsequent [2]** 48/17 59/13
**substantially [1]** 109/16
**succussation [1]** 117/10
**sue [2]** 57/7 91/13
**sued [3]** 57/11 57/15 114/4
**suffered [2]** 117/24 118/20
**suggest [1]** 100/25
**suggesting [1]** 100/24
**Suite [1]** 2/7
**sum [5]** 28/2 28/7 28/9 104/12 129/15
**summary [2]** 19/15 79/18
**sunshine [1]** 81/22
**superseding [1]** 104/5
**supervised [4]** 109/25 128/22 129/3 129/16
**supervision [1]** 129/5
**support [3]** 61/22 77/16 80/17
**supporting [2]** 9/8 62/4
**surely [1]** 112/23
**surfing [1]** 115/17
**surrounding [1]** 16/5
**sustained [5]** 56/13 56/14 57/18 62/18 70/23
**swear [1]** 4/6
**sweet [1]** 86/24
**sworn [2]** 4/10 4/11
**system [1]** 75/5

**T**

**table [5]** 66/15 87/18 87/21 124/6 124/21
**take [20]** 6/2 18/2 18/6 19/2 24/1 33/7 33/8 77/7 80/20 82/3 86/20 101/15 103/16 111/2 119/4 121/2 123/14 130/14 133/13 133/15
**taken [2]** 111/4 124/18
**takes [3]** 86/25 103/15 116/13
**talk [8]** 31/18 32/4 38/23 55/16 56/6 64/9 65/13 118/10
**talked [1]** 16/3
**talking [10]** 16/23 29/1 32/25 34/11 38/23 39/21 61/14 62/11 73/2 96/3
**taught [1]** 99/24
**tell [12]** 26/13 28/17 39/17 45/15 46/10 47/5 47/8 52/22 54/7 116/13

116/14 118/10
**telling [2]** 32/8 72/10
**template [3]** 24/22 40/23 59/13
**ten feet [1]** 125/2
**ten minutes [2]** 77/2 77/7
**tendering [1]** 27/16
**term [2]** 104/22 128/22
**terminology [1]** 40/8
**terms [6]** 53/11 60/6 67/3 82/11 128/23 131/21
**testified [19]** 11/18 13/25 32/19 36/11 37/9 41/16 42/17 68/10 68/12 89/3 93/4 93/18 93/19 94/10 96/12 97/21 100/19 101/3 101/17
**testify [7]** 4/5 5/1 18/17 38/2 101/2 125/5 125/19
**testifying [1]** 18/14
**testimony [21]** 11/6 11/20 13/17 21/11 27/10 63/10 66/24 67/1 68/2 89/17 91/24 96/11 98/10 99/11 100/7 101/23 102/13 102/20 107/4 112/19 125/17
**text [53]**
**texted [1]** 62/12
**texting [2]** 53/17 72/12
**texts [3]** 19/10 31/1 40/21
**texts.pdf [1]** 31/4
**thank [41]**
**thankfully [1]** 114/7
**Thanks [4]** 55/6 83/2 133/12 133/14
**Thanksgiving [1]** 126/20
**theft [3]** 73/17 75/24 113/13
**therefrom [2]** 68/8 68/14
**thief [2]** 113/21 114/22
**think [40]**
**thinking [1]** 107/20
**thought [2]** 85/11 115/12
**thousand [2]** 51/17 112/24
**thousands [5]** 53/25 53/25 54/18 54/18 126/12
**threads [1]** 89/20
**three years [1]** 128/22
**three years' [1]** 129/16
**thrust [1]** 125/25
**thumb [2]** 9/8 10/14
**Thursday [1]** 122/14
**tilt [1]** 82/18
**time [53]**
**times [10]** 27/11 27/14 27/14 35/23 90/12 91/14 101/22 101/22 102/4 114/2
**tipping [1]** 123/5
**Title [2]** 127/15 134/20
**Title 18 [1]** 127/15
**titled [2]** 16/14 24/5
**TMZ [1]** 121/25
**today's [2]** 120/12 120/19
**tons [1]** 44/16
**total [5]** 8/23 27/23 28/2 92/13 129/14
**totalling [2]** 51/3 91/5
**touch [1]** 118/12
**touched [1]** 98/12

**T**

**tough [1]**  121/18
**tougher [1]**  106/4
**tour [2]**  55/12 55/13
**toward [1]**  128/3
**towards [5]**  67/2 68/16 71/5 84/25
 127/25
**toys [1]**  117/15
**training [1]**  75/3
**transaction [4]**  25/9 30/19 32/22
 43/15
**transactions [8]**  6/4 17/1 26/24 89/6
 97/15 98/6 98/9 98/12
**transcript [5]**  1/14 1/24 77/17 103/1
 134/21
**transfer [24]**  6/11 6/12 9/12 14/13
 17/12 18/20 23/25 32/10 37/17 39/23
 40/9 40/24 47/15 50/7 50/9 50/16
 51/16 52/13 65/9 65/12 66/10 113/25
 126/8 132/8
**transfers [8]**  39/25 41/12 51/1 51/5
 54/6 54/18 55/4 75/17
**transmission [1]**  26/6
**treats [1]**  124/4
**tremendous [1]**  81/5
**Trevor [3]**  2/2 3/10 84/17
**trial [54]**
**trick [1]**  113/24
**tricked [1]**  107/20
**trinkets [2]**  117/16 117/17
**triple [1]**  56/12
**trouble [2]**  95/21 115/6
**true [4]**  96/11 116/20 132/7 134/20
**truly [2]**  95/16 121/19
**trust [2]**  90/18 93/10
**trusty [1]**  86/13
**truthfully [2]**  93/3 93/4
**TURNER [90]**
**Turner's [6]**  5/7 9/10 55/25 64/23
 72/5 125/7
**turnips [1]**  74/9
**two o'clock [1]**  82/25
**two p.m [2]**  122/15 122/17
**two years [1]**  41/14

**U**

**U.S [2]**  2/3 2/3
**U.S. [2]**  75/5 131/14
**U.S. banking [1]**  75/5
**U.S. Probation [1]**  131/14
**U.S.C. [1]**  123/22
**uhm [4]**  8/2 64/11 93/21 94/13
**ultimate [2]**  6/1 31/13
**ultimately [19]**  4/25 13/16 23/24
 26/21 32/1 32/20 33/6 34/23 36/16
 36/18 39/9 76/9 91/19 91/23 94/15
 100/14 100/14 113/15 124/9
**Um [2]**  52/8 53/15
**Um-hum [2]**  52/8 53/15
**unable [1]**  130/3
**uncomfortable [1]**  121/15
**uncommon [1]**  46/1
**uncover [1]**  25/25

**underlying [13]**  5/1 5/5 5/23 7/22
 9/22 10/5 17/17 17/25 19/19 21/11
 42/24 80/3 107/9
**understand [13]**  13/18 14/16 62/21
 67/12 71/3 72/25 78/4 78/19 101/13
 103/9 115/1 130/6 131/2
**understanding [3]**  3/19 3/25 86/11
**Understood [1]**  130/25
**undertaken [1]**  88/15
**undo [1]**  84/9
**unequivocally [1]**  125/10
**unexpected [1]**  128/14
**unfair [1]**  94/20
**unfortunately [1]**  21/25
**UNICOR [2]**  127/23 128/1
**uniform [1]**  88/7
**unindicted [1]**  90/3
**UNITED [22]**  1/1 1/6 1/16 3/4 3/10
 4/4 4/22 75/3 84/11 84/17 88/9 88/20
 89/1 90/25 127/16 128/8 128/8 128/9
 128/13 128/16 129/12 134/20
**unless [8]**  14/5 23/9 66/16 82/21
 92/3 122/11 122/17 123/15
**unmistakably [1]**  101/7
**unnamed [2]**  57/9 90/3
**unpaid [1]**  129/9
**unsuspecting [4]**  92/1 113/12
 113/24 114/14
**unwarranted [1]**  126/25
**updated [2]**  36/4 36/5
**upward [2]**  109/13 109/17
**Uriel [1]**  63/5
**us [2]**  31/23 103/15
**UTC [2]**  22/2 24/10
**utilized [1]**  96/10

**V**

**valid [1]**  95/14
**value [4]**  5/4 5/11 16/16 76/5
**variables [1]**  124/2
**variance [4]**  79/1 79/3 79/17 115/2
**variance/departure [1]**  79/17
**varied [1]**  122/8
**variety [1]**  93/2
**vary [2]**  124/21 127/8
**vehicles [2]**  17/21 113/14
**vendor [2]**  68/15 90/12
**vendors [4]**  30/5 67/15 96/23 122/22
**Ver [2]**  37/9 37/9
**veracity [1]**  93/9
**verdict [2]**  97/10 126/14
**verified [5]**  14/10 49/11 56/24 68/2
 76/18
**verify [3]**  56/22 63/15 79/21
**versus [4]**  32/15 76/5 124/13 124/19
**VI [3]**  127/14 128/23 129/14
**via [12]**  10/17 10/21 10/24 11/5 39/16
 40/16 40/24 45/23 53/16 55/22 60/13
 66/10
**victim [31]**
**victim's [1]**  31/25
**victims [78]**
**victims' [2]**  127/16 127/18

**victory [2]**  109/6 109/7
**view [4]**  104/6 112/11 116/23 117/2
**violation [1]**  109/24
**voir [6]**  10/7 10/8 10/9 14/2 14/7
 134/4
**voluminous [1]**  66/24
**vs. [5]**  4/23 88/9 88/20 89/1 90/25

**W**

**wages [2]**  127/23 127/24
**walk [1]**  119/10
**walked [1]**  119/9
**walks [1]**  119/14
**wanton [2]**  126/21 126/22
**warrant [5]**  10/20 10/25 11/10 14/1
 37/12
**warrants [2]**  73/12 114/7
**watch [13]**  31/19 36/16 36/18 36/25
 56/6 56/7 56/8 56/9 56/11 97/15 98/9
 117/22 122/25
**watches [15]**  17/22 33/5 33/6 33/9
 33/12 33/15 33/19 33/22 34/8 34/9
 34/12 95/21 111/8 111/8 111/12
**Water [2]**  22/16 54/22
**wearing [1]**  117/22
**WEDNESDAY [2]**  2/13 83/8
**weighs [1]**  120/3
**WhatsApp [1]**  72/3
**whenever [2]**  3/3 34/13
**who's [6]**  3/13 19/25 57/2 84/20 90/2
 118/7
**wide [1]**  66/13
**willful [1]**  99/11
**willfully [1]**  88/13
**willing [1]**  107/13
**wins [1]**  97/5
**wire [86]**
**wire.pdf [1]**  22/9
**wires [6]**  11/19 44/10 44/18 50/10
 54/4 54/15
**wiring [6]**  23/17 23/23 24/22 25/1
 25/6 63/21
**wise [2]**  91/9 91/10
**wised [1]**  90/15
**wish [10]**  3/20 69/12 95/7 107/1
 108/13 109/3 112/8 112/11 117/3
 121/11
**withdraw [1]**  81/16
**withheld [1]**  80/15
**witness [14]**  4/11 4/16 10/17 13/19
 13/20 13/24 32/16 67/25 68/10 69/9
 71/2 76/23 97/22 134/2
**witness's [1]**  69/13
**witnesses [3]**  93/17 93/18 134/1
**witnesses/victims [1]**  93/18
**woman [3]**  117/18 121/20 121/21
**work [8]**  75/19 76/11 106/2 120/4
 121/9 122/11 123/16 128/1
**worked [4]**  45/13 47/15 47/18 132/6
**world [1]**  80/11
**wrong [4]**  39/2 101/9 114/18 116/14
**wrote [1]**  120/17

**Y**

**Yep [2]**  11/2 110/20
**York [1]**  61/3
**you'd [2]**  61/12 63/13
**Young [4]**  35/9 35/14 35/15 35/18
**yours [1]**  101/12

**Z**

**Zelle [6]**  39/16 40/16 40/24 54/3
 55/22 55/24
**zero [1]**  32/15